# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NATHANIEL SPRIGGS** | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | Case 1:22-cv-01474 |
| | : | (Judge Wilson) |
| v. | : | |
| | : | |
| **CITY OF HARRISBURG** | : | |
| and | : | |
| **MAYOR WANDA WILLIAMS** | : | |
| (in her individual capacity only) | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S RESPONSE TO MAYOR WILLIAMS' STATEMENT OF ALLEGEDLY UNDISPUTED FACTS[1]

Respectfully submitted,

**WEINSTEIN LAW FIRM, LLC**

By:    /s/ Marc E. Weinstein
Marc E. Weinstein, Esquire
500 Office Center Drive, Suite 400
Fort Washington, PA 19034
267.513.1942 tel
marc@meweinsteinlaw.com
Counsel to Plaintiff

---

[1] This response to Mayor Williams' statement of allegedly undisputed facts is based on the record evidence construed in a light most favorable to Plaintiff, the non-moving party. Inferences, doubts and issues of credibility have been resolved in his favor, at this point in time. Cf. Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (internal quotation marks and citations omitted). If there is record evidence that casts doubt on the purported fact, or if the purported fact comes from interested witness, Plaintiff is permitted to dispute the purported fact. See Hill v. City of Scranton, 411 F.3d 118, 129 n.16 (3d Cir. 2005) ("when drawing all reasonable inferences in favor of the non-movant the courts must disregard evidence the jury is not required to believe, including testimony of interested witnesses.") (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-51 (2000)). Cited exhibits are to Plaintiff's attached exhibits, unless otherwise specified.

## LIST OF EXHIBITS TO PLAINTIFF'S RESPONSES TO DEFENDANT WILLIAMS' STATEMENT OF ALLEGEDLY UNDISPUTED FACTS

Exhibit 1        Deposition of Plaintiff

Exhibit 2        Declaration of Plaintiff

Exhibit 3        Text Messages with Aaron Johnson dated 5/30-5/31/21

Exhibit 4        Offer Letter dated 9/3/21

Exhibit 5        Deposition of Wanda Williams

Exhibit 6        Deposition of Daniel Hartman

Exhibit 7        Deposition of Joni Willingham

Exhibit 8        Deposition of Neil Grover

Exhibit 9        Deposition of Deborah Robinson

Exhibit 10       Deposition of Lisa Blackston

Exhibit 11       Deposition of Latisha Scott

Exhibit 12       Deposition of Dion Dockens

Exhibit 13       Payroll Action Form for Dion dated 5/6/22

Exhibit 14       Email String dated 4/1-4/8/22, and Job Description

Exhibit 15       Interview Evaluation dated 4/20/22

Exhibit 16       Email to Senior Staff dated 4/18/22

Exhibit 17       Request to State Ethics Commission for Training

Exhibit 18       City's Answers to Plaintiff's Interrogatories

Exhibit 19       Deposition of Marita Kelley

Exhibit 20       Email from Kelley to Spriggs dated June 15, 2022

Exhibit 21     Payroll Action form dated 4/22/22

Exhibit 22     Text Message from Susquehanna Township Supervisor

Exhibit 23     Text Message from Williams to Plaintiff dated 5/22/22

Exhibit 24     Email String Regarding Landscaping Contract dated March-April 2022

Exhibit 25     Disciplinary Memo dated 6/17/22

Exhibit 26     Deposition of Ronald Wise

Exhibit 27     Email to Willingham dated 6/17/22

Exhibit 28     Spriggs Email dated 4/26/22

Exhibit 29     Text Message with Hartman dated 2/26/22

Exhibit 30     Willingham Email dated 6/17/22

Exhibit 31     Public Works Director Job Description

Exhibit 32     Draft Minutes AFSCME LABOR/MANAGEMENT Meeting dated 3/1/22

Exhibit 33     Resume of Patrice Dockens

Exhibit 34     Log of Calls with Mayor Williams

**The Parties**

1.      Plaintiff is the former Director of Public Works for the City of Harrisburg. (ECF Doc.

No. 38, ¶ 62).

Response:      Undisputed.

2.      Plaintiff is Black. (ECF Doc. No. 38, ¶ 3).

Response:      Undisputed.

3.      Mayor Wanda Williams is the Mayor of Harrisburg. (ECF Doc. No. 38, ¶ 9).

Response:      Undisputed.

4.      Mayor Williams is Black. (ECF Doc. No. 38, ¶ 7).

Response:      Undisputed.

5.      The City of Harrisburg is a third-class city of the Commonwealth of Pennsylvania and

the county seat of Dauphin County, Pennsylvania. (ECF Doc. No. 38, ¶¶ 4-5).

Response:      Undisputed.

**Plaintiff's Prior Employment With The City**

6.      Between 1996 and 2017, Plaintiff was employed by the City. (ECF Doc. No. 38, ¶¶

16-19).

Response:      Undisputed.

**By way of further answer[2]**, Plaintiff, a Black male, began working for the City of

---

[2]   In this Response to Williams' Statement of Facts, Plaintiff also presents evidence that clarifies and/or puts into context the evidence submitted by Williams.  This is necessary for a complete examination of Williams' motion for summary judgment because, as this very Court has observed, Defendant's papers "do[] not provide the whole picture of the record evidence."  Scott v.

Harrisburg ("City") in 1996 as a Maintenance Technician. Pl.'s Dep. at 15 (attached as Ex.-1); Pl.'s Decl. ¶ 1 (attached as Ex.-2). Within a few months of his hire, he transferred into the Traffic and Engineering Department as a Traffic Technician, and he remained there for approximately 12 years. Ex.-1 at 16. As a Traffic Technician, he wired and maintained streetlights, traffic signals and electrical systems throughout the City. Id.

7.     In or about 2017, Plaintiff became the Solid Waste and Logistics Coordinator within the City's Department of Public Works. (ECF Doc. No. 38, ¶ 19).

Response:     Undisputed.

**By way of further answer**, by 2017, Plaintiff had ascended to the management-level position of Solid Waste Logistics Coordinator. Ex.-1 at 25-26. He served in that role under then-Mayor Papenfuse. Id. In or about July 2017, Plaintiff left his position with the City and accepted the position of Public Works Director with Susquehanna Township. Id. at 29; Ex.-2 ¶ 2. During that 21-year term of employment with the City, Plaintiff had a clean disciplinary record. Ex.-1 at 236.

8.     During his prior employment with the City, Plaintiff filed a sexual harassment complaint in the Pennsylvania Human Relations Commission "PHRC"). (See, Deposition Transcript of Plaintiff, attached hereto as Exhibit "A") (N.T., p. 19, ll. 4-13).

---

Blossburg Borough, 2024 U.S. Dist. LEXIS 30533, at *2 n.1, 2024 WL 692209 (M.D. Pa. Feb. 20, 2024) (Wilson, J.). Said more colloquially, Plaintiff includes the stuff Williams doesn't want the Court - or a jury - to know about.

Response:    Undisputed, but hardly a "material" fact.

9.    Plaintiff settled the sexual harassment complaint. (Ex. A., N.T. p. 19, ll. 15-16).

Response:    Undisputed, but hardly a "material" fact.

10.    During his prior employment with the City, Plaintiff filed a second discrimination complaint in the PHRC against the City and against former Mayor of Harrisburg, Eric Papenfuse. (Ex. A., N.T., p. 21, ll. 11-22).

Response:    Undisputed, but hardly a "material" fact.  Evidently, Papenfuse didn't take exception to it as he hired Plaintiff to start as Public Works Director even before Williams was inaugurated.

11.    Plaintiff withdrew his discrimination complaint. (Ex. A., N.T., p. 23, ll. 22-24).

Response:    Undisputed, but hardly a "material" fact.

12.    Plaintiff's role as Solid Waste Logistics Coordinator for the City was a management position. (Ex. A., N.T., p. 25, ll. 15-23).

Response:    Undisputed.

13.    In August 2017, Plaintiff became employed as Director of Public Works for Susquehanna Township, Dauphin County. (ECF Doc. No. 38, ¶ 21).

Response:    Undisputed.

**Plaintiff's Employment as a Public Works Director**

14.    In or about May 30, 2021, Plaintiff received a text message from Aaron Johnson stating that then City of Harrisburg Council President Williams wanted to meet with

him. (Ex. A., N.T., p. 32, ll. 9-11); (See, A. Johnson Text Messages attached hereto as Exhibit "B").

<u>Response</u>:      Undisputed.

15.    At the time of the May 30, 2021 text messages, Mayor Williams had won the democratic primary for Mayor of Harrisburg and Eric Papenfuse was still Mayor of Harrisburg. (Ex. A., N.T., p. 31, ll. 16-19).

<u>Response</u>:      Undisputed.

16.    On or about the first week of June 2021, Plaintiff met with Mayor Williams and Aaron Johnson at the Perkins Restaurant in Camp Hill to discuss Plaintiff's potential return to employment with the City. (Ex. A., N.T., p. 32, ll. 16-25).

<u>Response</u>:      Undisputed.

**By way of further answer**, Plaintiff graduated William Penn High School in Harrisburg and has known Wanda Williams for more than 35 years. Ex.-1 at 11; Ex.-2 ¶ 3. He has also known members of her family and been to her home. Ex.-1 at 11-12. In 2021, after Wanda Williams won the Democratic primary for Mayor and was the presumptive Mayor-elect, she inquired with Plaintiff to see if he would return to the City as Public Works Director. Ex.-1 at 31-32.

In or about June 2021, Plaintiff met with Williams, along with a mutual acquaintance named Aaron Johnson. Id.; <u>see also</u> Text Messages with Aaron Johnson dated 5/30-5/31/21 (attached as Ex.-3). At that first meeting, Williams told Plaintiff she was very concerned

with the way the Public Works Department was being run.  Ex.-1 at 33-34.  She told Plaintiff she had no faith in the then-current Director, David West, that West constantly came to work intoxicated or disappeared for days at a time.  Id.  Williams told Plaintiff she wanted him to come back and do a good job, sort of like what he'd done in Susquehanna Township, and what he had done for the City before.  Id.  Plaintiff told Williams he was not interested in returning to the City.  Id. at 34.

About a month later, in or about July 2021, Plaintiff met with Williams a second time. Id. at 33.  Williams told Plaintiff she really wanted him to return to the City.  Id. at 35. Williams asked Plaintiff how much of a salary he would need to return and Plaintiff told her $130,000.  Id.  Williams agreed to it.  Id.

Plaintiff started in or about September 2021, even before Williams was sworn in, as then-Mayor Papenfuse's administration had contacted Plaintiff separately and had wanted him to return.  Ex.-1 at 36-37, 39;  see also Offer Letter dated 9/3/21 (attached as Ex.-4). Williams was agreeable to Plaintiff starting before her term began.  Ex.-1 at 39.  Under the final months of the Papenfuse administration, Plaintiff's salary was $120,000 per year.  Id.; Ex.-4.

17.    In or about July 2021, Plaintiff had a second meeting with Mayor Williams and Aaron Johnson at the Perkins Restaurant to discuss Plaintiff's potential return to employment with the City. (Ex. A., N.T., p. 33, ll. 8-14; p. 34, ll. 16-19).

<u>Response</u>:    Undisputed.

18. In or about August 2021, Plaintiff met with Mayor Papenfuse about accepting the position of Public Works Director for the City. (Ex. A., N.T., p. 38, ll. 2-8).

<u>Response</u>:    Undisputed.

19. On September 3, 2021, Plaintiff executed a Conditional Offer of Employment for the position of Director – Department of Public Works. (See, Conditional Offer of Employment, attached hereto as Exhibit "C").

<u>Response</u>:    Undisputed.

20. Plaintiff's effective start date was September 27, 2021. (Ex. C.).

<u>Response</u>:    Undisputed.

21. A condition of Plaintiff's employment with the City was to "[c]ontinually comply with the Code of Conduct for the City of Harrisburg Management Employees." (Ex. C.).

<u>Response</u>:    Undisputed.

22. Plaintiff received a copy of the Code of Conduct for Management Employees. (See, 2017 Bureau of Human Resources Management Orientation Checklist and Code of Conduct attached hereto collectively as Exhibit "D").

<u>Response</u>:    Undisputed.

23. Plaintiff's salary was $120,000.00 per year. (Ex. C.).

<u>Response</u>:    Undisputed.

24.    Mayor Wiliams [sic] was elected Mayor of the City of Harrisburg in 2021 and her

term began January 2022. (ECF Doc. No. 38, ¶ 9).

<u>Response</u>:    Undisputed.

**By way of further answer**, Wanda Williams became the City's Mayor in January

2022. Williams Dep. at 12 (attached as Ex.-5). Prior to her election as Mayor, she served

on Harrisburg City Council since 2011 and was later elected Council President. Id. at 12-13.

Before being elected to Council, she served on the Harrisburg School Board. Id. at 15-16.

In the months prior to Williams taking office as Mayor, she had discussions with

Plaintiff regarding her son Dion Dockens ("Dion"). Ex.-1 at 52-53. Dion was a Laborer in

the City's Public Works Department. Ex.-5 at 106. In the first of those discussions, which

Williams initiated via phone in October or November 2021, Williams asked Plaintiff to

promote Dion into management. Ex.-1 at 53-54.[3] Williams disclosed that Dion was having

financial problems, and she was "pissed" that prior promises to promote Dion never

materialized. Id. at 53. Despite his personal reservations, Plaintiff told Williams okay. Id.

at 56. Plaintiff was of the opinion that Dion was not fit to be a manager, but chose not to

argue with Williams about it. Id. Plaintiff had known Dion for decades. Plaintiff knew of

Dion's history of tardiness and disciplines, and of not being a very efficient worker. Id.

In a second discussion with Williams, which occurred in or about November-

December 2021, Williams wanted to discuss with Plaintiff finding work for Dion after he had

---

[3] Williams testified it was *Plaintiff* who had initially brought up the idea of promoting Dion, as a way of enticing Williams to hire Plaintiff in the first place. Ex.-5 at 112.

sustained an injury. Id. at 60; Ex.-5 at 107. The City was requiring Dion to return to work, but he couldn't do his normal job due to "great pain" in his arms and hands. Ex.-1 at 62-63. Williams, who still wasn't even Mayor yet, directed Plaintiff to find alternate work for Dion that would not aggravate his injuries. Id. at 63. Plaintiff agreed to find Dion an appropriate position, and ultimately put Dion in a position collecting leaf bags. Id. at 64-65. Although Williams still complained to Plaintiff that the leaf bag job was causing pain to Dion's hands, Plaintiff spoke directly with Dion and Dion confirmed the leaf bag job was fine. Id. at 66-67.

Upon Williams' inauguration in January 2022, her top aides were as follows:

a) <u>Daniel Hartman</u> - Business Administrator. Hartman Dep. at 11-12 (attached as Ex.-6). Hartman served on Williams' transition team before joining the administration. Id. at 12.

b) <u>Joni Willingham</u> - Human Resources Director. Willingham has been in this position since 2014, and a City employee since 1987. Willingham Dep. at 9, 10 (attached as Ex.-7). Willingham's mother was friendly with Williams from serving on the Harrisburg School Board together. Id. at 38.[4]

c) <u>Neil Grover</u> - Solicitor. Grover, a White male, has been the City's Solicitor since 2014. Grover Dep. at 8 (attached as Ex.-8); Ex.-2 ¶ 4.

d) <u>Deborah Robinson</u> - Special Assistant to the Business Administrator. Robinson Dep. at 11-12 (attached as Ex.-9). Robinson had been a longtime friend of Williams. Id. at 9-10, 12.

---

[4] The City maintains 504 employees, and 113 summer staff, yet the City has not required its Human Resources Director to have any professional certifications in human resources. Ex.-7 at 11, 23.

Robinson's great-niece now works in the Administration too, as Special Assistant to the Business Administrator. Id. at 14. Robinson got Hartman to hire her. Id. at 16-17

e) <u>Lisa Blackston</u> - Williams' Senior Assistant, reporting directly to Williams. Blackston Dep. at 11-12 (attached as Ex.-10). Blackston was experienced working in City government, having worked for former Mayor Linda Thompson. Id. at 12.

f) <u>Latisha Scott</u> - Confidential Secretary to Williams. Scott Dep. at 7 (attached as Ex.-11). She sits at the front desk in the Mayor's suite. Id. at 8. Williams is the grandmother to one of Scott's children, as Scott has a child with Williams' son Rauwshan. Id. at 7.

25.     In or about November 2021, Plaintiff's wife, Lisa Spriggs attempted to obtain a job from Mayor-Elect Williams as the City's Parks and Recreation Director. (See, Cover Letter and Resume of Lisa Spriggs attached hereto, collectively, as Exhibit "E").

<u>Response</u>:     Disputed. Williams has offered no competent, firsthand evidence supporting this allegedly undisputed fact. All Williams has done is submit documentation purportedly sent in by Plaintiff's wife. When asked about it in his deposition, Plaintiff said he had never seen the documents before and didn't know whether his wife had, in fact, sought a job from Williams. Ex.-1 at 217-20.[5]

---

[5] Plaintiff was asked about this purported letter and job application at his deposition on August 29, 2024. He was questioned about it by **Williams' attorney David MacMain**. By this time in case, the City - represented by Attorneys Lavery and Weed had produced more than 7,000 documents during discovery. And Plaintiff had provided all the responsive documents he had.

However, Williams' attorneys - MacMain Law, had produced no documents from Williams

26.     Mayor Williams established a practice that she would not be involved in any

        personnel action involving a member of her family. (See, Deposition Transcript of

        City Solicitor Neil Grover, attached hereto as Exhibit "F") (N.T., p. 22, ll. 20-24, p.

        23, ll. 1-4).

        Response:    Disputed.  There was no formal policy established regarding whether

                     Williams would be involved in any personnel decision concerning any

                     of her family members.  Ex.-8 at 21-22.  According to Solicitor Grover,

                     Williams had a "practice" such that if a personnel decision pertained to

                     a relative - or there was a question about whether the Mayor should be

                     the approving authority - the personnel decision would be delegated to

                     Hartman. Id. at 22-23.  But Grover could point to nothing in writing

                     setting forth that alleged practice.  Id. at 22.  Neither could Hartman.

                     Ex.-6 at 38, 45.  **And despite the Mayor's proclaimed, unwritten**

                     **policy of recusal, on May 6, 2022, Williams approved - via her own**

                     **signature - a retroactive pay raise for her son Dion.  This official**

                     **action gave Dion a $1.50 hourly pay increase for more than 515**

                     **hours previously worked**. See Payroll Action Form for Dion dated

---

and had continued to seek extensions and delays in responding to Plaintiff's requests for documents.
In fact, it was this set of documents (allegedly pertaining to Plaintiff's wife) - presented to Plaintiff
during his deposition - that were first documents ever produced by Williams' attorney **David
MacMain.**  The mid-deposition ambushing sparked Plaintiff's letter to the Court dated August 30,
2024 (ECF No. 53).

5/6/22 (attached hereto as Ex.-13).

**By way of further answer**, during Plaintiff's short tenure in the Williams administration, Williams frequently pressured him regarding a supervisor position for Dion. Ex.-1 at 82. On dozens of occasions, by phone and at various locations, Williams pressed him and threatened him. Id. at 84. Generally, he tried to appease her. Id.

In January 2022, shortly after Williams had been inaugurated, she revisited the issue of a management job for Dion. Id. at 72. Although Plaintiff had identified a management position for Dion within the Parks and Recreation Department (with the assistance of Hartman - id. at 73; see also Text Message with Hartman dated 2/26/22, attached as Ex.-29), Williams now told Plaintiff that Dion wanted to remain in the Public Works Department with Plaintiff. Ex.-1 at 72, 75, 80. But Dion wanted a Supervisor's position. Id. at 75. Williams further added, "people like Dion and they want him to stay, so you need to find him a position in Public Works." Id. Plaintiff resisted, telling Williams, "Mayor, Dion and I are friends. I really don't want him to work for me directly. I believe it's going to be a problem." Id. at 76. Williams ordered Plaintiff to do it anyway and Plaintiff said okay. Id.

Within a few months of that directive, Williams called Plaintiff early one morning after he had announced the promotions of two other employees in his Department. Id. at 77. She screamed at him at the top of her lungs about why he hadn't promoted Dion yet. Id.

On another occasion, Williams threatened to fire Plaintiff if he didn't "hurry up" and promote Dion, as Dion was threatening to move to Ohio if he was not promoted. Id.; Ex.-5

at 126.  Williams has a daughter who lives in Ohio.  Dockens Dep. at 9 (attached as Ex.-12); Ex.-5 at 126.

There was no formal policy established regarding whether Williams would be involved in any personnel decision concerning any of her family members.  Ex.-8 at 21-22.  According to Solicitor Grover, Williams had a "practice" such that if a personnel decision pertained to a relative - or there was a question about whether the Mayor should be the approving authority - the personnel decision would be delegated to Hartman.  Id. at 22-23.  Grover could point to nothing in writing setting forth that alleged practice.  Id. at 22.  Neither could Hartman.  Ex.-6 at 38, 45.  According to Williams, she had an unwritten policy that she would not involve herself in any personnel decisions involving family members and that Hartman would make the decisions on her behalf.  Ex.-5 at 36-37.  According to Williams, this unwritten policy of recusal also applied to "anybody" with  whom she was familiar.  Id. at 38-39.

Despite the Mayor's proclaimed, unwritten policy of recusal, on May 6, 2022, Williams approved - via her own signature - a retroactive pay raise for her son Dion.  This official action gave Dion a $1.50 hourly pay increase for more than 515 hours previously worked.  See Payroll Action Form for Dion dated 5/6/22 (attached hereto as Ex.-13).  Despite the Mayor's proclaimed, unwritten policy of recusal, during Williams' first six months in office, aside from pressuring Plaintiff to promote Dion, Williams also pressured Plaintiff to make official decisions that would have benefitted her granddaughter and niece.  Ex.-1 at

12

116.

Dionne Dockens ("Dionne") is Williams granddaughter, as she's Dion's daughter.  Ex.-12 at 7.  Dionne has been a park ranger for the City of Harrisburg since 2023.  Id. at 8;  Ex.-7 at 16.

Brianna Bonaparte ("Brianna") is another granddaughter of Williams.  Brianna has been employed in the City's summer program for at least the last three years. Ex.-12 at 11;  Ex.-5 at 33-34.

Dion's son Dante, another of Williams' grandchildren, has been employed in the City's summer program too for the last three years.  Ex.-5 at 32.

Williams' niece, Patrice Dockens ("Patrice"), works for the City in Economic Development. Id. at 29, 31.  Patrice too was hired after Williams became Mayor.  Id. at 31.  Prior to Patrice getting a job in Economic Development, Williams pressured Plaintiff to create a management job for her in Public Works that would be conducive to Patrice's qualifications.  See Ex.-33. Plaintiff told Williams that he had nothing available that would satisfy her request, angering Williams.[6]

_____

[6] Given this roster of known Williams' family members on the City payroll, it was improper for Williams' attorney - **David MacMain** - to obstruct deposition questions to Williams on this topic. Ex. 5 at 24-25 (**MacMain**: "We're not here to give her whole family tree.").

Actually, her "whole family tree" is relevant.  Whether Williams has harnessed her position to establish a de facto jobs program for her family is probative as to a central issue in this case, i.e., whether Williams retaliated against Plaintiff because he spoke out against and resisted her incessant demands that he promote Dion.  Because of MacMain's improper interference during Williams' deposition, there may be other family members of the Mayor on the City payroll presently unknown to both the Court and the public.

27.    Mayor Williams approved a raise for Plaintiff on March 11, 2022, raising his salary

to $130,000. (See, Payroll Action Form attached hereto as Exhibit "G").

Response:    Disputed.  This was no "raise," as it was the salary Williams and

Plaintiff agreed upon in July 2021, before Plaintiff agreed to leave

Susquehanna Township and return to the City.  Ex.-1 at 33, 35

28.    Dan Hartman is the former Business Administrator and reported directly to Mayor

Williams. (See, Deposition Transcript of Dan Hartman, attached hereto as Exhibit

"H") (N.T., p. 12, ll. 4-6).

Response:    Undisputed.

29.    Plaintiff never reported to Dan Hartman that he thought Mayor Williams was making

any inappropriate requests of him. (Ex. A., N.T. p. 96, ll. 8-11).

Response:    Disputed.  Plaintiff had reported to Hartman that Williams had

demanded that Dion get a supervisor's position in Parks and

Recreation.  Ex.-1 at 73-74;  Ex.-29.  And Hartman knew about the

others.  Ex.-1 at 96.

**Dion Dockens**

30.    Dion Dockens is Mayor Wiliams' son. (ECF Doc. No. 38, ¶ 26).

Response:    Undisputed.

31.    Mr. Dockens and Plaintiff have been friends for decades. (See, Deposition Transcript

of Dion Dockens, attached hereto as Exhibit "I") (N.T., p. 28, ll. 6-7).

14

<u>Response</u>:    Undisputed.

32.    Mr. Dockens has worked for the City since June 30, 2014. (Ex. I., N.T., p. 11, 1. 23).

<u>Response</u>:    Undisputed.

33.    Mr. Dockens is a member of the union and works for the City's recycling crew in the City's Department of Public Works. (Ex. I., p. 12, ll. 8-22).

<u>Response</u>:    Undisputed.

**By way of further answer**, as Williams continued to pressure Plaintiff about promoting Dion, in or about April 2022, Plaintiff told Williams that Dion was not qualified to be promoted to a Sanitation Supervisor as he didn't have a commercial driver's license ("CDL"). Ex.-1 at 86. And so Williams asked Plaintiff to change the job qualifications so Dion could qualify. Id. at 86. Plaintiff found that request to be improper. Id. at 86-87.

Plaintiff, however, tried to appease Williams. At the time, he was creating two "Route Supervisor" positions. Id. at 124, 126. Although only two such positions were needed and Plaintiff already had in mind the two who deserved to be promoted, he would create three positions and give Dion the third one. Id. at 124-25; Ex.-7 at 39-40; Ex.-5 at 109.

The Route Supervisor position would not have a CDL requirement, and so Dion would be eligible. Ex.-1 at 125. Plaintiff collaborated with Willingham to get the job description language in place that would allow Dion to be promoted. Id. at 127-28; see also Email String Between Plaintiff and Willingham dated 4/1-4/8/22, and Job Description (attached as Ex. 14). Plaintiff interviewed Dion on April 20, 2022 and "Highly

15

Recommended" Dion for the promotion.  See Dion Interview Evaluation dated 4/20/22 (attached as Ex. 15).

The Pennsylvania Public Official and Employees Ethics Act, Act 170 of 1978, ("Act") became effective on January 1, 1979, and in subsequent years was amended and reenacted in 1989, codified in 1998, and amended in 2006.[7]  The Act applies to public officials and public employees.  See n.6, supra.

The Pennsylvania State Ethics Commission ("Commission") is an independent state agency charged with the responsibility of enforcing the Act.  Id.  The Commission's core mission and guiding principle is that public office is a public trust and that any effort to realize personal financial gain through one's public office other than compensation provided by law is a violation of that trust.  Id. (emphasis supplied).

Precisely at the same time Plaintiff was trying to appease Williams and promote Dion, the Commission came to City Hall to conduct training, on April 19, 2022. Ex.-1 at 92;  see also Hartman Email to Senior Staff dated 4/18/22 (attached as Ex.-16).  The training session was scheduled after Grover had emailed the Commission requesting training.  Ex.-8 at 30; see also Request to State Ethics Commission for Training (attached as Ex. 17).  The Mayor, and all City directors and management staff were in attendance.  Ex.-7 at 34;  Ex.-5 at 120. The Commission's Chief Counsel provided the training.  Ex.-8 at 33.  The presentation addressed what would be ethics violations, and attendees were given a booklet.  Ex.-7 at 33;

---

[7] See https://www.pa.gov/agencies/ethics/about-the-commission.html (last visited 1/24/25).

Ex.-1 at 104.

Although Williams claimed she became more "cautious" after the training, she couldn't identify even one thing she did differently after the training. Ex.-5 at 123-24. HR Director Willingham, however, left with the impression that Williams should not be involved in any personnel decisions involving her son Dion. Ex.-7 at 37.

34.    Mr. Dockens did not discuss his discipline with Mayor Williams. (Ex. I., N.T., p. 24, ll. 1-3).

       <u>Response</u>:    Disputed. Dockens testified this way but a jury need not believe him

                          because he is an interested witness (his mother is a defendant) and so

                          this may not be accepted as an undisputed fact. Just like a jury need not

                          believe Plaintiff's testimony on a particular point, they need not accept

                          Dockens' either. <u>See Hill v. City of Scranton</u>, 411 F.3d 118, 129 n.16

                          (3d Cir. 2005) ("when drawing all reasonable inferences in favor of the

                          non-movant the courts must disregard evidence the jury is not required

                          to believe, including testimony of interested witnesses.") (citing <u>Reeves</u>

                          <u>v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 149-51 (2000)).

35.    On April 20, 2022, Plaintiff, T.M. West, and Vicmarie Valentine interviewed Mr. Dockens for the position of Sanitation Supervisor for the City. (See, Sanitation Manager Questions attached hereto, collectively, as Exhibit "J").

Response:     Undisputed.

36.    At the time of his April 20, 2022 interview, Mr. Dockens possessed a permit for a Class B Commercial Driver's License ("CDL"). (Ex. J.).

Response:     Undisputed.

37.    Ms. Valentine, Mr. West, and Plaintiff each recommended Mr. Dockens for consideration for the position of Sanitation Manager. (Ex. J.).

Response:     Undisputed.

38.    Plaintiff believed Mr. Dockens did a "Great Job!" in his interview for the position of Sanitation Manager and he "highly" recommended Mr. Dockens for the position. (Ex. J.).

Response:     Undisputed, as Plaintiff was still trying to appease the Mayor. Plaintiff was of the opinion that Dion was not fit to be a manager, but chose not to argue with Williams about it. Ex.-1 at 56. Plaintiff had known Dion for decades. Plaintiff knew of Dion's history of tardiness and disciplines, and of not being a very efficient worker. Id. At one point Plaintiff told Williams, "Mayor, Dion and I are friends. I really don't want him to work for me directly. I believe it's going to be a problem." Id. at 76. As well, Plaintiff had not yet reached the point where he was going to speak out against Williams' unethical and unrelenting demands that Plaintiff promote Dion. That came nine days later, on

18

April 29, 2022, when Plaintiff made his report to Grover. Ex.-1 at 105-10.

39.    On April 27, 2022, Plaintiff notified Joni Willingham, Bureau of Human Resources Director, that he wanted to offer the position of route supervisor to three (3) individuals, Dion Dockens, Charles Appleberry, and Brian Smith. (See, April 27, 2022 Emails attached hereto as Exhibit "K").

Response:    Undisputed, as Plaintiff had not yet reached the point where he was going to speak out against Williams' unethical and unrelenting demands that Plaintiff promote Dion. That came two days later, on April 29, 2022, when Plaintiff made his report to Grover. Ex.-1 at 105-10.

**By way of further answer**, Plaintiff's job duties as Public Works Director did not include serving as a watchdog, ombudsman or inspector general for the City. His job did not entail reporting on, or addressing, the ethical violations of Mayor Williams. See Job Duties (attached as Ex.-31). Nonetheless, ten days after the Commission's training session, Plaintiff spoke with Grover about Williams' demands regarding Dion. Ex.-1 at 105-06, 110. Plaintiff had decided he was no longer going to do what Williams wanted. Id. at 123.

This conversation occurred on April 29, 2022, and **Plaintiff told Grover that in his view Williams' demands regarding her son violated the state ethics law**. Id. at 107. The discussion began on the 4th floor hallway of City Hall, right outside of the Human Resources

Department offices.  Id. at 108.  Grover had them go into a conference room on the 4th floor, and he turned off the lights.  Id.

After Grover vented to Plaintiff about Williams "driving [Grover] crazy" about another employee matter, Grover asked Plaintiff what he wanted to discuss.  Id. at 108-09. **Plaintiff told Grover that Williams' continued pressure on him to promote Dion was an ethics violation and that he didn't want to go to jail**.  Id. at 109, 110.

Grover agreed, and told Plaintiff they'd "both be in prison if they allowed this to happen."  Id. at 109.  Grover told Plaintiff that a promotion for Dion was not going to happen.  Ex.-8 at 28-29.  Plaintiff also told Grover of his concerns that Williams has pressured him to hire her granddaughter into the Public Works Department, although Williams had later told him not to worry that she had gotten her a job elsewhere.  Ex.-1 at 113, 114.  Plaintiff told Grover how concerned he was about the things that would be deemed unethical.  Id. at 110.  Grover told Plaintiff, "I don't want to hear anymore" and to "stop right there."  Grover stated he would go right away and talk to Williams.  Id. at 109.

Grover then went to see Williams and told her about her conversation with Plaintiff. Ex.-8 at 58; Ex.-5 at 109-10.  When Grover told Williams that Dion could not be promoted she was "very upset and tearful."  Ex.-8 at 58.  After Williams' meeting with Grover, she called Plaintiff, screaming at him about how Grover had told her that Plaintiff thought hiring her son would be an ethics violation.  Ex.-1 at 142-43.[8]

---

[8] Plaintiff notes that by this time - in 2022 - Williams had been an elected official in Harrisburg for more than a decade.  She was subject to the proscriptions of the Pennsylvania Public

The next working day, on or about May 2, 2022, there was a meeting between Williams, Plaintiff, Willingham, Grover, and another attorney from the solicitor's office. Id. at 120; Ex.-8 at 29. In that meeting, held in the Mayor's conference room, **Williams warned them that she was going to fire them all if they did not promote Dion**. Ex.-1 at 120. Plaintiff recounted the meeting as follows:

> The Mayor comes in and says she called the meeting because she was made aware by Neil [Grover] that – well, she looked at me and said, you don't want to hire Dion, and you're going to hire my son. And before I could say anything Neil goes, Mayor, we're not going to hire your son. And I'm advising you as legal counsel to stop talking because this can lead to litigation. And she said I will not stop talking. I'm the mayor, damn it. She said, you're going to hire my son or I'm going to fire you, she pointed to me. She says, I'm going to fire you, she pointed to Joni [Willingham]. She says, I'm going to fire you, she pointed to Neil. And she said, I'm going to fire you, and you just started, and I'll fire your behind, too, to the African American attorney.[9]

---

Official and Employees Ethics Act all that time, yet was distressed and defiant when informed that she could not use her official position to promote her son.

[9] Although Grover claimed to have no recollection of Williams threatening jobs in that meeting, he admitted having been "in the room where Mayor Williams has threatened to fire everyone in the room multiple times." Ex.-8 at 58.

21

Id. at 121.

Grover told Williams that they were not going to do it, that Plaintiff was correct, it's an ethical violation. Id. He told her that they "can't continue this behavior." Id. Williams then went off into a rant, despite Grover repeatedly advising her to stop talking. Id. Williams then told Plaintiff that if he couldn't promote Dion, then Plaintiff should give Dion a position as Parks and Recreation Supervisor. Id. at 122. Grover immediately stepped in, told Williams no, and that she would have to get approval from the Ethics Board and that Dion was not hireable. Id.

After the meeting, Williams called Plaintiff into her office and told him how upset she was with him for going to Grover and not promoting Dion. Williams told him that he better find a way to get Dion more money. Right then she ordered Plaintiff to pay him "out of class" for "working as a supervisor." Ex.-2 ¶ 5; Ex.-1 at 111; Ex.-6 at 39-40.

"Out-of-class" pay is due to any employee that does job duties that are outside of their job description. The employee is to receive a $1.50 extra an hour. Ex.-7 at 18-19. On May 6, 2022, just four days after the May 2nd meeting wherein Williams threatened the jobs of her staff, **Williams signed a Payroll Action form giving her son Dion a $1.50 hourly pay increase** for more than 515 hours previously worked, allegedly as "out of class" pay. See Payroll Action Form dated 5/6/22 (attached hereto as Ex. 13); Ex.-6 at 39-40.

40.    Mr. Dockens was not hired for the route supervisor position.

Response:    Undisputed, although Williams directed instead that Dion be paid "out of class" for "working as a supervisor." Ex.-2 ¶ 5; Ex.-1 at 111; Ex.-6 at 39-40. "Out-of-class" pay is due to any employee that does job duties that are outside of their job description. The employee is to receive a $1.50 extra an hour. Ex.-7 at 18-19. On May 6, 2022, just four days after the May 2nd meeting wherein Williams threatened the jobs of her staff, Williams signed a Payroll Action form giving her son Dion a $1.50 hourly pay increase for more than 515 hours previously worked, allegedly as "out of class" pay. See Payroll Action Form dated 5/6/22 (attached hereto as Ex. 13); Ex.-6 at 39-40.

**By way of further answer**, as Mayor, Williams maintains the sole authority to terminate employees, but sometimes she would authorize Grover, Hartman or Willingham to carry out her decision. Ex.-6 at 28-29. On June 21, 2022, Hartman summoned Plaintiff for a meeting. Ex.-1 at 184. Plaintiff went to City Hall right away, and entered the Mayor's suite on the second floor of City Hall. Ex.-1 at 185; Ex.-7 at 23-24. Latisha Scott, Williams' confidential secretary who sits at the front of the suite, greeted Plaintiff. Ex.-11 at 6-9; Ex.-1 at 185-86. Plaintiff asked Scott what the meeting was about and she replied "it's fucked up." Ex.-1 at 185-86.

Willingham then arrived and when Plaintiff asked her about what was going on she said she didn't know. Id. at 186. Plaintiff and Willingham were then ushered into the

Mayor's conference room, wherein Plaintiff again asked Willingham what was going on.  Id. at 187.  Willingham shrugged her shoulders, faced her palms up, and again stated she didn't know.  Id.  Hartman then entered the conference room with Deborah Robinson and told Plaintiff, "we called you down here because we're terminating your employment."  Id.; Ex.-7 at 56.  Plaintiff asked "for what?" and Hartman replied "for filling out a payroll action slip." Ex.-1 at 187.  When Plaintiff questioned Hartman, Hartman replied, "the Mayor just wants you fired."  Id. at 188.  Although Williams wasn't present for the termination meeting, **she made the decision to fire Plaintiff**.  See City Answers to Pl.'s Interrogs. at 1 (attached as Ex.-18).  She was the decisionmaker.  Id.

Williams fired Plaintiff because, according to her, **he had put in a payroll request form to increase his own pay**.  Ex.-5 at 136-37, 138.  According to Williams, earlier that same week she had rejected a pay raise for Plaintiff when he came to her asking for a raise. Id. at 137.  According to Williams, Plaintiff did this intentionally while she was out of state (Ex.-5 at 133), stating, **"You know, he had asked me for a raise and I said no.  And he went over my head when I was not available, I was not in the state, to go take it upon himself to give a payroll action form."**  Ex.-5 at 166-67.  According to Williams, this was the only reason for which she fired Plaintiff.  Id. at 165.

A Request for Payroll Action ("RPA") form is usually generated by Human Resources or the Finance Department, and is submitted to a Department Director.  Ex.-1 at 42.  The Department Director typically accedes to the request and sends back the completed RPA

form to Human Resources of the Finance Department. Id. Once the RPA form is completed and returned, then a Payroll Action ("PA") form would be generated by Human Resources. Id. at 52. In order for a specified payroll action to take effect, a number of officials need to sign the PA form, including the director of the department whose employee is being affected. See, e.g., Ex.-13.

During the week of June 13, 2022 (the week before Plaintiff was fired), Plaintiff - through his administrative aide - submitted several RPA forms, after discussing it with City Finance Director Marita Kelley. Id. at 176-77; see also Kelley Dep. at 11 (attached as Ex.-19); Email from Kelley to Spriggs dated June 15, 2022 (attached as Ex.-20). On the morning of Friday, June 17, 2022, Plaintiff signed the PA forms after he was called down to Human Resources to sign the forms. Ex.-1 at 180, 182. None of the Payroll Action forms Plaintiff signed was to increase his own pay. Ex.-2 ¶ 6.

41. On or about March 10, 2022, Solicitor Grover requested that the State Ethics Commission conduct two (2) to four (4) trainings for City management employees, and City elected and appointed officials. (See, Emails attached hereto as Exhibit "L").

    Response:    Undisputed.

42. Mayor Williams instructed Solicitor Grover to contact the State Ethics Commission for the training. (Ex. F., N.T., p. 30, ll. 12-16).

    Response:    Disputed. Williams and Grover each claimed that it was their idea to bring in the State Ethics Commission for training. Ex.-5 at 120; Ex.-8

at 31.  Hartman credited Grover. Ex.-6 at 42-43.

43.    On April 19, 2022, the State Ethics Commission conducted a training with senior City management regarding the State Ethics Act. (See, April 18, 2022 Email attached hereto as Exhibit "M").

Response:    Undisputed.

44.    Neil Grover has been the Solicitor for the City of Harrisburg since January 2014. (Ex. F., N.T., p. 8, l. 2).

Response:    Undisputed.

45.    Solicitor Grover is a white man. (ECF Doc. No. 38, ¶ 95).

Response:    Undisputed.

46.    The Solicitor is appointed by the appointing authority for the City of Harrisburg and serves at the pleasure of the appointing authority. (Ex. F., N.T., p. 9, ll. 18-20).

Response:    Undisputed, although the "appointing authority" is the Mayor herself, as Grover acknowledged.  Ex.-6 at 9.

**April Personnel Action Forms**

47.    On April 22, 2022, three (3) days after the Ethics Committee training, Plaintiff executed Request for Personnel Action Forms for Austin Griffin, the Deputy Director of Public Works, seeking a pay raise for Mr. Griffin of $110,000 and $102,000. (See, April Griffin Request for Personnel Action Forms attached hereto collectively as Exhibit "N").

<u>Response</u>:    Disputed in part.  Prior to the Mayor firing Plaintiff for the phony reason that he had put in a PA form to increase his own pay, the last discussion he had with the Mayor about his pay had been in April 2022. Ex.-1 at 162. 109.In April the Mayor had called him to her office and told him that she was assigning him two additional departments to manage. Id.; Ex.-6 at 55-56, 57.  There were several managers present. Ex.-1 at 162.  The two additional departments Williams was assigning to Plaintiff were Traffic Engineering and Engineering.  Id.;  see also Spriggs Email dated 4/26/22 (attached as Ex.-28).  Plaintiff raised the question of whether he should be compensated for the extra work.  Id. at 163. Williams said she was willing to discuss compensation for the extra duties. Id. She and Plaintiff agreed on a raise from $130,000 to $150,000. Id. at 167. **She also agreed on a raise for Plaintiff's Deputy Director of Public Works, Austin Griffin**.  Id. at 164, 166. Williams instructed him to prepare a RPA form to reflect the salary increases.  Plaintiff did so. Ex.-2 ¶ 7;  <u>see also</u> Request for Payroll Action form dated 4/22/22 (attached as Ex.-21).

**By way of further answer**, prior to the Mayor firing Plaintiff for the phony reason that he had put in a PA form to increase his own pay, the last discussion he had with the Mayor about his pay had been in April 2022.  Ex.-1 at 162.  The Mayor had called him to her

27

office and told him that she was assigning him two additional departments to manage.  Id.;
Ex.-6 at 55-56, 57.  There were several managers present, including Hartman.  Ex.-1 at 162;
Ex.-2 ¶¶ 7, 12.

The two additional departments Williams was assigning to Plaintiff were Traffic
Engineering and Engineering.  Id.;  <u>see also</u> Spriggs Email dated 4/26/22 (attached as Ex.
28).  Plaintiff raised the question of whether he should be compensated for the extra work.
Id. at 163.  Williams said she was willing to discuss compensation for the extra duties.  Id.
She and Plaintiff agreed on a raise from $130,000 to $150,000.  Id. at 167.  She also agreed
on a raise for Plaintiff's Deputy Director of Public Works, Austin Griffin.  Id. at 164, 166.

Williams instructed him to prepare a RPA form to reflect the salary increases.
Plaintiff did so.  Ex.-2 ¶ 7;  <u>see also</u> Request for Payroll Action form dated 4/22/22 (attached
as Ex. 21).  The raises, however, never went through.  Ex.-1 at 168.  Williams told Plaintiff
she couldn't keep her word.  Id. at 169.  The day after so notifying Plaintiff, Williams asked
him to come to her office after they had finished a Department Directors meeting in City
Council chambers.  Id.  They went to her conference room and she told him she didn't like
how their last conversation on the raise had gone.  Id.

Williams said to Plaintiff that he was lucky that she **"saved" him from the "Jews
and White guys who wanted to fire you at Susquehanna Township."**  Ex.-2 ¶ 8.[10]

---

[10]      At her deposition Williams denied saying this to Plaintiff, before adding the non-
sequitur, "Why would I do that?  I've been tormented all my whole life as a light skinned
African-American. Why would I do that?"  Ex.-5 at 149.

Plaintiff replied, "Where are you getting this from? They wanted me to stay." She then said they wanted you fired. Id. Plaintiff then pulled out his cell phone and showed Williams a text message from the Chairman of the Susquehanna Township Board of Supervisors commending him for his hard work, leadership and service while employed there. Id.; see also Text Message from Susquehanna Township Supervisor (attached as Ex.-22). Williams then quickly changed the topic. Ex.-2 ¶ 8. Williams and Plaintiff never again discussed the topic of a pay raise for him during the remainder of his employment. Id.

48.    On April 22, 2022, Plaintiff executed a Request for Personnel Action Form attempting to increase his own pay to $150,000. (See, April Request for Personnel Action Form, attached hereto as Exhibit "O").

    Response:    Disputed, see Resp. ¶ 47.

49.    In Spring 2022, Mayor Williams told Business Administrator Dan Hartman that she was not going to raise Plaintiff's salary again because he already received a raise, and he had not been working for the City for more than a year. (Ex. H, N.T., p. 54, ll. 1-5).

    Response:    Disputed, as Williams specifically authorized the raise. See Resp. ¶ 47. Shortly thereafter, however, Williams to Plaintiff she couldn't keep her word. Ex.-1 at 168-69.

50.    Mayor Williams did not authorize the payroll increase for either Mr. Griffin or Plaintiff. (Ex. A., N.T., p. 168, ll. 10-14).

    Response:    Disputed. See Resp. ¶ 47.

51.    On April 29, 2022, Solicitor Grover spoke with Mayor Williams and advised her that Mr. Dockens could not be promoted under the State Ethics Act. (Ex. F., N.T., p. 28, ll. 9-12).

Response:    Undisputed, as after Williams' meeting with Grover, she called Plaintiff, screaming at him about how Grover had told her that Plaintiff thought hiring her son would be an ethics violation.  Ex.-1 at 142-43.

52.    After speaking with Mayor Williams, on April 29, 2022, Solicitor Grover ran into Plaintiff at City Hall and advised him that Plaintiff could not promote Mr. Dockens. (Ex. F., N.T., p. 28, ll. 1-21).

Response:    Disputed, it was after Grover's meeting with Plaintiff on April 29, 2022 that Grover went to see Williams and told her about his conversation with Plaintiff.  Ex.-8 at 58;  Ex.-5 at 109-10.  And when Grover told Williams that Dion could not be promoted she was "very upset and tearful."  Ex.-8 at 58.

53.    On May 2, 2022, Mayor Williams conducted a meeting with Plaintiff, Solicitor Grover, and HR Director Joni Willingham. (ECF Doc. No. 38, ¶ 49).

Response:    Undisputed, although another attorney from the solicitor's office was there too.  Ex.-1 at 120;  Ex.-8 at 29.  In that meeting, held in the Mayor's conference room, Williams warned them that she was going to fire them all if they did not promote Dion.  Ex.-1 at 120.

**June 2022 Personnel and Payroll Action Forms**

54.     Marita Kelley is Finance Director for the City of Harrisburg. (See, Deposition

transcript of Marita Kelley, attached hereto as Exhibit "P") (N.T., p. 14, ll. 8-11).

Response:        Undisputed, although the City contends she is no longer employed with

the City.  City Stmt. of Facts ¶ 42.

55.     Plaintiff did not discuss the June 2022 Request for Personnel Action Form for Mr.

Griffin with Mayor Williams. (Ex. A., N.T., p. 175, ll. 12-14).

Response:        Undisputed, as Plaintiff spoke with Kelley, Willingham and Fedor

about it.  Ex.-1 at 176-77;  Ex.-19 at 11;  Ex.-20;  Ex. 7 at 61-62.

56.     Plaintiff did not tell Director Kelley that he had previously unsuccessfully put in for

a salary increase for Mr. Griffin. (Ex. A., N.T., p. 179, ll. 15-18).

Response:        Undisputed, as Plaintiff did not tell Kelley of the pay raise Williams

initially approved for himself and Griffin in April when she assigned

them two additional departments to oversee.  Ex.-1 at 163-67.

57.     Director Kelley was not aware of Mayor Williams' directive that Mr. Griffin should

not receive a pay raise. (Ex. P., N.T., p. 18, ll. 20-24).

Response:        Undisputed, as there was no "directive" that Griffin never receive a pay

raise.  It is undisputed that Williams rescinded her initial approval of a

pay raise for both Plaintiff and Griffin back in April.  Ex.-1 at 168-69;

Ex.-2 ¶ 14.  It is undisputed that two months later City Finance Director

told Plaintiff he could put in a form to provide a raise to Griffin.  Ex.-20.  Further, Willingham herself confirmed that Williams never said Griffin should not receive a pay raise.  Ex.-30.

58.    Director Kelly was not aware of Mayor Williams' directive that Plaintiff should not receive a pay raise. (Ex. P., N.T., p. 19, ll. 1-14).

Response:    Undisputed, <u>as there was no "directive"</u> that Plaintiff should not receive a pay raise.  Indeed, Williams initially approved a pay raise for both Plaintiff and Griffin back in April when they were assigned to additional departments to manage.  Ex.-1 at 168-69

59.    Mayor Williams told Plaintiff several times she would not approve more raises. (See, Deposition Transcript of Mayor Williams attached hereto as Exhibit "Q") (N.T., p. 145, ll. 16-25).

Response:    Disputed.  The only time Williams told Plaintiff she would not approve a pay raise was in April, after she initially approved it.  Ex.-1 at 168-69; Ex.-2 ¶¶ 8, 13.  As well, there is irrefutable evidence that there was no "standing directive" that no pay raises were to be provided to management in public works.  On June 7, 2022, Williams' team presented to City Council - at a public meeting - a proposed raise for the Public Works Department Highway Manager John Watson.  Ex.-2 ¶ 19.

> The meeting can be viewed at this link:
>
> https://www.youtube.com/watch?v=TOYWpeSzUmI
>
> (last visited 2/7/25).  See 59:20-1:00:02.

60.    On June 15, 2022, Director Kelley confirmed to Plaintiff that there was budget approval for Mr. Griffin's salary for a maximum of $102,000. (Ex. P., N.T., p. 21, ll. 11-24, p. 22, ll. 14-16).

      Response:    Disputed in part, as Director Kelley also wrote to Plaintiff that he could put in a Payroll Action form to initiate a raise for Griffin.  Ex.-20.

61.    On June 17, 2022, Plaintiff executed a Request for Personnel Action Form for a pay increase for Austin Griffin of $102,000. (See, June Request for Personnel Action Form attached hereto as Exhibit "R"; See, June Payroll Action Form, attached hereto as Exhibit "S").

      Response:    Undisputed, as Plaintiff had specifically authorized to do so by Director Kelley.  Ex.-20.

62.    Sara Fedor is the Payroll Manager for the City of Harrisburg. (ECF Doc. No. 38, ¶ 63).

      Response:    Undisputed.

63.    HR Director Joni Willingham knew that Mayor Williams directed there were to be no further increases in public works. (See, Deposition Transcript of Joni Willingham attached hereto as Exhibit "T") (N.T., p. 63, ll. 4-7).

Response:    Disputed.   Yes, Willingham testified this way, but a jury need not believe her and so this may not be considered an undisputed fact at the Rule 56 stage.   See Hill v. City of Scranton;  Reeves v. Sanderson Plumbing Prods., Inc.  **Willingham is an interested witness who was directly involved in one or more employment decisions alleged by the Plaintiff to be illegal, and therefore has a vested interest in this litigation to see her actions vindicated.  As well, she is employed by the City and is paid by the City, and serves at the pleasure of Williams and so she has a direct financial incentive to assist the Defendants.**   Moreover, Spriggs did not know of any purported standing directive as to Public Works management raises.  Ex.-2 ¶ 14. As well, **there was no such standing directive as to Public Works raises, as Willingham acknowledged in an email dated Friday, June 17, 2022** (Griffin's salary increased earlier in 2022 "with possibility of a review later.") (Ex.-30).  As well, there is irrefutable evidence that there was no "standing directive" that no pay raises were to be provided to management in public works.  On June 7, 2022, Williams' team presented to City Council - at a public meeting - a proposed raise for the Public Works Department Highway Manager John Watson.  Ex.-2 ¶ 19.

34

The meeting can be viewed at this link:

https://www.youtube.com/watch?v=TOYWpeSzUmI

(last visited 2/7/25).  See 59:20-1:00:02.

64.    HR Director Willingham took the signed payroll forms to Business Administrator

Hartman to see if there were any changes to the Mayor's directive and if Mr. Griffin's

raise was approved. (Ex. T., N.T., p. 64, ll. 10-12).

Response:    Disputed in part.  It is undisputed that Willingham ran to see Hartman

after Plaintiff signed the Payroll Action forms on June 17, 2022.

However, again, it is disputed that there was any standing directive

pertaining to salaries in Public Works, or to Griffin or Plaintiff in

particular.   Ex.-2 ¶¶ 8, 14;  Ex.-1 at 168-69.

65.    Business Administrator Hartman confirmed to HR Director Willingham that the pay

raise was "absolutely not" approved. (Ex. T., N.T., p. 64, ll. 14-18).

Response:    Disputed.  Yes, Willingham testified this way, but a jury need not

believe her and so this may not be considered an undisputed fact at the

Rule 56 stage.  See Hill v. City of Scranton;  Reeves v. Sanderson

Plumbing Prods., Inc.  Further, the testimony is contradicted by the fact

that Finance Director Kelley authorized Plaintiff to put in for a raise for

Griffin.  Ex.-20.  As well, Plaintiff was the Public Works Director and

he was never told of any standing directive of no pay raises for Public

Works. Ex.-2 ¶¶ 8, 14.

66.    Director Kelley did not sign the June 17, 2022 payroll action form for Austin Griffin. (Ex. P., p. 37, ll. 5-10).

Response:    Undisputed.

67.    Business Administrator Hartman called Mayor Williams to tell her about the Payroll Action Form. (Ex. H., N.T., p. 68, ll. 19-24; p. 69, ll. 1-5).

Response:    Undisputed.

68.    Mayor Williams approved Plaintiff's termination from employment on Friday, June 17, 2022. (Ex. H., N.T., p. 71, ll. 18-23).

Response:    Undisputed.

**By way of further answer**, while working for Williams, Lisa Blackston's office was the first office outside of the Mayor's office. Ex.-10 at 13. Among other duties, Blackston's job was to oversee the functioning of the office, handle Williams' schedule and do anything Williams required of her. Id. at 14.

On June 21, 2022, the day Plaintiff was fired, Blackston learned of Plaintiff's firing from Deborah Robinson when Blackston arrived at the office. Id. at 17. Blackston observed other staffers in the Mayor's suite watching Plaintiff outside City Hall, right after the termination. Id. at 18. They were laughing. Id. The Mayor also joined them at one point. Id. The staffers thought it was hilarious that Plaintiff had been terminated. Id. at 21. The Mayor herself was laughing about it. Id.

36

Robinson, Williams' longtime friend (Ex.-9 at 9-10, 12), said that "[Plaintiff] should have listened to what the Mayor wanted him to do." Ex.-10 at 19. Blackston herself had observed Williams displeasure with Plaintiff prior to the termination, for "not doing things that she was requesting." Id. at 20. All together, Plaintiff's employment with the City totaled more than 22 years, and his firing was the first disciplinary action on his record. Ex.-1 at 236.

Williams rehired David West, Plaintiff's predecessor, as Public Works Director. Ex.-5 at 49. This was the same man Williams told Plaintiff she had no faith in because West constantly came to work intoxicated or disappeared for days at a time. Ex.-1 at 33-34.

Williams' unrelenting pressure on Plaintiff to promote her son Dion, and her establishment of a taxpayer-funded jobs program for her family weren't Williams' only tactics for enriching herself at taxpayer expense. As another example, Williams directed the Parks and Recreation Director to set up the Mayor's granddaughter's wedding. Ex.-2 ¶ 9. The wedding was held at City Hall. Id.; Ex.-5 at 154. Williams also instructed Plaintiff to provide a City-owned vehicle to another aide so that the aide could pick up things for the wedding about a week in advance. Ex.-2 ¶ 9.

In addition, Williams helped herself to the City's Sanitation Department resources. In or about May 2022, Williams was moving to a different residence. Id. ¶ 10; Ex.-5 at 71. To assist her move, Williams directed Plaintiff to have a City-owned, 20-yard dumpster placed at her old residence. Ex.-2 ¶ 10; Ex.-4 at 81. The dumpster remained at the Mayor's

departing location for several weeks, and it was emptied at the City's dump on Paxton Street and re-set back at the house several times.  Ex.-2 ¶ 10;  see also Text Message from Williams to Plaintiff dated 5/22/22 (attached as Ex.-23);  Ex.-5 at 87-88 (confirming Williams' phone number on text message).

Rather than reimbursing the City for using the dumpster for personal reasons, Williams told Plaintiff to bill it to "blight clean-up."  Ex.-2 ¶ 10.  She further told him to call it a "community dumpster" - and to propagate a fiction that she allegedly allowed neighbors to dump items in there too.  Id.;  Ex.-5 at 81-83.  The City typically charges for the tonnage dumped ($300 per ton) and a tipping scale fee of at least $400.  As well, the normal fee for just renting a dumpster is $400 per week.  Ex.-2 ¶ 10.

Williams also pressured Plaintiff to steer a landscaping contract to her brother in-law. Id. ¶ 11.  In March-April 2022 a landscaping contract came up for bid.  Id.  The City has hundreds of vacant lots that must be cleared of trash and have the lawn mowed.  Id.  Plaintiff selected the lowest responsible bidder.  Id.;  see also Email String Regarding Landscaping Contract dated March-April 2022 (attached as Ex.-24).   After Williams learned of the contract and the selection, she called Plaintiff and told him she wanted the contract rescinded and given to her brother in-law's company.  Ex.-2 ¶ 11.  Williams told Plaintiff that she had the Chief of Police pull up the successful bidder's criminal background and his tax delinquencies in order to get him disqualified.  Id.

Plaintiff refused to rescind the contract and award it to Williams' brother in-law,

telling her it would be illegal.  Id.  Williams told Plaintiff later that City Procurement Manager Hillary Greene told Williams the same thing.

Williams also used her official position to promote her reputation and that of her family.  On one occasion she directed Plaintiff to silence a Public Works employee who she thought was speaking ill of her and her family.  Ex.-1 at 87-88;  Ex.-5 at 116-19.  Williams warned Plaintiff, well, "you better do something and you better do it now."  Ex.-1 at 89.  Dutifully, Plaintiff asked the employee to discontinue such comments, and the employee turned around and filed a grievance against the City.  Id. at 89-90.

In another instance Williams called Plaintiff - furious - after he had disciplined an employee for walking off the job during a shift.  Id. at 144.  The employee happened to be a boyfriend of Williams' daughter.  Id.;  Ex.-5 at 124-25, 127.

69.    Director Kelley was not terminated. (ECF Doc. No. 38, ¶ 103).

    Response:    Undisputed.

70.    On June 16, 2022, City employee Ronald Wise observed Mr. Dockens operating a City recycling truck. (See, June 17, 2022 Inter-Office Memorandum attached hereto as Exhibit "U").

    Response:    Undisputed.

71.    Mr. Wise is the Sanitation Supervisor for the City of Harrisburg. (See, Deposition Transcript of Ronald Wise, attached hereto as Exhibit "V") (N.T., p. 9, ll. 19-20).

Response:    Disputed.  At the time relevant to this case, Wise was the Sanitation

Manager.  Ex.-25.  But then, curiously, two weeks after Plaintiff's

replacement was hired, Wise was demoted to Sanitation Supervisor.

Ex.-26 at 25-26.

72.    Plaintiff directed Mr. Wise to write Mr. Dockens up in connection with the June 16,

2022 incident. (Ex. V., N.T., p. 11, l. 24; p. 12, ll. 1-2).

Response:    Undisputed, as the staff had been warned not to do what Dockens did.

Ex.-1 at 147-48.

73.    Plaintiff decided that Mr. Dockens was to receive a one (1) day suspension. (Ex. V.,

N.T., p. 15, ll. 3-5).

Response:    Undisputed.

**By way of further answer**, Plaintiff was informed of Williams' decision to fire him

on Tuesday, June 21, 2022.  Ex.-1 at 184-86.  This was the first day after the Juneteenth

holiday weekend.[11]  The day before the holiday weekend, on Friday, June 17, 2022, Plaintiff

authorized a discipline to be issued to Dion for driving a recycling truck without having a

CDL.  Ex.-1 at 145-46;  see also Disciplinary Memo dated 6/17/22 (attached as Ex.-25).

Plaintiff was made aware of the incident earlier that week by Dion's supervisor,

Ronald Wise.  Ex.-1 at 145-46. Plaintiff decided to discipline Dion because his staff was

warned prior that they were not to drive vehicles that required a CDL license unless they had

---

[11] See https://www.federaltimes.com/2022/06/13/is-juneteenth-a-federal-holiday/ (last visited 1/28/25).

one.  Id. at 147-48.

Wise issued the discipline per Plaintiff's instructions. Ex.-24 at 11-12.  After Plaintiff was fired, Dion's discipline was reduced.  See Wise Dep. at 22 (attached hereto as Ex.-26). Wise was demoted two weeks after David West was rehired to replace Plaintiff as Public Works Director.  Id. at 25-26.  Although Williams claimed not to know of Dion's discipline before Plaintiff was fired (Ex.-5 at 130), HR Director Willingham was aware of it on Friday, June 17, 2022.  See Email to Willingham dated 6/17/22 (attached hereto as Ex.-27).[12]

74.    On June 17, 2022, Mr. Dockens had a meeting with his supervisors regarding a discipline for driving a City vehicle without a CDL license. (Ex. I., N.T., p. 20, ll. 15-17).

       Response:    Undisputed.

75.    Mr. Dockens, Kevin Jackson, Ronald Wise, and Austin Griffin were present at the June 17, 2022 meeting. (Ex. I., N.T., p. 20, ll. 8-12).

       Response:    Undisputed.

76.    At the time of the June 17, 2022 meeting, Mr. Dockens possessed a CDL permit. (Ex. I., N.T., p. 21, ll. 4-8).

       Response:    Undisputed.

---

[12] Williams testified that she was not made aware of Dion's discipline until three weeks later. Ex.-5 at 130.  As Williams is an interested witness, a jury will not be required to believe her claim of ignorance.  See Hill v. City of Scranton, 411 F.3d 118, 129 n.16 (3d Cir. 2005) ("when drawing all reasonable inferences in favor of the non-movant the courts must disregard evidence the jury is not required to believe, including testimony of interested witnesses.") (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-51 (2000)).

77.  At the June 17, 2022 meeting, Mr. Dockens told Mr. Wise that he had a CDL permit. (Ex. V., N.T., p. 18, ll. 14-19).

     Response:    Undisputed.

78.  Mr. Dockens received a counseling and not a Class A violation. (Ex. I., N.T., p. 23, ll. 5-7).

     Response:    Undisputed, in that after Plaintiff was fired, Dion's suspension was reduced to a counseling.  Ex.-26 at 22.

79.  Mr. Dockens did not tell Mayor Williams about the June 17, 2022 meeting he had with his supervisors. (Ex. I., N.T., p. 23, ll. 22-24; p. 24, ll. 1-3; p. 24, ll. 8-21).

     Response:    His testimony is disputed as a jury need not believe him because he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

80.  There are no text messages between Mayor Williams and Mr. Dockens for June 17, 2022. (Ex. I., N.T., p. 16, ll. 15-18).

     Response:    His testimony is disputed as a jury need not believe him because he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

## Plaintiff's Termination from Employment

81.  Plaintiff was terminated on June 21, 2022. (See, Termination Letter attached hereto as Exhibit "W").

<u>Response</u>:    Undisputed.

82.    Approximately one (1) week prior to Plaintiff's termination, Solicitor Grover attended

a Loudermill hearing during which it was discussed that there was a hostile work

environment and issues of trust in the Public Works Department of which Plaintiff

was the Director. (Ex. H., N.T., p. 67, ll. 21-24; p. 68, ll. 1-3).

<u>Response</u>:    His testimony is disputed as a jury need not believe him because he is

an interested witness and so this may not be accepted as an undisputed

fact.  As well, Plaintiff did not attend a single <u>Loudermill</u> meeting as

the Public Works Director.  Ex.-2 ¶ 20.  Further, the so-called "hostile

environment" claim was concerning fellow union employees not

wanting to work with each other.  It had nothing to do with accusations

toward Plaintiff.   Ex.-2 ¶ 20;   <u>see also</u> Draft Minutes AFSCME

LABOR/MANAGEMENT Meeting dated 3/1/22 (attached as Ex.-32)

(highlighted section on 2nd page).   And the Union agreed with

Plaintiff.  Ex.-32 (highlighted section on 3rd page).  As far issues of

trust, the Minutes also show it was Plaintiff who stuck up for the Union

by the City's extending of the probationary period to 9 months from 6

months.  Ex.-32 (last page).  There's nothing in the Minutes suggestive

of any issue of trust, and a jury could find Williams' assertions to the

contrary to be pure fiction.

83.    Business Administrator Hartman discussed the Loudermill with Mayor Williams. (Ex.

H., N.T., p. 68, ll. 4-11).

Response:    Disputed, see Resp. ¶ 82.

## <u>CERTIFICATE OF SERVICE</u>

I, Marc E. Weinstein, Esquire, hereby certify that on this day I caused the foregoing document to be filed on the ECF system.  Defendant's counsellors are filing users under the ECF system.  Upon the electronic filing of a pleading or other document, the ECF system will automatically generate and send a Notice of Electronic Filing to all filing users associated with this case.  Electronic service by the Court of the Notice of Electronic Filing constitutes service of the filed document and no additional service upon the filing user is required.

By:    /s/ Marc E. Weinstein
       Marc E. Weinstein, Esquire
       500 Office Center Drive
       Suite 400
       Fort Washington, PA 19034
       267.513.1942
       marc@meweinsteinlaw.com
       Counsel to Plaintiff