# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NATHANIEL SPRIGGS** | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | Case 1:22-cv-01474 |
| | : | (Judge Wilson) |
| v. | : | |
| | : | |
| **CITY OF HARRISBURG** | : | |
| and | : | |
| **MAYOR WANDA WILLIAMS** | : | |
| (in her individual capacity only) | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S RESPONSE TO THE CITY OF HARRISBURG'S STATEMENT OF ALLEGEDLY UNDISPUTED FACTS[1]

Respectfully submitted,

**WEINSTEIN LAW FIRM, LLC**

By:   /s/ Marc E. Weinstein
Marc E. Weinstein, Esquire
500 Office Center Drive, Suite 400
Fort Washington, PA 19034
Counsel to Plaintiff
267.513.1942 tel
marc@meweinsteinlaw.com

---

[1] This response to the City of Harrisburg's statement of allegedly undisputed facts is based on the record evidence construed in a light most favorable to Plaintiff, the non-moving party. Inferences, doubts and issues of credibility have been resolved in his favor, at this point in time. Cf. Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (internal quotation marks and citations omitted). If there is record evidence that casts doubt on the purported fact, or if the purported fact comes from interested witness, Plaintiff is permitted to dispute the purported fact. See Hill v. City of Scranton, 411 F.3d 118, 129 n.16 (3d Cir. 2005) ("when drawing all reasonable inferences in favor of the non-movant the courts must disregard evidence the jury is not required to believe, including testimony of interested witnesses.") (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-51 (2000)). Cited exhibits are to Plaintiff's attached exhibits, unless otherwise specified.

**LIST OF EXHIBITS TO PLAINTIFF'S RESPONSES TO DEFENDANT CITY OF
HARRISBURG'S STATEMENT OF ALLEGEDLY UNDISPUTED FACTS**

Exhibit 1       Deposition of Plaintiff

Exhibit 2       Declaration of Plaintiff

Exhibit 3       Text Messages with Aaron Johnson dated 5/30-5/31/21

Exhibit 4       Offer Letter dated 9/3/21

Exhibit 5       Deposition of Wanda Williams

Exhibit 6       Deposition of Daniel Hartman

Exhibit 7       Deposition of Joni Willingham

Exhibit 8       Deposition of Neil Grover

Exhibit 9       Deposition of Deborah Robinson

Exhibit 10      Deposition of Lisa Blackston

Exhibit 11      Deposition of Latisha Scott

Exhibit 12      Deposition of Dion Dockens

Exhibit 13      Payroll Action Form for Dion dated 5/6/22

Exhibit 14      Email String dated 4/1-4/8/22, and Job Description

Exhibit 15      Interview Evaluation dated 4/20/22

Exhibit 16      Email to Senior Staff dated 4/18/22

Exhibit 17      Request to State Ethics Commission for Training

Exhibit 18      City's Answers to Plaintiff's Interrogatories

Exhibit 19      Deposition of Marita Kelley

1

Exhibit 20    Email from Kelley to Spriggs dated June 15, 2022

Exhibit 21    Payroll Action form dated 4/22/22

Exhibit 22    Text Message from Susquehanna Township Supervisor

Exhibit 23    Text Message from Williams to Plaintiff dated 5/22/22

Exhibit 24    Email String Regarding Landscaping Contract dated March-April 2022

Exhibit 25    Disciplinary Memo dated 6/17/22

Exhibit 26    Deposition of Ronald Wise

Exhibit 27    Email to Willingham dated 6/17/22

Exhibit 28    Spriggs Email dated 4/26/22

Exhibit 29    Text Message with Hartman dated 2/26/22

Exhibit 30    Willingham Email dated 6/17/22

Exhibit 31    Public Works Director Job Description

Exhibit 32    Draft Minutes AFSCME LABOR/MANAGEMENT Meeting dated 3/1/22

Exhibit 33    Resume of Patrice Dockens

Exhibit 34    Log of Calls with Mayor Williams

**JONI WILLINGHAM**

1.   Joni Willingham is the current Human Resources Director of the City of Harrisburg, and she has been employed in that position since 2014. (Deposition of Joni Willingham, Ex. B, p. 11, lns. 10 - 11).

    <u>Response</u>:    Undisputed.

2.   She has served under four (4) different Mayors. (Id., p. 11, lns. 22 - 23).

    <u>Response</u>:    Disputed, as it's unclear as to whether the City is averring that she served under four (4) different Mayors since she began in 1987 or that she's been Human Resources Director under four (4) different Mayors.

3.   Willingham began working for the City in August of 1987. (Id., p. 10, lns. 1 - 3).

    <u>Response</u>:    Undisputed.

**By way of further answer**[2], Plaintiff, a Black male, began working for the City of Harrisburg ("City") in 1996 as a Maintenance Technician.  Pl.'s Dep. at 15 (attached as Ex.-1);  Pl.'s Decl. ¶ 1 (attached as Ex.-2).  Within a few months of his hire, he transferred into the Traffic and Engineering Department as a Traffic Technician, and he remained there for approximately 12 years.  Ex.-1 at 16.  As a Traffic Technician, he wired and maintained

---

[2]   In this Response to the City of Harrisburg's ("City") Statement of Facts, Plaintiff also presents evidence that clarifies and/or puts into context the evidence submitted by the City.  This is necessary for a complete examination of Williams' motion for summary judgment because, as this very Court has observed, Defendant's papers "do[] not provide the whole picture of the record evidence." <u>Scott v. Blossburg Borough</u>, 2024 U.S. Dist. LEXIS 30533, at *2 n.1, 2024 WL 692209 (M.D. Pa. Feb. 20, 2024) (Wilson, J.).  Said more colloquially, Plaintiff includes the stuff the City doesn't want the Court - or a jury - to know about.

streetlights, traffic signals and electrical systems throughout the City.  Id.

By 2017, Plaintiff had ascended to the management-level position of Solid Waste Logistics Coordinator.  Ex.-1 at 25-26.  He served in that role under then-Mayor Papenfuse. Id.  In or about July 2017, Plaintiff left his position with the City and accepted the position of Public Works Director with Susquehanna Township.  Id. at 29;  Ex.-2 ¶ 2.  During that 21-year term of employment with the City, Plaintiff had a clean disciplinary record.  Ex.-1 at 236.

Plaintiff graduated William Penn High School in Harrisburg and has known Wanda Williams for more than 35 years.  Ex.-1 at 11;  Ex.-2 ¶ 3.  He has also known members of her family and been to her home.  Ex.-1 at 11-12.  In 2021, after Wanda Williams won the Democratic primary for Mayor and was the presumptive Mayor-elect, she inquired with Plaintiff to see if he would return to the City as Public Works Director.  Ex.-1 at 31-32.

In or about June 2021, Plaintiff met with Williams, along with a mutual acquaintance named Aaron Johnson.  Id.;  see also Text Messages with Aaron Johnson dated 5/30-5/31/21 (attached as Ex.-3).  At that first meeting, Williams told Plaintiff she was very concerned with the way the Public Works Department was being run.  Ex.-1 at 33-34.  She told Plaintiff she had no faith in the then-current Director, David West, that West constantly came to work intoxicated or disappeared for days at a time.  Id.  Williams told Plaintiff she wanted him to come back and do a good job, sort of like what he'd done in Susquehanna Township, and what he had done for the City before.  Id.  Plaintiff told Williams he was not interested in

returning to the City.  Id. at 34.

About a month later, in or about July 2021, Plaintiff met with Williams a second time. Id. at 33.  Williams told Plaintiff she really wanted him to return to the City.  Id. at 35. Williams asked Plaintiff how much of a salary he would need to return and Plaintiff told her $130,000.  Id.  Williams agreed to it.  Id.

Plaintiff started in or about September 2021, even before Williams was sworn in, as then-Mayor Papenfuse's administration had contacted Plaintiff separately and had wanted him to return.  Ex.-1 at 36-37, 39;  see also Offer Letter dated 9/3/21 (attached as Ex.-4). Williams was agreeable to Plaintiff starting before her term began.  Ex.-1 at 39.  Under the final months of the Papenfuse administration, Plaintiff's salary was $120,000 per year.  Id.; Ex.-4.

Wanda Williams became the City's Mayor in January 2022.  Williams Dep. at 12 (attached as Ex.-5).  Prior to her election as Mayor, she served on Harrisburg City Council since 2011 and was later elected Council President.  Id. at 12-13.  Before being elected to Council, she served on the Harrisburg School Board.  Id. at 15-16.

In the months prior to Williams taking office as Mayor, she had discussions with Plaintiff regarding her son Dion Dockens ("Dion").  Ex.-1 at 52-53.  Dion was a Laborer in the City's Public Works Department.  Ex.-5 at 106.  In the first of those discussions, which Williams initiated via phone in October or November 2021, Williams asked Plaintiff to

promote Dion into management. Ex.-1 at 53-54.[3] Williams disclosed that Dion was having financial problems, and she was "pissed" that prior promises to promote Dion never materialized. Id. at 53. Despite his personal reservations, Plaintiff told Williams okay. Id. at 56. Plaintiff was of the opinion that Dion was not fit to be a manager, but chose not to argue with Williams about it. Id. Plaintiff had known Dion for decades. Plaintiff knew of Dion's history of tardiness and disciplines, and of not being a very efficient worker. Id.

In a second discussion with Williams, which occurred in or about November-December 2021, Williams wanted to discuss with Plaintiff finding work for Dion after he had sustained an injury. Id. at 60; Ex.-5 at 107. The City was requiring Dion to return to work, but he couldn't do his normal job due to "great pain" in his arms and hands. Ex.-1 at 62-63. Williams, who still wasn't even Mayor yet, directed Plaintiff to find alternate work for Dion that would not aggravate his injuries. Id. at 63. Plaintiff agreed to find Dion an appropriate position, and ultimately put Dion in a position collecting leaf bags. Id. at 64-65. Although Williams still complained to Plaintiff that the leaf bag job was causing pain to Dion's hands, Plaintiff spoke directly with Dion and Dion confirmed the leaf bag job was fine. Id. at 66-67.

Upon Williams' inauguration in January 2022, her top aides were as follows:

a) Daniel Hartman - Business Administrator. Hartman Dep. at 11-12 (attached as Ex.-6). Hartman served on Williams' transition team before joining the administration. Id. at 12.

b) Joni Willingham - Human Resources Director. Willingham has been in this position since

---

[3] Williams testified it was *Plaintiff* who had initially brought up the idea of promoting Dion, as a way of enticing Williams to hire Plaintiff in the first place. Ex.-5 at 112.

2014, and a City employee since 1987.  Willingham Dep. at 9, 10 (attached as Ex.-7).

Willingham's mother was friendly with Williams from serving on the Harrisburg School

Board together.  Id. at 38.[4]

c)  <u>Neil Grover</u> - Solicitor.  Grover, a White male, has been the City's Solicitor since 2014.

Grover Dep. at 8 (attached as Ex.-8);  Ex.-2 ¶ 4.

d)  <u>Deborah Robinson</u> - Special Assistant to the Business Administrator.  Robinson Dep.  at

11-12 (attached as Ex.-9).  Robinson had been a longtime friend of Williams.  Id. at 9-10, 12.

Robinson's great-niece now works in the Administration too, as Special Assistant to the

Business Administrator.  Id. at 14.  Robinson got Hartman to hire her.  Id. at 16-17

e)  <u>Lisa Blackston</u> - Williams' Senior Assistant, reporting directly to Williams.  Blackston

Dep. at 11-12 (attached as Ex.-10).  Blackston was experienced working in City government,

having worked for former Mayor Linda Thompson.  Id. at 12.

f)  <u>Latisha Scott</u> - Confidential Secretary to Williams.  Scott Dep. at 7 (attached as Ex.-11).

She sits at the front desk in the Mayor's suite.  Id. at 8.  Williams is the grandmother to one

of Scott's children, as Scott has a child with Williams' son Rauwshan.  Id. at 7.

4.    Human Resources is a bureau level and not cabinet level position like a Department

       Director. As such, Willingham's position was lower than that of Nate Spriggs. Spriggs

       outranked Willingham. (Id., p. 87, lns. 19 – 24; p. 88, lns. 1 - 8).

---

[4]  The City maintains 504 employees, and 113 summer staff, yet the City has not required its Human Resources Director to have any professional certifications in human resources. Ex.-7 at 11, 23.

Response:    Disputed in part.  Irrespective of whether Willingham's position was "bureau" or "cabinet" level, she was in the senior staff meetings and was never characterized by Williams as any lower-ranking than Plaintiff.  Ex.-2 at ¶ 15.

5.    In her role as Human Resources Director, Willingham knows that Spriggs was an experienced Department Director and had served in the position before June 2022. He had worked for many years for the City. (Id., p. 87, lns. 5 - 8).

Response:    Undisputed.

6.    There is specific methodology and corresponding forms to increase the pay of a City employee. (Id., p. 89, lns. 3 - 12).

Response:    Disputed in part.  It is disputed that there is a "specific methodology" to increase the pay of a City employee, as Willingham did not say that in the deposition page cited.  It is undisputed that there are forms needed to be completed in order for a City employee's pay to be adjusted.

7.    The process is that the Department Director for a Department fills out a Personnel Action request. Then a Payroll Action form is generated by the Payroll Manager. The Payroll Manager has discretion to stop the form if she sees or learns something about it that is not correct. Sarah Fedor is the Payroll Manager. If she has questions she can and does, ask Joni Willingham, as the Human Resources Director. Fedor works for

Willingham. A Department Director then signs the Payroll Action form. After that, the Human Resources Director reviews it. (Id., p. 77 lns. 6 – 24;  p. 78 lns. 1 -23). The Payroll Action form requires five (5) signatures before any increase is effectuated. (Id. and p. 89, lns. 8 - 12).

Response:    Undisputed.

8.    During the process, the budget is checked to see if there is money for a possible pay raise. However, simply because there is money in the budget, it does not mean that a salary increase is pre-approved or automatic. (Id. p. 46, lns. 11 - 16).

Response:    Undisputed.

9.    Spriggs, as a Department Director, regularly came to the Payroll Manager's desk to sign Payroll forms. (Id. p. 59, lns. 4 - 8).

Response:    Undisputed.

10.    Austin Green's (who works for Spriggs) position as to pay was the highest it could go in the budget, but the budget alone did not dictate that any given individual would get the entire budgeted salary. (Id. p. 46, lns. 11 - 16).

Response:    Disputed.  His name is Austin Griffin, and the statement is not clear. The statement doesn't indicate what budget year being referred to, what Griffin's salary was and/or what was budgeted for the position.

11.    Simply because a salary line item had money in it, it did not mean the Mayor of Harrisburg was going to approve a salary increase. (Id. p. 46 lns. 22 – 24; p. 47 ln. 1).

Response:    Undisputed.

12. Spriggs had submitted the required forms for pay increases on other occasions. (Id.,
p. 83, lns. 5 - 7).

Response:    Undisputed.

13. In April of 2022, Spriggs sent in Payroll Action forms for himself and his employee,
Austin Green. (Id. p. 83, lns. 5 – 7).

Response:    Undisputed, as the Mayor initially agreed to it after assigning both
Plaintiff and Austin Griffin two additional departments to manage.
Ex.-1 at 162-64.

**By way of further answer**, prior to the Mayor firing Plaintiff for the phony reason
that he had put in a Payroll Action form to increase his own pay, the last discussion he had
with the Mayor about his pay had been in April 2022. Ex.-1 at 162. The Mayor had called
him to her office and told him that she was assigning him two additional departments to
manage. Id.; Ex.-6 at 55-56, 57. There were several managers present, including Hartman.
Ex.-1 at 162; Ex.-2 ¶¶ 7, 12.

The two additional departments Williams was assigning to Plaintiff were Traffic
Engineering and Engineering. Id.; see also Spriggs Email dated 4/26/22 (attached as Ex.
28). Plaintiff raised the question of whether he should be compensated for the extra work.
Id. at 163. Williams said she was willing to discuss compensation for the extra duties. Id.
She and Plaintiff agreed on a raise from $130,000 to $150,000. Id. at 167. She also agreed

10

on a raise for Plaintiff's Deputy Director of Public Works, Austin Griffin.  Id. at 164, 166.

Williams instructed him to prepare a Request for Payroll Action form to reflect the salary increases.  Plaintiff did so.  Ex.-2 ¶ 7;  see also Request for Payroll Action form dated 4/22/22 (attached as Ex. 21).  The raises, however, never went through.  Ex.-1 at 168. Williams told Plaintiff she couldn't keep her word.  Id. at 169.  The day after so notifying Plaintiff, Williams asked him to come to her office after they had finished a Department Directors meeting in City Council chambers.  Id.  They went to her conference room and she told him she didn't like how their last conversation on the raise had gone.  Id.

Williams said to Plaintiff that he was lucky that she **"saved" him from the "Jews and White guys who wanted to fire you at Susquehanna Township."**  Ex.-2 ¶ 8.[5] Plaintiff replied, "Where are you getting this from?  They wanted me to stay."  She then said they wanted you fired.  Id.  Plaintiff then pulled out his cell phone and showed Williams a text message from the Chairman of the Susquehanna Township Board of Supervisors commending him for his hard work, leadership and service while employed there.  Id.; see also Text Message from Susquehanna Township Supervisor (attached as Ex.-22).  Williams then quickly changed the topic.  Ex.-2 ¶ 8.  Williams and Plaintiff never again discussed the topic of a pay raise for him during the remainder of his employment.  Id.

14.     Spriggs sought $150,000 for himself and $102,000 for Green, with another increase

---

[5]  At her deposition Williams denied saying this to Plaintiff, before adding the non-sequitur, "Why would I do that?  I've been tormented all my whole life as a light skinned African-American. Why would I do that?"  Ex.-5 at 149.

for Green to $110,000 to be effective in April and to be paid retroactively back to January 1st. (Id., p. 83, lns. 7 - 11).

Response:    Disputed.  Spriggs did not "seek" these amounts, but rather this is what Williams initially agreed to for both him and Griffin.  Ex.-1 at 167 (Plaintiff's raise), 164-65 (Griffin raise).  It is further disputed that Griffin was to receive $102,000 as the initial forms to grant that amount were in error and then corrected to $110,000.  Id. at 165.

15.    The Mayor's office said no to the raises and a directive was issued that there were to be no raises. The forms were sent back to Willingham. (Id. p. 83, lns. 12 - 17).

Response:    Disputed in part.  It wasn't the "Mayor's office" that reversed the initial approval of raises for both Plaintiff and Griffin in April 2022;  it was the Mayor herself.  Ex.-1 at 168.

16.    Spriggs never contacted Human Resources to question why the raises did not go into effect. As such, Spriggs had to be aware that there were not going to be raises for the positions. (Id. p. 84, lns. 3 - 4).

Response:    Disputed in part.  The Mayor herself told him why the pay raises would would not go through at that time.  Ex.-1 at 168.

17.    The Mayor's directive on pay raises for Public Works came out in a meeting with Joni Willingham, Deb Robinson, and Dan Hartman, in February 2022. (Id. p. 80, lns. 3 - 8).

<u>Response</u>:    Disputed.  In April 2022, when the Mayor assigned Plaintiff two more departments to manage, she initially agreed to pay raises for both Plaintiff and Griffin.  Ex.-1 at 163-67.  As well, Plaintiff - Public Works Director - was never told of any directive on pay raises for his department. Ex.-2 ¶ 14.  Further, in February 2022, Plaintiff spoke with Hartman about Griffin's pay and was told it would be updated midway through the year.  Ex.-2 ¶ 14.  As well, there was no such "standing directive" as to Public Works raises, as Willingham acknowledged in an email dated Friday, June 17, 2022 (Griffin's salary increased earlier in 2022  "with possibility of a review later.") (Ex.-30).

**As well, Willingham's testimony on this point need not be credited by a jury as she's an interested witness, i.e. Human Resources Director of the City.  She was directly involved in one or more employment decisions alleged by the Plaintiff to be illegal, and therefore has a vested interest in this litigation to see her actions vindicated.  As well, she is employed by the City and is paid by the City, and serves at the pleasure of Williams and so she has a direct financial incentive to assist the Defendants.**

Just like a jury need not believe Plaintiff's testimony on a particular point, they need not accept Willingham's either.  <u>See Hill v. City of</u>

Scranton, 411 F.3d 118, 129 n.16 (3d Cir. 2005) ("when drawing all reasonable inferences in favor of the non-movant the courts must disregard evidence the jury is not required to believe, including testimony of interested witnesses.") (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-51 (2000)).

18.    At the meeting, salaries were discussed and there was a spread sheet for the relevant salaries. It was noted that Austin Green was to make $96,000. Spriggs wanted him to be raised to $102,000. The comment was made that Green was a new hire and his performance needed to be reviewed before any raise was implemented. (Id. p. 80, lns. 9 - 20).

Response:    Disputed, see Resp. ¶ 17 supra.

19.    Time went on and Spriggs tried to get Austin Green a pay raise again in June 2022. (Id. p. 39., lns. 12 – 14; p. 43, lns. 2 – 19; p. 44, lns. 20 - 24).

Response:    Disputed.  Plaintiff did not "try" to get Austin Griffin a pay raise in June 2022.  Rather, on June 15, 2022, City Finance Director (Ex.-1 at 174), Marita Kelley sent Plaintiff a list of positions (including Griffin's) that had been approved for a pay increase at the mid-point of the year.  Ex.-1 at 177-79;  see also Email from Kelley to Spriggs dated June 15, 2022 (attached as Ex.-20).  In that email, Kelley specifically wrote to Plaintiff that he could submit a Request for Payroll Action

14

form for Griffin's raise to be effectuated.  Ex.-20.

**By way of further answer**, a Request for Payroll Action ("RPA") form is usually generated by Human Resources or the Finance Department, and is submitted to a Department Director.  Ex.-1 at 42.  The Department Director typically accedes to the request and sends back the completed RPA form to Human Resources of the Finance Department.  Id.  Once the RPA form is completed and returned, then a Payroll Action ("PA") form would be generated by Human Resources.  Id. at 52.  In order for a specified payroll action to take effect, a number of officials need to sign the PA form, including the director of the department whose employee is being affected.  See, e.g., Ex.-13.

During the week of June 13, 2022 (the week before Plaintiff was fired), Plaintiff - through his administrative aide - submitted several RPA forms, after discussing it with City Finance Director Marita Kelley.  Id. at 176-77;  see also Kelley Dep. at 11 (attached as Ex.-19); Email from Kelley to Spriggs dated June 15, 2022 (attached as Ex.-20).  On the morning of Friday, June 17, 2022, Plaintiff signed the PA forms after he was called down to Human Resources to sign the forms.  Ex.-1 at 180, 182.  None of the Payroll Action forms Plaintiff signed was to increase his own pay.  Ex.-2 ¶ 6.

20.    In the week prior to the termination of Springs [sic], his office generated a Payroll Action request which was transformed into a Payroll Action form. Rosemary Nye with Nate Sprigg's office generated the form. (Id. p. 59 lns. 15 - 24).

Response:    Undisputed, as it had been suggested and authorized by City Finance

Director Marita Kelley.  <u>See</u> Resp. ¶ 19 supra.

21.    On Friday, June 17, 2022, Spriggs came to the Human Resources office to sign the

form. (Id. p. 60, lns. 22 – 24; p. 61, lns. 1 - 4).

<u>Response</u>:    Undisputed, as it had been suggested and authorized by City Finance

Director Marita Kelley just two days before.  <u>See</u> Resp. ¶ 19 supra.

Plaintiff signed several Payroll Action forms that day.  Ex.-1 at 182.

22.    The Payroll Manager, Sarah Fedor's office is next to Willingham's. Willingham saw

Spriggs and he made a comment about Marita Kelly, the Finance Director, saying

something about Austin Green's [sic] salary and why Green was not making the full

budgeted salary. (Id., p. 61, lns. 20 – 24; p. 62, lns. 1 - 5).

<u>Response</u>:    Disputed, as this summary distorts Willingham's testimony.  What

Willingham said in her deposition was that when Plaintiff came to HR

he said, "Marita said she doesn't understand why Austin was not

making the full salary in the budget and that he should submit a payroll

action form -- a request for a payroll action form to increase Austin's

salary."  Ex.-7 at 61-62.

23.    After Spriggs left the office, Willingham took the form from Fedor and went to see

Dan Hartman, her superior, to check on the raise. She wanted to confirm that the

Mayor had changed her directive and was now approving the pay raise. (Id. p. 63, lns.

1 - 7).

16

Response:    Disputed in part.  It's undisputed Willingham took the form and went to see Hartman to check on the raise, despite not raising any questions about it with Plaintiff when he was there.  Ex.-7 at 63-64.  It is disputed as to Mayor's "directive" as it's unclear what directive is being referred to in this allegedly undisputed fact and when it was made.  It is further disputed because there was no such "directive" regarding Griffin's pay.  Ex.-1 at 163-67 (Williams initially authorizing pay raise in April); Ex.-2 ¶ 14.

24.    Hartman told Willingham the raise was absolutely not approved. (Id. p. 64, lns. 14 - 18).

Response:    It is undisputed that Hartman told Willingham this, but it is disputed whether it's true.  More specifically, if Willingham's testimony as to what Hartman told her is being offered here for the truth of the matter, i.e., whether the raise for Griffin was approved, it's hearsay.

25.    Willingham testified that Hartman was her superior and he would know if the directive had been changed. (Id. p. 64., lns. 1 - 12).

Response:    Disputed, Willingham cannot offer firsthand testimony as to what Hartman would know, and further Hartman acknowledged Plaintiff and Williams communicated directly without his involvement or knowledge.  Ex.-5 at 26-27.

26.    Hartman told Willingham that he would take care of it. (Id., p. 68, lns. 3 - 4).

   Response:    Undisputed.

27.    Willingham also spoke with Marita Kelly [sic], the Finance Director, about what Kelly told Spriggs. (Id. p. 85, lns. 9 - 16).

   Response:    Undisputed.

28.    Kelly told Willingham that she did not direct Spriggs to fill out the forms. Kelly noted that Spriggs had asked Kelly about the budget and Kelly told Spriggs the salary was budgeted. Spriggs could fill out the forms if he chose to do so as a Director. (Id. p. 85, lns. 9 - 16).

   Response:    Disputed because the citations are to pure hearsay.  Willingham is testifying about what Kelley told her, what Kelley and Plaintiff said to each other.  This asserted fact cannot be sustained based on such testimony.  As well, even if the asserted fact is considered notwithstanding its hearsay nature, it is disputed in that Kelley did not tell Plaintiff that "he could fill out the forms if he chose to so as a Director."  Rather, Kelley wrote, "you may process a PAF to update [Griffin's] corrected budgeted salary allocation."  Ex.-20.

29.    Sarah Fedor was not aware of the standing Mayor's directive that no raises were to be provided to management in Public Works. (Id. p. 79, lns. 22 - 23).

   Response:    Disputed.  Again, this is hearsay.  The City is trying to establish Fedor's

18

lack of knowledge via what she allegedly told Willingham. That's hearsay. If the City wants to establish Fedor's lack of knowledge they need do to so via Fedor's testimony, not by Willingham's testimony.

**As well, there is irrefutable evidence that there was no "standing directive" that no pay raises were to be provided to management in public works.** On June 7, 2022, Williams' team presented to City Council - at a public meeting - a proposed raise for the Public Works Department Highway Manager John Watson. Ex.-2 ¶ 19.

The meeting can be viewed at this link:

https://www.youtube.com/watch?v=TOYWpeSzUmI

(last visited 2/7/25). See 59:20-1:00:02.

30.   Willingham did not sign off on the Payroll Action form for Austin Green because she had not been told that the Mayor had changed her mind about allowing pay raises in the Public Works Department. As such, she took the form to her supervisor, Dan Hartman, the Business Administrator. (Id., p. 90, lns. 20 – 24; p. 91, ln. 1).

Response:   It is undisputed that Willingham did not sign the Payroll Action form for Austin Griffin after Plaintiff signed it. However, it is disputed as to why she didn't sign it. Willingham's testimony need not be credited by a jury as she's an interested witness, i.e. Human Resources Director of the City. Just like a jury need not believe Plaintiff's testimony on a

particular point, they need not accept Willingham's either.  See Hill v. City of Scranton, 411 F.3d 118, 129 n.16 (3d Cir. 2005) ("when drawing all reasonable inferences in favor of the non-movant the courts must disregard evidence the jury is not required to believe, including testimony of interested witnesses.") (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-51 (2000)).  It is undisputed that Willingham took the form to Hartman.

31.   Willingham did not prevent Spriggs from signing the Payroll Action form because he was a Department Director (he outranked her) and she did not know if the Mayor had changed the April directive providing for no pay raises. (Id. p. 88, lns. 5 - 8; p. 90, lns. 10 - 19).

Response:   Disputed.  Yes, Willingham testified this way, but a jury need not believe her and so this may not be considered an undisputed fact at the Rule 56 stage.  See Hill v. City of Scranton;  Reeves v. Sanderson Plumbing Prods., Inc.

32.   Hartman told Willingham that Spriggs knew that the Mayor had a standing directive as to no Public Works management raises and that Spriggs had now sought a raise for Green twice. (Id., p. 44, lns. 17 - 24).

Response:   Disputed.  Although according to Willingham, Hartman told her this, it's hearsay.  Further, it's unclear the foundation for which Hartman

could claim what Spriggs knew and didn't know.  Said another way, if the City was hoping to establish what Spriggs knew on this point, it must do so through Hartman's testimony - not Willingham's.

Moreover, Spriggs did not know of any purported standing directive as to Public Works management raises.  Ex.-2 ¶ 14.  As well, there was no such "standing directive" as to Public Works raises, as Willingham acknowledged in an email dated Friday, June 17, 2022 (Griffin's salary increased earlier in 2022 "with possibility of a review later.") (Ex.-30).

**As well, there is irrefutable evidence that there was no "standing directive" that no pay raises were to be provided to management in public works.**  On June 7, 2022, Williams' team presented to City Council - at a public meeting - a proposed raise for the Public Works Department Highway Manager John Watson.  Ex.-2 ¶ 19.

The meeting can be viewed at this link:

https://www.youtube.com/watch?v=TOYWpeSzUmI

(last visited 2/7/25).  See 59:20-1:00:02.

In any event, a  jury need not believe Willingham and so this may not be considered an undisputed fact at the Rule 56 stage.  See Hill v. City of Scranton;  Reeves v. Sanderson Plumbing Prods., Inc.

33.    Plaintiff, Nate Spriggs, was terminated on Tuesday, June 22, 2022. (Id., p. 42, lns. 19

- 21).

> Response:    Disputed, as Plaintiff was terminated on Tuesday, June 21, 2022.  Ex.-1
>
> at 184-88.

34.    Prior to the termination, Dan Hartman, the Business Administrator then, contacted

Willingham and told her on the preceding Thursday or Friday that Spriggs would be

terminated. (Id., p. 43, lns. 3 - 7).

> Response:    Disputed.  Willingham's testimony as to when Hartman contacted her
>
> and what he said is not to be accepted as an undisputed fact on
>
> summary judgment because she is an interested witness.  See Hill v.
>
> City of Scranton;  Reeves v. Sanderson Plumbing Prods., Inc.  As well,
>
> it could not have been the Thursday before the firing because Plaintiff
>
> did not sign the Payroll Action forms until Friday.  Ex. 1 at 180, 182.

35.    Hartman wanted Willingham to be present at the termination. (Id, p. 45, lns. 1 - 5).

> Response:    Disputed.  Willingham's testimony as to what Hartman said to her, even
>
> if not offered for the truth such that it would be hearsay, is not to be
>
> accepted as an undisputed fact on summary judgment because she is an
>
> interested witness.  See Hill v. City of Scranton;  Reeves v. Sanderson
>
> Plumbing Prods., Inc.

36.    Willingham was aware that Green's salary as management personnel was the highest

it could go and that just because money was in a salary item in the budget, it did not

mean that the person in the position would be paid the full budgeted amount. (Id. p. 46, lns. 8 - 16).

Response:   Disputed in part.  Presuming the asserted undisputed fact is that Griffin's salary was the highest it could go (rather than what Willingham was purportedly aware of), this is disputed.  In fact, the budgeted amount for Griffin's salary was higher than what Griffin was being paid.  Indeed, on June 15, 2022, City Finance Director (Ex.-1 at 174), Marita Kelley sent Plaintiff a list of positions (including Griffin's) that had been approved for a pay increase at the mid-point of the year.  Ex.-1 at 177-79;  see also Email from Kelley to Spriggs dated June 15, 2022 (attached as Ex.-20).  In that email, Kelley specifically wrote to Plaintiff that he could submit a Request for Payroll Action form for Griffin's raise to be effectuated.  Ex.-20.

37.  The Mayor was not in the City when the terminable offenses occurred and Hartman, as Business Administrator, could act as Mayor while she was away. So, Hartman was authorized on his own to terminate Spriggs. (Id. p. 49, lns. 9 - 12).

Response:   Disputed.  Willingham cannot testify as to whether Williams was in the City, in particular without some showing of firsthand knowledge.  As well, she cannot testify, without some foundation, as to whether Williams had authorized Hartman on his own to terminate Spriggs.  In

23

either event, the fact is disputed as it was Williams who made the decision to fire Plaintiff.  Ex.-18 (**"the decision to terminate Plaintiff was made solely by Mayor Williams."**)

**By way of further answer**, during Plaintiff's short tenure in the Williams administration, Williams frequently pressured him regarding a supervisor position for Dion. Ex.-1 at 82.  On dozens of occasions, by phone and at various locations, Williams pressed him and threatened him.  Id. at 84.  Generally, he tried to appease her.  Id.

In January 2022, shortly after Williams had been inaugurated, she revisited the issue of a management job for Dion.  Id. at 72.  Although Plaintiff had identified a management position for Dion within the Parks and Recreation Department (with the assistance of Hartman - id. at 73;  see also Text Message with Hartman dated 2/26/22, attached as Ex.-29), Williams now told Plaintiff that Dion wanted to remain in the Public Works Department with Plaintiff.  Ex.-1 at 72, 75, 80.  But Dion wanted a Supervisor's position.  Id. at 75.  Williams further added, "people like Dion and they want him to stay, so you need to find him a position in Public Works."  Id.  Plaintiff resisted, telling Williams, "Mayor, Dion and I are friends.  I really don't want him to work for me directly.  I believe it's going to be a problem."  Id. at 76.  Williams ordered Plaintiff to do it anyway and Plaintiff said okay.  Id.

Within a few months of that directive, Williams called Plaintiff early one morning after he had announced the promotions of two other employees in his Department.  Id. at 77. She screamed at him at the top of her lungs about why he hadn't promoted Dion yet.  Id.

On another occasion, Williams threatened to fire Plaintiff if he didn't "hurry up" and promote Dion, as Dion was threatening to move to Ohio if he was not promoted. Id.; Ex.-5 at 126. Williams has a daughter who lives in Ohio. Dockens Dep. at 9 (attached as Ex.-12); Ex.-5 at 126.

There was no formal policy established regarding whether Williams would be involved in any personnel decision concerning any of her family members. Ex.-8 at 21-22. According to Solicitor Grover, Williams had a "practice" such that if a personnel decision pertained to a relative - or there was a question about whether the Mayor should be the approving authority - the personnel decision would be delegated to Hartman. Id. at 22-23. Grover could point to nothing in writing setting forth that alleged practice. Id. at 22. Neither could Hartman. Ex.-6 at 38, 45. According to Williams, she had an unwritten policy that she would not involve herself in any personnel decisions involving family members and that Hartman would make the decisions on her behalf. Ex.-5 at 36-37. According to Williams, this unwritten policy of recusal also applied to "anybody" with whom she was familiar. Id. at 38-39.

Despite the Mayor's proclaimed, unwritten policy of recusal, on May 6, 2022, Williams approved - via her own signature - a retroactive pay raise for her son Dion. This official action gave Dion a $1.50 hourly pay increase for more than 515 hours previously worked. See Payroll Action Form for Dion dated 5/6/22 (attached hereto as Ex.-13). Despite the Mayor's proclaimed, unwritten policy of recusal, during Williams' first six months in

office, aside from pressuring Plaintiff to promote Dion, Williams also pressured Plaintiff to make official decisions that would have benefitted her granddaughter and niece. Ex.-1 at 116.

Dionne Dockens ("Dionne") is Williams granddaughter, as she's Dion's daughter. Ex.-12 at 7. Dionne has been a park ranger for the City of Harrisburg since 2023. Id. at 8; Ex.-7 at 16.

Brianna Bonaparte ("Brianna") is another granddaughter of Williams. Brianna has been employed in the City's summer program for at least the last three years. Ex.-12 at 11; Ex.-5 at 33-34.

Dion's son Dante, another of Williams' grandchildren, has been employed in the City's summer program too for the last three years. Ex.-5 at 32.

Williams' niece, Patrice Dockens ("Patrice"), works for the City in Economic Development. Id. at 29, 31. Patrice too was hired after Williams became Mayor. Id. at 31. Prior to Patrice getting a job in Economic Development, Williams pressured Plaintiff to create a management job for her in Public Works that would be conducive to Patrice's qualifications. See Ex.-33. Plaintiff told Williams that he had nothing available that would satisfy her request, angering Williams.[6]

---

[6] Given this roster of known Williams' family members on the City payroll, it was improper for Williams' attorney - **David MacMain** - to obstruct deposition questions to Williams on this topic. Ex. 5 at 24-25 (**MacMain**: "We're not here to give her whole family tree.").

Actually, her "whole family tree" is relevant. Whether Williams has harnessed her position to establish a de facto jobs program for her family is probative as to a central issue in this case, i.e.,

As Williams continued to pressure Plaintiff about promoting Dion, in or about April 2022, Plaintiff told Williams that Dion was not qualified to be promoted to a Sanitation Supervisor as he didn't have a commercial driver's license ("CDL"). Ex.-1 at 86. And so Williams asked Plaintiff to change the job qualifications so Dion could qualify. Id. at 86. Plaintiff found that request to be improper. Id. at 86-87.

Plaintiff, however, tried to appease Williams. At the time, he was creating two "Route Supervisor" positions. Id. at 124, 126. Although only two such positions were needed and Plaintiff already had in mind the two who deserved to be promoted, he would create three positions and give Dion the third one. Id. at 124-25; Ex.-7 at 39-40; Ex.-5 at 109.

The Route Supervisor position would not have a CDL requirement, and so Dion would be eligible. Ex.-1 at 125. Plaintiff collaborated with Willingham to get the job description language in place that would allow Dion to be promoted. Id. at 127-28; see also Email String Between Plaintiff and Willingham dated 4/1-4/8/22, and Job Description (attached as Ex. 14). Plaintiff interviewed Dion on April 20, 2022 and "Highly Recommended" Dion for the promotion. See Dion Interview Evaluation dated 4/20/22 (attached as Ex. 15).

Plaintiff's job duties as Public Works Director did not include serving as a watchdog, ombudsman or inspector general for the City. His job did not entail reporting on, or

---

whether Williams retaliated against Plaintiff because he spoke out against and resisted her incessant demands that he promote Dion. Because of MacMain's improper interference during Williams' deposition, there may be other family members of the Mayor on the City payroll presently unknown to both the Court and the public.

addressing, the ethical violations of Mayor Williams.  See Job Duties (attached as Ex.-31).

Nonetheless, ten days after the Commission's training session, Plaintiff spoke with Grover

about Williams' demands regarding Dion.  Ex.-1 at 105-06, 110.  Plaintiff had decided he

was no longer going to do what Williams wanted.  Id. at 123.

This conversation occurred on April 29, 2022, and **Plaintiff told Grover that in his**

**view Williams' demands regarding her son violated the state ethics law**.  Id. at 107.  The

discussion began on the 4th floor hallway of City Hall, right outside of the Human Resources

Department offices.  Id. at 108.  Grover had them go into a conference room on the 4th floor,

and he turned off the lights.  Id.

After Grover vented to Plaintiff about Williams "driving [Grover] crazy" about

another employee matter, Grover asked Plaintiff what he wanted to discuss.  Id. at 108-09.

**Plaintiff told Grover that Williams' continued pressure on him to promote Dion was**

**an ethics violation and that he didn't want to go to jail**.  Id. at 109, 110.

Grover agreed, and told Plaintiff they'd "both be in prison if they allowed this to

happen."  Id. at 109.  Grover told Plaintiff that a promotion for Dion was not going to

happen.  Ex.-8 at 28-29.  Plaintiff also told Grover of his concerns that Williams has

pressured him to hire her granddaughter into the Public Works Department, although

Williams had later told him not to worry that she had gotten her a job elsewhere.  Ex.-1 at

113, 114.  Plaintiff told Grover how concerned he was about the things that would be deemed

unethical.  Id. at 110.  Grover told Plaintiff, "I don't want to hear anymore" and to "stop right

there." Grover stated he would go right away and talk to Williams. Id. at 109.

Grover then went to see Williams and told her about her conversation with Plaintiff. Ex.-8 at 58; Ex.-5 at 109-10. When Grover told Williams that Dion could not be promoted she was "very upset and tearful." Ex.-8 at 58. After Williams' meeting with Grover, she called Plaintiff, screaming at him about how Grover had told her that Plaintiff thought hiring her son would be an ethics violation. Ex.-1 at 142-43.[7]

The next working day, on or about May 2, 2022, there was a meeting between Williams, Plaintiff, Willingham, Grover, and another attorney from the solicitor's office. Id. at 120; Ex.-8 at 29. In that meeting, held in the Mayor's conference room, **Williams warned them that she was going to fire them all if they did not promote Dion**. Ex.-1 at 120. Plaintiff recounted the meeting as follows:

> The Mayor comes in and says she called the meeting because she
> was made aware by Neil [Grover] that – well, she looked at me and
> said, you don't want to hire Dion, and you're going to hire my son.
> And before I could say anything Neil goes, Mayor, we're not going
> to hire your son. And I'm advising you as legal counsel to stop
> talking because this can lead to litigation. And she said I will not
> stop talking. I'm the mayor, damn it. She said, you're going to

---

[7] Plaintiff notes that by this time - in 2022 - Williams had been an elected official in Harrisburg for more than a decade. She was subject to the proscriptions of the Pennsylvania Public Official and Employees Ethics Act all that time, yet was distressed and defiant when informed that she could not use her official position to promote her son.

> hire my son or I'm going to fire you, she pointed to me. She says,
>
> I'm going to fire you, she pointed to Joni [Willingham]. She says,
>
> I'm going to fire you, she pointed to Neil. And she said, I'm going
>
> to fire you, and you just started, and I'll fire your behind, too, to the
>
> African American attorney.[8]

Id. at 121.

Grover told Williams that they were not going to do it, that Plaintiff was correct, it's an ethical violation. Id. He told her that they "can't continue this behavior." Id. Williams then went off into a rant, despite Grover repeatedly advising her to stop talking. Id. Williams then told Plaintiff that if he couldn't promote Dion, then Plaintiff should give Dion a position as Parks and Recreation Supervisor. Id. at 122. Grover immediately stepped in, told Williams no, and that she would have to get approval from the Ethics Board and that Dion was not hireable. Id.

After the meeting, Williams called Plaintiff into her office and told him how upset she was with him for going to Grover and not promoting Dion. Williams told him that he better find a way to get Dion more money. Right then she ordered Plaintiff to pay him "out of class" for "working as a supervisor." Ex.-2 ¶ 5; Ex.-1 at 111; Ex.-6 at 39-40.

"Out-of-class" pay is due to any employee that does job duties that are outside of their

---

[8] Although Grover claimed to have no recollection of Williams threatening jobs in that meeting, he admitted having been "in the room where Mayor Williams has threatened to fire everyone in the room multiple times." Ex.-8 at 58.

job description.  The employee is to receive a $1.50 extra an hour.  Ex.-7 at 18-19.  On May 6, 2022, just four days after the May 2nd meeting wherein Williams threatened the jobs of her staff, **Williams signed a Payroll Action form giving her son Dion a $1.50 hourly pay increase** for more than 515 hours previously worked, allegedly as "out of class" pay.  See Payroll Action Form dated 5/6/22 (attached hereto as Ex. 13);  Ex.-6 at 39-40.

As Mayor, Williams maintains the sole authority to terminate employees, but sometimes she would authorize Grover, Hartman or Willingham to carry out her decision. Ex.-6 at 28-29.  On June 21, 2022, Hartman summoned Plaintiff for a meeting.  Ex.-1 at 184. Plaintiff went to City Hall right away, and entered the Mayor's suite on the second floor of City Hall.  Ex.-1 at 185;  Ex.-7 at 23-24.  Latisha Scott, Williams' confidential secretary who sits at the front of the suite, greeted Plaintiff.  Ex.-11 at 6-9;  Ex.-1 at 185-86.  Plaintiff asked Scott what the meeting was about and she replied "it's fucked up."  Ex.-1 at 185-86.

Willingham then arrived and when Plaintiff asked her about what was going on she said she didn't know.  Id. at 186.  Plaintiff and Willingham were then ushered into the Mayor's conference room, wherein Plaintiff again asked Willingham what was going on.  Id. at 187.  Willingham shrugged her shoulders, faced her palms up, and again stated she didn't know.  Id.  Hartman then entered the conference room with Deborah Robinson and told Plaintiff, "we called you down here because we're terminating your employment."  Id.; Ex.-7 at 56.  Plaintiff asked "for what?" and Hartman replied "for filling out a payroll action slip." Ex.-1 at 187.  When Plaintiff questioned Hartman, Hartman replied, "the Mayor just wants

you fired." Id. at 188.  Although Williams wasn't present for the termination meeting, she made the decision to fire Plaintiff.  See City Answers to Pl.'s Interrogs. at 1 (attached as Ex.-18).  She was the decisionmaker.  Id.

Williams fired Plaintiff because, according to her, he had put in a payroll request form to increase his own pay.  Ex.-5 at 136-37, 138.  According to Williams, earlier that same week she had rejected a pay raise for Plaintiff when he came to her asking for a raise.  Id. at 137.  According to Williams, Plaintiff did this intentionally while she was out of state (Ex.-5 at 133), stating, "You know, he had asked me for a raise and I said no.  And he went over my head when I was not available, I was not in the state, to go take it upon himself to give a payroll action form."  Ex.-5 at 166-67.  According to Williams, this was the only reason for which she fired Plaintiff.  Id. at 165.

While working for Williams, Lisa Blackston's office was the first office outside of the Mayor's office.  Ex.-10 at 13.  Among other duties, Blackston's job was to oversee the functioning of the office, handle Williams' schedule and do anything Williams required of her.  Id. at 14.

On June 21, 2022, the day Plaintiff was fired, Blackston learned of Plaintiff's firing from Deborah Robinson when Blackston arrived at the office.  Id. at 17.  Blackston observed other staffers in the Mayor's suite watching Plaintiff outside City Hall, right after the termination.  Id. at 18.  They were laughing.  Id.  The Mayor also joined them at one point. Id.  The staffers thought it was hilarious that Plaintiff had been terminated.  Id. at 21.  The

Mayor herself was laughing about it.  Id.

Robinson, Williams' longtime friend (Ex.-9 at 9-10, 12), said that "[Plaintiff] should have listened to what the Mayor wanted him to do."  Ex.-10 at 19.  Blackston herself had observed Williams displeasure with Plaintiff prior to the termination, for "not doing things that she was requesting."  Id. at 20.  All together, Plaintiff's employment with the City totaled more than 22 years, and his firing was the first disciplinary action on his record.  Ex.-1 at 236.

Williams rehired David West, Plaintiff's predecessor, as Public Works Director.  Ex.-5 at 49.  This was the same man Williams told Plaintiff she had no faith in because West constantly came to work intoxicated or disappeared for days at a time.  Ex.-1 at 33-34.

Plaintiff was informed of Williams' decision to fire him on Tuesday, June 21, 2022. Ex.-1 at 184-86.  This was the first day after the Juneteenth holiday weekend.[9]  The day before the holiday weekend, on Friday, June 17, 2022, Plaintiff authorized a discipline to be issued to Dion for driving a recycling truck without having a CDL.  Ex.-1 at 145-46;  see also Disciplinary Memo dated 6/17/22 (attached as Ex.-25).  Although Williams claimed not to know of Dion's discipline before Plaintiff was fired (Ex.-5 at 130), HR Director Willingham was aware of it on Friday, June 17, 2022.  See Email to Willingham dated 6/17/22 (attached

---

[9] See https://www.federaltimes.com/2022/06/13/is-juneteenth-a-federal-holiday/ (last visited 1/28/25).

hereto as Ex.-27).[10]

38.  Willingham did not speak to the Mayor about the matter from the time it arose to the

time Spriggs was fired. (Id. p. 51, lns. 5 - 9).

Response:    Undisputed.

39.  At the termination meeting, Spriggs alleged he was directed by Marita Kelly and

Sarah Fedor to fill out the forms. (Id. p. 57, lns. 6 - 11).

Response:    Disputed.  Plaintiff testified that Marita Kelley had "authorized" the

forms.  Ex.-1 at 188.

40.  Sarah Fedor's position is far below Spriggs' rank as a cabinet level Director. She

works for a Bureau Director, Willingham, who is also at a lower rank than Spriggs

held. (Id., p. 22, lns. 13 – 15; p. 88, lns. 5 - 8).

Response:    Disputed in part.  It is undisputed that Plaintiff's position was higher in

the administration than Fedor's.  As far as whether it's "far below"

Plaintiff's rank, that is Willingham's opinion and a jury need not

believe any of her opinions, just like they need to believe Plaintiff's

opinions or any opinions from his witnesses.  See Hill v. City of

Scranton;  Reeves v. Sanderson Plumbing Prods., Inc.

---

[10] Williams testified that she was not made aware of Dion's discipline until three weeks later. Ex.-5 at 130.  As Williams is an interested witness, a jury will not be required to believe her claim of ignorance.  See Hill v. City of Scranton, 411 F.3d 118, 129 n.16 (3d Cir. 2005) ("when drawing all reasonable inferences in favor of the non-movant the courts must disregard evidence the jury is not required to believe, including testimony of interested witnesses.") (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-51 (2000)).

41.   Hartman did not say that the Mayor just wanted Spriggs fired but Hartman did say that the Mayor approved the termination. (Id. p. 58, lns. 18 - 22).

   Response:   Disputed. Ex.-1 at 188 ("And he [Hartman] said, no, the mayor just wants you fired.")[11]

## MARITA KELLY (sic)

42.   Marita Kelly was the Finance Director of the City. She is now retired. (Deposition of Marita Kelly, Ex. C, p. 9, lns. 8 - 9).

   Response:   Disputed in part.  It is undisputed that Kelley was Finance Director for the City in 2022 when Plaintiff served as Public Works Director.  It is disputed that she's now retired because nowhere on the cited pages does it state that asserted fact.  The City cannot just make up facts, however small or irrelevant.

43.   She took over that position on January 4, 2022. (Id. p. 9, lns. 2 - 4).

   Response:   Undisputed.

44.   Prior to that time, she had previously worked for the City as the budget manager of the City from 1988 until 1992. (Id., p. 16, lns. 11 - 13).

   Response:   Undisputed.

45.   She spent much of her career, over 20 years, with the Commonwealth of Pennsylvania, in various roles starting in 1983. Some of her positions included work

---

[11]   Given Plaintiff's clear testimony on this point (Ex.-1 at 188), it's disappointing to see the City assert this is an undisputed fact consistent with Fed. R. Civ. P. 56 and Fed. R. Civ. P. 11.

for PennDOT, the Department of Revenue, and the Department of Community and Economic Development. In her role with the Department of Community and Economic Development, she served as the full-time recovery coordinator for the City of Harrisburg as an Act 47 coordinator during the city's bankruptcy and financial reorganization. (Id, p. 9, lns. 8 – 19; p. 12 lns. 10 - 18).

<u>Response</u>:   Undisputed.

46.   She has 38 years of finance and accounting experience. (Id. p. 16, lns. 7 - 9).

<u>Response</u>:   Undisputed.

47.   Dan Hartman asked her to be the Finance Director for the City. (Id., p. 11, lns. 2 - 4).

<u>Response</u>:   Undisputed.

48.   As Finance Director, one of her jobs was to help prepare the budget. (Id. p. 16 , lns. 2 - 4).

<u>Response</u>:   Undisputed.

49.   She reported directly to Dan Hartman. (Id., p. 18, lns. 13 - 14).

<u>Response</u>:   Undisputed.

50.   She and Nate Spriggs were on the same level organizationally, in the City. (Id., p. 36, lns. 6 - 9).

<u>Response</u>:   Undisputed.

51.   Kelly could not direct or order Spriggs in any way. (Id. p. 36, lns. 10 - 13).

<u>Response</u>:   Undisputed.

52.     Kelly could give suggestions, but she could not give direction to another Director. (Id. p 36, lns. 13 - 15).

    <u>Response</u>:     Undisputed.

53.     If a Director asked her about the budget for personnel, she could tell them whether a position was fully funded but that does not mean that a person would be paid all of the budgeted amount. Often a person is paid less than the budget amount. (Id. p. 36, lns. 16 - 23).

    <u>Response</u>:     Undisputed.

54.     Kelley states she was not privy to any conversation with the Mayor relating to anyone's salary in terms of a particular person asking the Mayor a particular question. (Id. p. 19, lns. 9 - 14).

    <u>Response</u>:     It's undisputed that Kelley said this in her deposition, although it's unclear as to what fact is being asserted in the statement and therefore disputed.

55.     Kelly testified that she would not be privy to the Mayor's conversations with anyone about salaries concerning any particular person. (Id. p. 19, lns. 9 - 14).

    <u>Response</u>:     It's undisputed that Kelley said this in her deposition, and undisputed that it's true.

56.     During the week of June 13, 2022 to June 17, 2022, Nate Spriggs called and asked her some questions about the budgetary appropriations for certain management positions

within Public Works. (Id. p. 19, lns. 15 – 24; p. 20, lns. 1 - 2).

Response:    Disputed in part, as this was only <u>after</u> Kelley sent over to Plaintiff a list of jobs that had been approved at the midway point of the year, **including Austin Griffin's full budgeted salary**.  Ex.-1 at 177.

58.    She did not have authority to direct another Director to fill out a Payroll Request form. (Id., p. 20 ln. 24; p. 21, lns. 1 - 4).

Response:    Undisputed.

59.    Kelly testified that it is likely that she emailed Spriggs on June 15, 2022, and told him which positions in Public Works had been approved in the budget. (Id. p. 20, lns. 12 - 17).

Response:    It's undisputed that Kelley said this in her deposition.  It is also undisputed that she emailed Plaintiff on June 15, 2022.  <u>See</u> Ex.-20. Kelley's summary, however, is incomplete and so it's disputed in part. **Kelley specifically told him he may process a Payroll Action form for his Deputy Director of Public Works, Austin Griffin, so that Griffin would get paid the budgeted amount of his position of $102,000**. Ex.-20 (highlighted).

60.    Kelly testified that she may have suggested to Spriggs that he seek the budget limit in the budget for Austin Griffin. However, she could not direct or order him to fill out any form. (Id. p. 20, ln. 24; p. 21, lns. 1 - 4).

Response:    It's undisputed that Kelley said this in her deposition.    Kelley's recollection, however, isn't fully accurate so it's disputed in part. Kelley specifically told him he may process a Payroll Action form for his Deputy Director of Public Works, Austin Griffin, so that Griffin would get paid the budgeted amount of his position of $102,000.  Ex.-20 (highlighted).  It is undisputed that Kelley could not direct or order Plaintiff to fill out any form.

61.    She was not privy to the Mayor's prior directive against any raise for Austin Griffin. (Id. 18, lns. 20 - 24).

Response:    It's undisputed that Kelley said this in her deposition.  It's undisputed that she was not privy to the Mayor's purported prior directive against any raise for Austin Griffin, as there was no such directive.  Pl.'s Decl. ¶ 14; Ex.-30 (Willingham acknowledged in an email dated Friday, June 17, 2022 that Griffin's salary increased earlier in 2022 "with possibility of a review later.").

62.    Kelly recalled that Spriggs asked her if a cost-of-living increase was in the budget for Austin Griffin. She checked the budget book and found that the salary listed in the budget book was a budget maximum of $102,000 and she told Spriggs the same. (Id. p. 21, lns. 11 – 24; p. 22, lns. 1 - 2)

Response:    It's undisputed that Kelley said this in her deposition, and undisputed

that it's true.  Ex.-20.

63.  Spriggs asked Kelly if it was all right to process a Payroll Action form for Griffin, and Kelly told him that the budget had the money in it as an appropriation. (Id. p. 22, lns. 7 - 16).

Response:   It's undisputed that Kelley said this in her deposition, and undisputed that her testimony on this fact is true.  Ex.-20.

64.  Up to that point, she had no further involvement in the matter. (Id. p. 23, lns. 16 - 21).

Response:   It's undisputed that Kelley said this in her deposition.  It is undisputed that Kelley had no involvement regarding any possible raise for Griffin prior to the week of June 13, 2022 (the week before Williams fired Plaintiff).

65.  Sarah Fedor called Kelly later and told her that the Austin Griffin form would not be processed further. Kelley was not given any other information. (Id. p. 32, lns. 6 - 10).

Response:   Undisputed.

66.  Kelly was later told by the Human Resource Director, Joni Willingham, that Spriggs was fired because there was a standing directive about no raises in Public Works and Spriggs violated that directive as it related to Austin Griffin. (Id. p. 37, lns. 20 – 24; p. 38, lns. 1 - 14).

Response:   It's undisputed that Kelley said this in her deposition.  It is disputed that Willingham told her this because there was no "standing directive"

40

about raises in Public Works (Ex.-2 ¶ 14), as Willingham tacitly admitted in Ex.-30, and because **Williams fired Plaintiff allegedly because he put in a raise for himself after she had rejected a pay raise for him earlier that week**.  Ex.-5 at 136-37, 138, 166-67.

**As well, there is irrefutable evidence that there was no "standing directive" that no pay raises were to be provided to management in public works.**  On June 7, 2022, Williams' team presented to City Council - at a public meeting - a proposed raise for the Public Works Department Highway Manager John Watson.  Ex.-2 ¶ 19.

The meeting can be viewed at this link:

https://www.youtube.com/watch?v=TOYWpeSzUmI

(last visited 2/7/25).  See 59:20-1:00:02.

## DAN HARTMAN

67.  Dan Hartman was the Business Manager of the City at the time of Nate Spriggs' termination. (Ex. D, Deposition of Dan Hartman., p. 11, lns. 17 - 24).

   Response:   Undisputed.

68.  Hartman was employed with the City from January 3, 2022, until June 7, 2024. (Id., p. 11, lns. 17 - 21).

   Response:   Undisputed.

69.  Prior to coming to the City, Hartman worked on Governor Tom Wolf's transition

team and he worked for PennDOT for many years. (Id., p. 12, lns. 19 - 24; p. 13, lns. 1 - 3).

Response:    This irrelevant fact is undisputed.

70.    Hartman is now the Special Assistant to the Deputy Secretary of Penn Dot. (Id., p. 10, lns. 18 - 19).

Response:    This irrelevant fact is undisputed.

71.    Hartman has a degree from Penn State in public policy and a master's degree in management with a focus on banking and financing from Boston University. (Id., p. 15, lns. 13 – 24; p. 16, ln. 1).

Response:    This irrelevant fact is undisputed.

72.    Hartman's direct supervisor while he was working for the City was Mayor Wanda Williams. (Id, p. 12, lns. 4 - 6).

Response:    Undisputed.

73.    Hartman's duties as Business Administrator included: overseeing the administration department including licenses and taxation, Human Resources, Labor relations, IT, and general oversight of the other City Departments, including public safety. (Id. p. 24, lns. 19 – 24; p. 25, lns. 1 – 8; p. 105 lns. 10 - 14).

Response:    Undisputed.

74.    Hartman was authorized to make executive decisions. (Id., p. 105, lns. 22 – 24; p. 106, ln. 1).

<u>Response</u>:    Undisputed.

75.    Nate Spriggs was already employed for a few months by the City as Public Works

Director when Hartman came to the City. (Id., p. 23, lns. 6 - 11).

<u>Response</u>:    Undisputed.

76.    Nate Spriggs was in the line of reporting to Dan Hartman. (Id. p. 25, lns. 22 – 24; p.

26, lns. 1 - 3).

<u>Response</u>:    Disputed in part.  Plaintiff also directly reported to Williams on certain

matters.  Ex.-6 at 27.

77.    Hartman had some hiring and firing authority but the final authority for termination

was with the Mayor. (Id., p. 27, lns. 17 – 24).

<u>Response</u>:    It is undisputed that Hartman said this, but it's unclear as to what this

means.

78.    Joni Willingham and Solicitor Neil Grover also had hiring and firing authority under

the Mayor's authorization. (Id., p. 28, lns. 5 - 12).

<u>Response</u>:    Disputed, as later on the same page Hartman testified, "As the chief

executive of the City, those decisions would run through her

[Williams]."

79.    Hartman would frequently advise the Mayor, with Neil Grover and Joni Willingham,

on termination decisions relating to individual employees. (Id., p. 28, lns. 17 - 22).

<u>Response</u>:    Undisputed.

80.     Spriggs was hired by Mayor Papenfuse at $120,000. (Id., at p. 50, lns. 13 - 17).

        Response:    Disputed, in part.  Papenfuse, the outgoing Mayor, and Williams, the

                     incoming Mayor, agreed Plaintiff would return before Williams was

                     inaugurated.  Ex.-1 at 36-37, 39.

81.     Mayor Williams gave Spriggs a raise to $130,000 on March 11, 2022. (Id., p. 51, lns.

        4 - 10).

        Response:    Disputed.  Williams did not "give" Spriggs a raise.  Rather, after

                     Williams won the primary election and decided she wanted Plaintiff to

                     return to the City to serve as Public Works Director, **she offered him**

                     **a salary of $130,000** so that he would leave his job at Susquehanna

                     Township and accept the position.  Ex.-1 at 33-35.

82.     The raise was retroactive to January 2022. (Id. p. 51, lns. 19 - 22).

        Response:    Disputed.  It wasn't a "raise" as it was the agreed-upon salary between

                     Plaintiff and Williams for him to accept the job.  Ex.-1 at 33-35.

83.     Hartman was not told by Mayor Williams that she was willing to raise Spriggs to

        $150,000 because he was temporarily going to take on some additional Departments.

        However, Williams had stressed that she did not want to give anyone a raise until they

        had been there at least a year. (Id., p. 52, lns. 9 – 24; p. 53, lns. 1 - 9).

        Response:    Disputed.  Hartman was at the meeting wherein Williams told Plaintiff

                     of his additional duties and agreed to the pay increase (later recinded)

for both Plaintiff and Griffin.  Ex.-2 ¶¶ 7, 12.

As well, a jury need not believe Hartman, just like they need not believe Plaintiff's testimony, as he's an interested witness.  See Hill v. City of Scranton;  Reeves v. Sanderson Plumbing Prods., Inc.  **Hartman was directly involved in one or more employment decisions alleged by the Plaintiff to be illegal, and therefore has a vested interest in this litigation to see his actions vindicated.**

Further, there is irrefutable evidence that pay raises were given to Public Works employees who had not been employed at least a year. On June 7, 2022, Williams' team presented to City Council - at a public meeting - a proposed raise for the Public Works Department Highway Manager John Watson, an **employee of less than one year**.  Ex.-2 ¶ 19. The meeting can be viewed at this link:

https://www.youtube.com/watch?v=TOYWpeSzUmI

(last visited 2/7/25).  See 59:20-1:00:02.

84.    Hartman was aware that Spriggs had made multiple attempts to get his pay increased. (Id., p. 53, lns. 19 - 24).

Response:    Disputed.  Plaintiff did not make "multiple" attempts to get his pay increased.  Rather, he asked for a commensurate pay increase only when Williams assigned him two additional departments to manage.

45

Ex. 1 at 167; Ex.-2 ¶ 13.  Hartman was at the meeting.  Ex.-2 ¶¶ 7, 12.

85.    The Mayor insisted that no raises were to occur because he'd not been there for a year and she had just given him a raise when she came into office. (Id., p. 54, lns. 1 - 5).

Response:    Disputed.  Williams offered Plaintiff a raise to $150,000 in April 2022 when she informed him he would be taking over two additional departments.  She and Plaintiff agreed on a raise from $130,000 to $150,000.  Ex.-1 at 167.  She also agreed on a raise for Plaintiff's Deputy Director of Public Works, Austin Griffin.  Id. at 164, 166. Williams instructed him to prepare a Request for Payroll Action form to reflect the salary increases.  Plaintiff did so.  Ex.-2 ¶ 7;  see also Request for Payroll Action form dated 4/22/22 (attached as Ex. 21). The raises, however, never went through.  Ex.-1 at 168.  Williams told Plaintiff she couldn't keep her word and move forward with the raises. Id. at 169.  It is further disputed because Plaintiff did not get a raise when she came into office, it was the salary she agreed upon in June 2022 when she asked him to return to the City as Public Works Director.  Ex.-1 at 33-35.  And there was no directive regarding employees having to be employed for a year to get a raise (Ex.-2 ¶ 14), and the City has offered no such documentation establishing there was such an edict.

As well, there is irrefutable evidence that pay raises were given to Public Works employees who had not been employed at least a year. On June 7, 2022, Williams' team presented to City Council - at a public meeting - a proposed raise for the Public Works Department Highway Manager John Watson, an **employee of less than one year**.  Ex.-2 ¶ 19. The meeting can be viewed at this link:

https://www.youtube.com/watch?v=TOYWpeSzUmI

(last visited 2/7/25).  See 59:20-1:00:02.

86.  The Mayor did not tell Hartman that the raise to $130,000 was for Spriggs to manage additional departments. (Id., p. 54, lns. 23 – 24; p. 55, lns. 1 - 5).

Response:  Disputed.  It was not a "raise."  It was what was agreed upon at the time of hire.  Ex.-1 at 33-35.  Further, the raise that Plaintiff and Williams did discuss was about raising his salary to $150,000 occurred in April 2022 when she informed him he would be taking over two additional departments.  Ex.-1 at 167.

To the extent Hartman testifies about what the Mayor told him or did not tell him, a jury need not believe it as he's an interested witness.  See Hill v. City of Scranton;  Reeves v. Sanderson Plumbing Prods., Inc. Hartman was the Mayor's top aide at this time and has a personal interest in defending the City and Williams from any lawsuit arising

47

from what occurred under his watch.

87. Hartman was aware that there was some discussion that Spriggs would temporarily take on traffic and engineering. (Id., p. 55, lns. 21 – 24; p. 56, lns. 5 – 13).

    <u>Response</u>:    Disputed, in part.  The assignment to additional departments was never indicated to be only temporary.   Ex.-2 ¶ 12.

88. Spriggs was paid more than the Business Administrator at Sprigg's $130,000 salary. (Id., p. 60, lns. 12 - 15).

    <u>Response</u>:    Undisputed.

89. Hartman terminated Spriggs on June 21, 2022. (Id., p. 65, lns. 16 - 20).

    <u>Response</u>:    Disputed.   Hartman informed Spriggs of <u>Williams' decision</u> to terminate Plaintiff on June 21, 2022.  Ex.-1 at 188;  Ex.-18;  Ex.-5 at 136-37, 138, 165.

90. Hartman handed Spriggs the termination letter and told Spriggs the termination had been authorized by the Mayor. (Id., p. 67, lns 4 - 6).

    <u>Response</u>:    Disputed.  Hartman told Plaintiff "the Mayor just wants you fired." Ex.-1 at 188.

91. It was Dan Hartman's idea to terminate Spriggs. (Id., p. 68, lns 19 – 24; p. 69, lns. 1 - 4).

    <u>Response</u>:    Disputed.  This asserted fact reflects an effort to airbrush the evidence in the light most favorable to the City.  The City wants the Court to

ignore Willliams' clear testimony and its own answers to Plaintiff's interrogatories.

Initially, Hartman's testimony on whose "idea" it was to terminate Plaintiff is not to be accepted as an undisputed fact on summary judgment because he is an interested witness.  See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra.

As well, Hartman himself told Plaintiff, "the Mayor just wants you fired." Ex.-1. at 188.

**Moreover, there is ample evidence to contradict this purportedly undisputed fact.  The Mayor herself testified that she fired Plaintiff allegedly because he put in a raise for himself after she had rejected a pay raise for him earlier that week.  Ex.-5 at 133, 136-37, 138, 166-67;  see also City Answers to Pl.'s Interrogs. at 1 (attached as Ex.-18); see also Ex.-5 at 165 ("You know, he had asked me for a raise and I said no. And he went over my head when I was not available, I was not in the state, to go take it upon himself to give a payroll action form.")**

92.  There were two reasons why Spriggs was terminated. For some time, the union representing workers in Public Works, AFSCME, had growing concerns about Spriggs' leadership and management style. This culminated in a shouting match at a

Loudermill hearing that the Solicitor, Neil Grover, participated in. The AFSCME complaints centered on hostile work environment and issues of trust in Public Works under Spriggs' leadership. Hartman was notified of the event by Solicitor Grover. (Id., p. 67, lns. 16-24; 68, lns. 1 - 3).

Response:    Disputed, as explained in Response to ¶ 91; in particular see Ex.-5 at 165 (**Plaintiff allegedly putting in for his own raise, "the only reason" for which she fired him**).

As well, Plaintiff did not attend a single Loudermill meeting as the Public Works Director.  Ex.-2 ¶ 20.

The hostile environment claim was concerning fellow union employees not wanting to work with each other. It had nothing to do with accusations toward Plaintiff.  Ex.-2 ¶ 20;  see also Draft Minutes AFSCME LABOR/MANAGEMENT Meeting dated 3/1/22 (attached as Ex.-32) (highlighted section on 2nd page).[12]  And the Union agreed with Plaintiff.  Ex.-32 (highlighted section on 3rd page).

As far as issues of trust, the Minutes also show it was Plaintiff who stuck up for the Union by the City's extending of the probationary period to 9 months from 6 months.  Ex.-32 (last page).

Further Hartman's testimony about what allegedly occurred with the

---

[12]  These Minutes - buried among 7,000+ documents produced by the City - eviscerate the City's contention that it was Plaintiff who was the cause of a "hostile work environment."

union need not be believed by a jury and so it cannot be accepted as an undisputed fact at the summary judgment phase. See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra. As well, this cannot be accepted as an undisputed fact as it's based on solely on inadmissible hearsay, i.e., Hartman recounting what Grover allegedly told him.

93.    Hartman's recollection was that the Loudermill hearing incident occurred on June 16, 2022. (Id., p. 75, lns. 19 – 24; p. 76, ln. 1).

Response:    Disputed, as Plaintiff did not attend a single Loudermill meeting as the Public Works Director. Ex.-2 ¶ 20.

As well, as an interested witness, Hartman's testimony - like Plaintiff's testimony - need not be believed by a jury and so it cannot be accepted as an undisputed fact at the summary judgment phase. See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra. Further, this cannot be accepted as an undisputed fact as it's based solely on inadmissible hearsay, i.e., Hartman recounting what Grover allegedly told him.

94.    Hartman then told the Mayor about the events that occurred at the Loudermill hearing. (Id., p. 68, lns. 4 - 7).

Response:    Disputed, as Plaintiff did not attend a single Loudermill meeting as the

Public Works Director.  Ex.-2 ¶ 20.

As well, as an interested witness, Hartman's testimony - like Plaintiff's testimony - need not be believed by a jury and so it cannot be accepted as an undisputed fact at the summary judgment phase.  <u>See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc.</u> supra.

95.    However, the incident at the Loudermill hearing was a growing issue involving Spriggs' management at Public Works. Hartman began to hear concerns as early as February 2022. Then, in April while Solicitor Grover was negotiating labor issues, more information on problems at Public Works arose. Some of the matters revolved around the change in position of two employees, Howard Drayton and Kevin Jackson. (Id., p. 76, lns. 3 - 15).

<u>Response</u>:    Disputed, as an interested witness, Hartman's testimony - like Plaintiff's testimony - need not be believed by a jury and so it cannot be accepted as an undisputed fact at the summary judgment phase.  <u>See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc.</u> supra.  As well, this cannot be accepted as an undisputed fact as it's based solely on inadmissible hearsay, i.e., Hartman recounting what Grover allegedly told him.

As well, it disputed that Hartman or Grover began to hear concerns about Plaintiff.  Ex.-32 (showing the opposite is true).

As well, regarding the change of position for Drayton and Jackson, it was the Mayor who removed these two employees from the budget for allegations of theft. It had nothing to do with Plaintiff. Ex.-2 ¶ 20.

96.    Hartman was aware that Jackson and Drayton were to be moved from their current positions. They were union employees and the redeployment of them by Spriggs caused a number of major issues with the union that rose to the level of the Solicitor, Neil Grover. (Id., p. 98, lns. 6 – 17; p. 100 lns. 20 – 24; p. 101, lns. 1 - 5).

Response:    Disputed, regarding the change of position for Drayton and Jackson, it was the Mayor who removed these two employees from the budget for allegations of theft. It had nothing to do with Plaintiff. Ex.-2 ¶ 20.

As well, it disputed that Spriggs caused "major issues" with the union about Plaintiff. Ex.-32 (showing the opposite is true).

As well, as an interested witness, Hartman's testimony - like Plaintiff's testimony - need not be believed by a jury and so it cannot be accepted as an undisputed fact at the summary judgment phase. See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra. As well, this cannot be accepted as an undisputed fact as it's based solely on inadmissible hearsay, i.e., Hartman recounting what Grover allegedly told him.

97.    The issue with Jackson resulted in a settlement between the City and the union that

53

Neil Grover had to negotiate. (Id., p.100, lns. 20 – 24; p. 101, ln. 1).

Response:    Disputed, as an interested witness, Hartman's testimony - like Plaintiff's testimony - need not be believed by a jury and so it cannot be accepted as an undisputed fact at the summary judgment phase.  See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra.  As well, this cannot be accepted as an undisputed fact as it's based solely on inadmissible hearsay, i.e., Hartman recounting what Grover allegedly told him.

Again,, it was the Mayor who removed Jackson from the budget for allegations of theft.  It had nothing to do with Plaintiff.  Ex.-2 ¶ 20.

98.    Union representative Darrin Spann was very upset with Spriggs regarding a lack of truthfulness and that it was creating a hostile work environment. There was a very high rate of employees leaving Public Works at the time. After Spriggs was terminated, the situation stabilized. (Id., p. 101, lns. 8 - 24).

Response:    Disputed, as the hostile environment claim was concerning fellow union employees not wanting to work with each other. It had nothing to do with accusations toward Plaintiff.  Ex.-2 ¶ 20.

The hostile environment claim was concerning fellow union employees not wanting to work with each other.  It had nothing to do with accusations toward Plaintiff.  Ex.-2 ¶ 20;  see also Draft Minutes

AFSCME LABOR/MANAGEMENT Meeting dated 3/1/22 (attached as Ex.-32) (highlighted section on 2nd page).  And the Union agreed with Plaintiff.  Ex.-32 (highlighted section on 3rd page).

As far issues of trust, the Minutes also show it was Plaintiff who stuck up for the Union by the City's extending of the probationary period to 9 months from 6 months.  Ex.-32 (last page).

As well, as an interested witness, Hartman's testimony - like Plaintiff's testimony - need not be believed by a jury and so it cannot be accepted as an undisputed fact at the summary judgment phase.  See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra.

99.   Darrin Spann reported that Spann was very upset about the Public Works, work environment, Spriggs' management style, and the way that Spriggs targeted employees in Public Works. (Id., p. 102, lns. 1 - 12).

Response:   Disputed, as the hostile environment claim was concerning fellow union employees not wanting to work with each other. It had nothing to do with accusations toward Plaintiff.  Ex.-2 ¶ 20.

As well, as an interested witness, Hartman's testimony - like Plaintiff's testimony - need not be believed by a jury and so it cannot be accepted as an undisputed fact at the summary judgment phase.  See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra.

The hostile environment claim was concerning fellow union employees not wanting to work with each other. It had nothing to do with accusations toward Plaintiff. Ex.-2 ¶ 20;  see also Draft Minutes AFSCME LABOR/MANAGEMENT Meeting dated 3/1/22 (attached as Ex.-32) (highlighted section on 2nd page).  And the Union agreed with Plaintiff.  Ex.-32 (highlighted section on 3rd page).

As far issues of trust, the Minutes also show it was Plaintiff who stuck up for the Union by the City's extending of the probationary period to 9 months from 6 months.  Ex.-32 (last page).

100.   Also, Darrin Spann, the Executive Director of AFSCME at the time, made negative comments about Spriggs' management at Public Works prior to a labor relations meeting. These events occurred prior to Spriggs' attempt to process the Payroll Action form to get Austin Griffin a raise. (Id., p. 77, lns. 1 – 24; p. 78, lns. 1 - 3).

Response:    Disputed, as an interested witness, Hartman's testimony - like Plaintiff's testimony - need not be believed by a jury and so it cannot be accepted as an undisputed fact at the summary judgment phase.  See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra.

The hostile environment claim was concerning fellow union employees not wanting to work with each other. It had nothing to do with

accusations toward Plaintiff. Ex.-2 ¶ 20;  <u>see also</u> Draft Minutes AFSCME LABOR/MANAGEMENT Meeting dated 3/1/22 (attached as Ex.-32) (highlighted section on 2nd page).  And the Union agreed with Plaintiff. Ex.-32 (highlighted section on 3rd page).

As far issues of trust, the Minutes also show it was Plaintiff who stuck up for the Union by the City's extending of the probationary period to 9 months from 6 months.  Ex.-32 (last page).

101.    In the late morning of June 17, 2022, Joni Willingham of Human Resources came to Hartman's office to tell him that Spriggs' had just tried to submit a raise for Austin Griffin's salary and to ask him if the Mayor had lifted her directive about pay raises until after a year of service. Hartman was aware that the Mayor had not lifted the directive. In fact, the Mayor had been saying for months that the raises were not to be given. (Id., p. 77, lns. 23 – 24; p. 78, lns. 1 – 24; p. 79, lns. 1 - 6).

<u>Response</u>:    Disputed, as an interested witness, Hartman's testimony - like Plaintiff's testimony - need not be believed by a jury and so it cannot be accepted as an undisputed fact at the summary judgment phase.  <u>See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc.</u> supra.

And there was no directive regarding employees having to be employed for a year to get a raise (Ex.-2 ¶ 14), and the City has offered no such

57

documentation establishing there was such an edict.  Indeed, Williams

had initially authorized a raise to Plaintiff and Griffin in April 2022,

which was within the "past few months."  Ex.-1 at at 164, 166, 168,

169;  Ex.-2 ¶ 7.

As well, there is irrefutable evidence that pay raises were given to

Public Works employees who had not been employed at least a year.

On June 7, 2022, Williams' team presented to City Council - at a public

meeting - a proposed raise for the Public Works Department Highway

Manager John Watson, an **employee of less than one year**.  Ex.-2 ¶ 19.

The meeting can be viewed at this link:

https://www.youtube.com/watch?v=TOYWpeSzUmI

(last visited 2/7/25).  See 59:20-1:00:02.

102. Hartman told Willingham that nothing had changed as to the "no raise" directive and

the Mayor had stated the same multiple times over the past few months. (Id. p. 79, lns.

19 – 24; p. 80, lns. 1 - 4).

Response:    Disputed, as an interested witness, Hartman's testimony - like

Plaintiff's testimony - need not be believed by a jury and so it cannot

be accepted as an undisputed fact at the summary judgment phase.  See

Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc.

supra.  Further, there was no such directive on pay raises only after a

year of service or anything communicated by the Mayor to that effect. Ex.-2 ¶ 14.  Indeed, Williams had initially authorized a raise to Plaintiff and Griffin in April 2022, which was within the "past few months." Ex.-1 at at 164, 166, 168, 169;  Ex.-2 ¶ 7.

**As well, there is irrefutable evidence that there was no "standing directive" that no pay raises were to be provided to management in public works.**  On June 7, 2022, Williams' team presented to City Council - at a public meeting - a proposed raise for the Public Works Department Highway Manager John Watson.  Ex.-2 ¶ 19.

The meeting can be viewed at this link:

https://www.youtube.com/watch?v=TOYWpeSzUmI

(last visited 2/7/25).  See 59:20-1:00:02.

103.   Hartman knew that if the Mayor had changed her mind about a raise for Austin Griffin, she would have told Hartman. She did not tell Hartman that she had changed her long-standing directive. (Id., p. 81, lns. 3 - 10).

Response:   Disputed.   Hartman cannot offer firsthand testimony as to what Williams would have done if she had changed her mind.  Further, there was no such directive.  Ex.-2 ¶ 14.  Indeed, Williams had initially authorized a raise to Plaintiff and Griffin in April 2022, which was within the "past few months."  Ex.-1 at at 164, 166, 168, 169;  Ex.-2 ¶

7.  Hartman was at that meeting.  Ex.-2 ¶¶ 7, 12.

104.  Hartman then called the Mayor, who was out of state on vacation. (Id., p. 81, lns. 19 – 20; p. 82, lns. 7 - 11).

Response:    Disputed, as an interested witness, Hartman's testimony - like Plaintiff's testimony - need not be believed by a jury and so it cannot be accepted as an undisputed fact at the summary judgment phase.  See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra.  Hartman informed Plaintiff of his firing and was Williams' highest ranking aide at the time of Plaintiff's firing.  He has an interest in not being found to be complicit in a violation of the law.

105.  Hartman did not call Spriggs to talk with him directly because Hartman knew that the attempt to raise Griffin's wage was a direct violation of a previous order. (Id., p. 81, lns. 21 – 24; p. 82, lns. 1 - 2, p).

Response:    Disputed, as an interested witness, Hartman's testimony - like Plaintiff's testimony - need not be believed by a jury and so it cannot be accepted as an undisputed fact at the summary judgment phase.  See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra.  Further, there was no no such directive or "previous order." Ex.-2 ¶ 14.  Indeed, Williams had initially authorized a raise to Plaintiff and Griffin in April 2022, which was within the "past few months."

60

Ex.-1 at at 164, 166, 168, 169; Ex.-2 ¶ 7. **The City has produced not one document establishing Williams had ever issued any such order.**

106.    Hartman called the Mayor and asked her if she changed her directive and she told him she had not done so. She told him no one was getting a raise in Public Works. (Id., p. 82, ln. 15 - 22).

Response:    Disputed, as an interested witness, Hartman's testimony - like Plaintiff's testimony - need not be believed by a jury and so it cannot be accepted as an undisputed fact at the summary judgment phase. See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra. **As well, if the jury decides Hartman is not being truthful on any one thing, it can find him untruthful on everything.** A time honored maxim of the law is: "Falsus in uno -- Falsus in omnibus." Translated it means: False in one thing, false in all. Black's Law Dictionary 747 (11th ed. 2019).

107.    Hartman asked her what she would like to do. (Id., p. 81, lns. 19 - 20).

Response:    See Response to ¶ 106.

108.    Hartman suggested to the Mayor that they look at the full range of disciplinary actions for Spriggs, including termination. (Id., p. 83, lns. 7 - 9).

Response:    See Response to ¶ 106.

109.   At some point, Hartman conferred with legal counsel, Neil Grover, and the Human

       Resources Director, Joni Willingham, and they all agreed to termination. (Id., p. 83,

       lns. 10 -13).

       <u>Response</u>:    <u>See</u> Response to ¶ 106.

110.   Hartman believed that Joni Willingham had caught Nate Spriggs doing something

       Spriggs was well aware violated a standing directive. (Id., p. 68, lns. 19 – 24; pg. 69,

       1 - 4).

       <u>Response</u>:    <u>See</u> Response to ¶ 106.

111.   Hartman felt that what Spriggs tried to do was insubordination. (Id., p. 68, ln. 19 -

       23).

       <u>Response</u>:    <u>See</u> Response to ¶ 106.

112.   The Mayor was in Florida on vacation at the time it was decided to terminate Spriggs.

       Hartman communicated with her by telephone. (Id., p. 70, ln. 4 - 20).

       <u>Response</u>:    Undisputed.

113.   Hartman had signatory authority as Business Administrator whenever the Mayor was

       away, by executive order. (Id., p. 71, lns. 2 - 6).

       <u>Response</u>:    Disputed, as the City has never produced the purported Executive Order

                   and a Hartman's testimony on this point may not be accepted as true as

                   he's an interested witness.

114.   The Mayor approved the termination on June 17, 2022. (Id., p. 71, lns. 18 - 23).

Response:    _See_ Response to ¶ 106.

115.   Dan Hartman or Neil Grover read the termination over the phone to the Mayor. (Id.,

p. 71, ln. 24; p. 72., lns. 1 - 3).

Response:    _See_ Response to ¶ 106.

116.   Spriggs was given the termination on June 21, 2022, because of the Juneteenth

weekend. (Id., p. 69, lns. 15 – 24; p. 70, lns. 1 - 3).

Response:    _See_ Response to ¶ 106.

117.   Hartman recommended the termination to the Mayor. (Id., p. 85, lns. 11 - 14).

Response:    _See_ Response to ¶ 106.

118.   The Mayor wanted to think on it and later, on Friday afternoon, she called back and

Hartman told him to move forward with the termination. (Id., p. 85, ln. 16; p. 86, lns.

2 - 8).

Response:    _See_ Response to ¶ 106.

119.   The discipline of Dion Dockens, the Mayor's son and a Public Works employee, was

not discussed at any point during the pre-termination time frame. In fact, Hartman

learned the same from Neil Grover later. (Id., p. 86, lns. 15 - 23).

Response:    _See_ Response to ¶ 106.  Further, a jury could disbelieve this testimony

in that Willingham was notified of Dion's discipline on June 17, 2022.

Ex.-27.  **A jury need not believe she just kept it to herself, and

didn't tell her boss, Williams, about Williams' son being**

**suspended.**

120.    Hartman testified that after he spoke with Joni Willingham on June 17th, there was

no need to hear Spriggs' side of the story because Hartman knew the Mayor had

turned down the Griffin raise request before and had a standing directive. Hartman

called the Mayor knowing there was a past history of her telling Spriggs no to the pay

raise. There was no other side to the story, Hartman testified. (Id., p. 87, lns. 12 - 24).

Response:    See Response to ¶ 106.   Further, there was no such directive or

"previous order." Ex.-2 ¶ 14.  Indeed, Williams had initially authorized

a raise to Plaintiff and Griffin in April 2022, which was within the past

few months.  Ex.-1 at at 164, 166, 168, 169;  Ex.-2 ¶ 7.  The City has

produced not one document establishing Williams had ever issued any

such order.

**As well, there is irrefutable evidence that there was no "standing**

**directive" that no pay raises were to be provided to management**

**in public works.**  On June 7, 2022, Williams' team presented to City

Council - at a public meeting - a proposed raise for the Public Works

Department Highway Manager John Watson.  Ex.-2 ¶ 19.

The meeting can be viewed at this link:

https://www.youtube.com/watch?v=TOYWpeSzUmI

(last visited 2/7/25).  See 59:20-1:00:02.

121.    Hartman believes that Spriggs' act was an intentional circumvention of what the

Mayor had instructed. (Id., p. 88, lns. 19 - 22).

> Response:    See Response to ¶ 106.    Further, there was no such directive or
>
> "previous order." Ex.-2 ¶ 14.  Indeed, Williams had initially authorized
>
> a raise to Plaintiff and Griffin in April 2022, which was within the past
>
> few months.  Ex.-1 at at 164, 166, 168, 169;  Ex.-2 ¶ 7.  The City has
>
> produced not one document establishing Williams had ever issued any
>
> such order.  See also Ex.-30 (Willingham acknowledged in an email
>
> dated Friday, June 17, 2022 that Griffin's salary increased earlier in
>
> 2022 "with possibility of a review later.").

122.    Hartman agreed that $102,000 was in the budget for the position Griffin held. (Id., p

91, lns. 13 - 17).

> Response:    Undisputed.

123.    Hartman also thought that Marita Kelly, Finance Director, was not aware of the

Mayor's standing directive when she informed Spriggs that there was money in the

line item. (Id., p, 95, lns. 2 - 9).

> Response:    See Response to ¶ 106.  Further, there was no such "standing directive"
>
> or "previous order."   Ex.-2 ¶ 14.   Indeed, Williams had initially
>
> authorized a raise to Plaintiff and Griffin in April 2022, which was
>
> within the past few months. Ex.-1 at at 164, 166, 168, 169; Ex.-2 ¶ 7.

The City has produced not one document establishing Williams had ever issued any such order. See also Ex.-30 (Willingham acknowledged in an email dated Friday, June 17, 2022 that Griffin's salary increased earlier in 2022 "with possibility of a review later.").

124. The normal first step in the raise process would be for the Department Director to go to the Finance Director to see what the budget book provided in the line item. (Id., p. 95, lns. 12 - 17).

Response:    See Response to ¶ 106.

125. Hartman thought that Marita Kelly simply made sure that there was money in the line item relating to the position. (Id., p. 96, lns. 11 - 14).

Response:    See Response to ¶ 106.  Even if true, it's pure conjecture.

126. He did not speak to Marita Kelly because when Joni Willingham told him that Spriggs was seeking the Griffin raise, Hartman knew it violated the Mayor's directive and he told Willingham the same. (Id., p. 97, lns. 18 - 22).

Response:    See Response to ¶ 106.  Further, there was no such "standing directive" or "previous order."  Ex.-2 ¶ 14.  Indeed, Williams had initially authorized a raise to Plaintiff and Griffin in April 2022, which was within the past few months.  Ex.-1 at 164, 166, 168, 169;  Ex.-2 ¶ 7. The City has produced not one document establishing Williams had ever issued any such order.  See also Ex.-30 (Willingham

acknowledged in an email dated Friday, June 17, 2022 that Griffin's

salary increased earlier in 2022 "with possibility of a review later.").

127.   Hartman testified that as Business Administrator, he had to make executive decisions

with Department Directors and legal counsel. (Id., p. 105, lns. 22 – 24; p. 25, ln. 1).

Response:   Disputed in part, as it's unclear as to what "executive decisions" he is

referring.

## NEIL GROVER

128.   Neil Grover is the full-time Solicitor for the City of Harrisburg. (Ex. E, Deposition

of Neil Grover, p. 7, lns. 21 - 23).

Response:   Undisputed.

129.   Grover was appointed to the office during the administration of Mayor Papenfuse in

2014. (Id., p. 8, lns. 12 - 15).

Response:   Undisputed.

130.   Grover was asked to stay on by the new administration after Mayor Papenfuse left the

office. (Id., p. 9, lns. 18 - 22).

Response:   Undisputed.

131.   Grover was aware of when Nate Spriggs was re-hired by the City but Grover was not

involved in the matter. (Id., p. 17, lns. 14 - 24).

Response:   Undisputed.

132.   He was also aware that Spriggs had been asked to stay on by Mayor Williams as well

but again, he was not involved in the decision. (Id., p 19, lns. 6 - 13).

    <u>Response</u>:    Undisputed.

133.    Grover is aware of Mayor William's leadership style. He knows that she is passionate about matters and in his presence, on multiple occasions, she has threatened to fire people. He has seen her angry, tearful, and upset on multiple occasions. (Id., p. 58, lns. 15 – 24; p. 59, lns. 1 - 24). The Mayor has threatened to fire everyone and that is her way of responding to some situations. (Id., p. 58, lns. 1 - 4).

    <u>Response</u>:    Disputed.

134.    Grover suggested to the Mayor that it might be a good idea to ask the State Ethics Commission to provide some training to senior staff. (Id., p. 31, lns. 7 - 9).

    <u>Response</u>:    Disputed.  Williams claimed that it was her idea to bring in the State Ethics Commission for training.  Ex.-5 at 120.

135.    The request occurred on March 10, 2020, and the training was scheduled for April 19, 2022. (Id., p, 30, lns. 12 - 22).

    <u>Response</u>:    Undisputed.

**By way of further answer**, the Pennsylvania Public Official and Employees Ethics Act, Act 170 of 1978, ("Act") became effective on January 1, 1979, and in subsequent years was amended and reenacted in 1989, codified in 1998, and amended in 2006.[13]  The Act applies to public officials and public employees.  <u>See</u> n.6, supra.

---

[13] See https://www.pa.gov/agencies/ethics/about-the-commission.html (last visited 1/24/25).

The Pennsylvania State Ethics Commission ("Commission") is an independent state agency charged with the responsibility of enforcing the Act.  Id.  The Commission's core mission and guiding principle is that public office is a public trust and that any effort to realize personal financial gain through one's public office other than compensation provided by law is a violation of that trust.  Id. (emphasis supplied).

Precisely at the same time Plaintiff was trying to appease Williams and promote Dion, the Commission came to City Hall to conduct training, on April 19, 2022.  Ex.-1 at 92;  see also Hartman Email to Senior Staff dated 4/18/22 (attached as Ex.-16).  The training session was scheduled after Grover had emailed the Commission requesting training.  Ex.-8 at 30; see also Request to State Ethics Commission for Training (attached as Ex. 17).  The Mayor, and all City directors and management staff were in attendance.  Ex.-7 at 34;  Ex.-5 at 120. The Commission's Chief Counsel provided the training.  Ex.-8 at 33.  The presentation addressed what would be ethics violations, and attendees were given a booklet.  Ex.-7 at 33; Ex.-1 at 104.

Although Williams claimed she became more "cautious" after the training, she couldn't identify even one thing she did differently after the training.  Ex.-5 at 123-24.  HR Director Willingham, however, left with the impression that Williams should not be involved in any personnel decisions involving her son Dion.  Ex.-7 at 37.

136.  Grover has provided general guidance as to the Mayor's involvement in personnel matters, including those involving a City-employed member of her family. (Id., p. 21,

lns. 6 - 12).

Response:     Undisputed.

137.    In looking at the State Ethics Law, the Mayor only has one relative that the law might

apply to, which was her son, Dion Dockens. Her granddaughter works for the City but

the law is defined so as not to apply to her granddaughter. (Id., p. 27, lns. 18 - 23).

Response:     Disputed, as this is not an asserted statement of undisputed fact; it's a

legal contention.    Irrespective, the law unequivocally applies to

Williams' efforts on behalf of her son, as he's considered "immediate

family" under 65 Pa. C.S. § 1102 (definitions section of the Public

Official and Employee Ethics Act ).

138.    On April 29, 2022, Grover advised the Mayor that her son, Dion Dockens, could not

be promoted due to the State Ethics Act. As Grover was leaving the Mayor's office,

he saw Spriggs outside of the Human Resources Office and he told Spriggs not to go

forward with the promotion of Dockens. Grover told Spriggs he was going to seek an

advisory opinion from the State Ethics Commission on the subject. Spriggs told

Grover he had been wondering about the promotion, but the Mayor had told Spriggs

to promote Dockens regardless. Grover told Spriggs he could not proceed with the

promotion. (Id., p. 28, lns. 9 – 24; p. 29, lns. 1 - 2).

Response:     Disputed.  On the purportedly undisputed fact as to what Grover told

Williams on April 29, 2022, that is disputed because Grover is an

70

interested witness, and so his testimony need not be believed by a jury and so it cannot be accepted as an undisputed fact at the summary judgment phase.  See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra.  **Grover is an interested witness who was directly involved in one or more employment decisions alleged by the Plaintiff to be illegal, and therefore has a vested interest in this litigation to see his actions vindicated.  As well, he is employed by the City and is paid by the City, and serves at the pleasure of Williams and so he has a direct financial incentive to assist the Defendants.**

As far as Grover's encounter with the Spriggs, that's disputed too. Initially, Grover could <u>not</u> have seen Plaintiff while leaving the Mayor's office when Spriggs was leaving the HR offices <u>as the offices were on a separate floor</u>. Ex.-7 at 23-24.  Grover's account as to what he and Spriggs said during that encounter is disputed as Spriggs account is vastly different.  <u>See</u> Ex.-1 at 105-10.

139.  Grover immediately went back to the Mayor's office to tell her that Spriggs had told Grover that the Mayor told Spriggs to promote Dockens anyway. (Id., p. 58, lns. 15 - 22).

<u>Response</u>:    Disputed.  Grover, who is City Solicitor, is an interested witness as it's

71

his job to protect the City's legal interests.  Accordingly, his testimony

on this point need not be believed by a jury and not accepted as an

undisputed fact at the summary judgment stage.  See Hill v. City of

Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra.

140.   The Mayor called Spriggs on the phone in front of Grover and she was very upset,

angry, and tearful. (Id., p. 58, lns. 23 – 24; p. 59, lns. 1 - 3.

Response:   Disputed.  Grover is an interested witness and so his testimony on this

point need not be believed by a jury and not accepted as an undisputed

fact at the summary judgment stage.  See Hill v. City of Scranton,

Reeves v. Sanderson Plumbing Prods., Inc. supra.   Moreover,

Plaintiff's account of the call is vastly different.  Ex.-1 at 142-43.

**By way of further answer**, Williams' unrelenting pressure on Plaintiff to promote

her son Dion, and her establishment of a taxpayer-funded jobs program for her family

weren't Williams' only tactics for enriching herself at taxpayer expense.  As another

example, Williams directed the Parks and Recreation Director to set up the Mayor's

granddaughter's wedding.  Ex.-2 ¶ 9.  The wedding was held at City Hall.  Id.; Ex.-5 at 154.

Williams also instructed Plaintiff to provide a City-owned vehicle to another aide so that the

aide could pick up things for the wedding about a week in advance.  Ex.-2 ¶ 9.

In addition, Williams helped herself to the City's Sanitation Department resources.

In or about May 2022, Williams was moving to a different residence.  Id. ¶ 10;  Ex.-5 at 71.

To assist her move, Williams directed Plaintiff to have a City-owned, 20-yard dumpster placed at her old residence. Ex.-2 ¶ 10; Ex.-4 at 81. The dumpster remained at the Mayor's departing location for several weeks, and it was emptied at the City's dump on Paxton Street and re-set back at the house several times. Ex.-2 ¶ 10; see also Text Message from Williams to Plaintiff dated 5/22/22 (attached as Ex.-23); Ex.-5 at 87-88 (confirming Williams' phone number on text message).

Rather than reimbursing the City for using the dumpster for personal reasons, Williams told Plaintiff to bill it to "blight clean-up." Ex.-2 ¶ 10. She further told him to call it a "community dumpster" - and to propagate a fiction that she allegedly allowed neighbors to dump items in there too. Id.; Ex.-5 at 81-83. The City typically charges for the tonnage dumped ($300 per ton) and a tipping scale fee of at least $400. As well, the normal fee for just renting a dumpster is $400 per week. Ex.-2 ¶ 10.

Williams also pressured Plaintiff to steer a landscaping contract to her brother in-law. Id. ¶ 11. In March-April 2022 a landscaping contract came up for bid. Id. The City has hundreds of vacant lots that must be cleared of trash and have the lawn mowed. Id. Plaintiff selected the lowest responsible bidder. Id.; see also Email String Regarding Landscaping Contract dated March-April 2022 (attached as Ex.-24). After Williams learned of the contract and the selection, she called Plaintiff and told him she wanted the contract rescinded and given to her brother in-law's company. Ex.-2 ¶ 11. Williams told Plaintiff that she had the Chief of Police pull up the successful bidder's criminal background and his tax

delinquencies in order to get him disqualified.  Id.  Plaintiff refused to rescind the contract and award it to Williams' brother in-law, telling her it would be illegal.  Id.  Williams told Plaintiff later that City Procurement Manager Hillary Greene told Williams the same thing.

Williams also used her official position to promote her reputation and that of her family.  On one occasion she directed Plaintiff to silence a Public Works employee who she thought was speaking ill of her and her family.  Ex.-1 at 87-88;  Ex.-5 at 116-19.  Williams warned Plaintiff, well, "you better do something and you better do it now."  Ex.-1 at 89. Dutifully, Plaintiff asked the employee to discontinue such comments, and the employee turned around and filed a grievance against the City.  Id. at 89-90.

In another instance Williams called Plaintiff - furious - after he had disciplined an employee for walking off the job during a shift.  Id. at 144.  The employee happened to be a boyfriend of Williams' daughter.  Id.;  Ex.-5 at 124-25, 127.

141.  Grover believes the Mayor was upset because two of her Directors were telling opposite stories and she could have been upset because one of them was lying to her. (Id., p. 69, ln. 23 – 24; p. 70, ln. 1).

Response:    Disputed.  Grover is an interested witness and so his testimony on this point need not be believed by a jury and not accepted as an undisputed fact at the summary judgment stage.  See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra.  A jury need not accept Grover's "beliefs" anymore than it's required that it accept

74

Plaintiff's "beliefs."  As well, what Grover was thinking as to why the

Mayor was upset is pure speculation, not competent evidence upon

which to base an allegedly undisputed fact.

142.   Grover told the Mayor about the talk with Spriggs.  The Mayor stated that she did not

tell Spriggs to proceed regardless. On May 2, 2022, the Mayor then had a meeting

with senior staff. The meeting included Hartman, the Mayor's staff, Human

Resources, the Law Bureau – Grover and his senior deputies, and Spriggs. The

meeting was held in the Mayor's conference room. The Mayor was advised that the

promotion of her son could not proceed under the State Ethics Act. The Mayor asked

if that was a formal opinion from Mr. Grover and he told her that it was a formal

opinion. (Id., p. 29, lns. 3 - 22, p. 55, lns. 1 - 13).

> Response:   Disputed.  Grover is an interested witness and so his testimony on this
>
> point need not be believed by a jury and not accepted as an undisputed
>
> fact at the summary judgment stage.  See Hill v. City of Scranton,
>
> Reeves v. Sanderson Plumbing Prods., Inc. supra.  Moreover,
>
> Plaintiff's account of the meeting is vastly different.  Ex.-1 at 120-21.

143.   The State Ethics Commission never issued an advisory opinion. (Id., p. 55, lns. 14 -

16).

> Response:   Disputed.  Grover is an interested witness and so his testimony on this
>
> point need not be believed by a jury and not accepted as an undisputed

75

fact at the summary judgment stage.  See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra.  Moreover, the assertion is disputed given that the State Ethics Commission did open an investigation into Williams.  Ex.-1 at 54-56;  Ex.-6 at 62;  Ex.-7 at 74-76.

144.   Grover heard the Mayor say that she felt it was unfair that Dockens could not progress in his career only because a parent became an elected official. She said she was not familiar with all the nuances of the State Ethics Act. (Id., p. 60, lns. 15 - 22).

    Response:   Disputed.  Initially, it's hearsay.  As well, Grover is an interested witness and so his testimony on this point need not be believed by a jury and not accepted as an undisputed fact at the summary judgment stage.  See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra.  Moreover, Plaintiff's account of the meeting is vastly different.  Ex.-1 at 120-21.  It's also inherently doubtful that Williams was not sufficiently familiar with the State Ethics to know that she shouldn't be using her official position to push through a retroactive pay raise for her son and to browbeat the City's Public Works Director into promoting him.  She had been an elected official and subject to the Ethics Act for more than a decade.  Ex-5 at 12-16.

145.   In fact, Grover was aware that the Public Works Director before Spriggs wanted to

promote Dockens, Spriggs wanted to promote Dockens, and the Public Works Director after Spriggs, Dave West wanted to promote Dockens. Dockens has never been promoted. (Id. p., 64, lns. 4 – 13).

Response:    Disputed.  Again, Grover is an interested witness and so his testimony on this point need not be believed by a jury and not accepted as an undisputed fact at the summary judgment stage.  See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra. Moreover, the testimony is dubious given that Williams told Plaintiff that prior promises to promote Dion (before Plaintiff became Public Works Director) never materialized. Ex.-1 at 53.  As well, the testimony is dubious given Dion's history of tardiness and disciplines, and of not being a very efficient worker.  Id. at 56.

146.    Spriggs, in fact, had placed Dockens and two other employees on a promotion list. However, Grover told Human Resources Dockens had to be removed from the list because of the State Ethics Act. (Id., p. 65, lns. 20 – 24; p. 66, lns. 1 – 24; p. 67, lns. 1 – 24; p. 68, lns. 1 - 11).

Response:    Disputed in part.  It is undisputed that Plaintiff initially assented to the Mayor's demand of promoting Dion by planning to promote him into one of the newly-created Route Supervisor positions. Ex.-1 at 124-26. The position would not require a CDL, which Dion did not have.  Ex.-1

77

at 125.  However, it is disputed that Plaintiff ultimately agreed to put Dion into the position, as after the State Ethics Commission training he told Grover he thought it would be illegal. Ex.-1 at 105-10.  Plaintiff decided he would not do it.  Ex.-1 at 123.

147.  Grover testified that in Public Works many upper management come from the ranks of employees and start out as entry level workers. However, because the Mayor was in office, Dockens' career was at a standstill because of the State Ethics Act.

Response:    Disputed.  Grover has no basis upon which to opine that Dockens' career is at a "standstill" just because he may not be able to be promoted with his current employer while his mother is the Mayor. Perhaps if he did not have a history of tardiness and disciplines, and of not being a very efficient worker (Ex.-1 at 56) he would have opportunities presented from another employer.   This is truly a ludicrous opinion, let alone asserted statement of undisputed fact.

148.  During Grover's career he has been through at least a dozen budget cycles. He is aware that simply because money is included in a salary line item, it does not per se mean that the full salary will be paid to an employee. (Id., p. 62, lns. 1 – 6, lns. 11 - 16).

Response:    Disputed.  Again, Grover is an interested witness and so his testimony on this point need not be believed by a jury and not accepted as an

undisputed fact at the summary judgment stage.  <u>See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc.</u> supra.  To the extent the asserted fact is that just because a salary line item is in the budget doesn't mean the employee will get that full amount, that's undisputed.

149.  Grover is aware that even after money is put into a budget for a position, it requires an entire process to have the money paid to an employee, including a form that requires multiple signatures from various Department Heads. Grover knows this because he too has to do Payroll Request forms every year. (Id., p. 64, ln. 24; p. 63, lns. 1 - 15).

<u>Response</u>:  Disputed.  Again, Grover is an interested witness and so his testimony on this point need not be believed by a jury and not accepted as an undisputed fact at the summary judgment stage.  <u>See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc.</u> supra.  To the extent the asserted fact is that payroll forms require multiple signatures for the action to take effect, that's undisputed.

150.  Grover was never involved in, nor issued any guidance, relating to the Mayor's alleged involvement in any discipline relating to her son. (Id., p. 34, lns. 10 - 17).

<u>Response</u>:  Disputed.  Again, Grover is an interested witness and so his testimony on this point need not be believed by a jury and not accepted as an

79

undisputed fact at the summary judgment stage.  See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra.  Moreover, this testimony is dubious given the discipline given to Dion on June 17, 2022 was reported to Willingham that very day.  Ex.-27.

151.  Grover recalled where Spriggs was terminated. He was out of the office due to COVID. He had been sick from about June 9th or 10th, 2022. (Id., p. 35, lns. 6 - 21).

Response:    Undisputed.

152.  About June 17, 2022, there were discussions about Spriggs being terminated with Dan Hartman. (Id., p. 37, lns. 17 - 22).

Response:    Disputed.  Again, Grover is an interested witness and so his testimony on this point need not be believed by a jury and not accepted as an undisputed fact at the summary judgment stage.  See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc. supra.  Further, the asserted fact is unclear as it doesn't indicate who was present for the discussions and/or whether Grover witnessed such alleged discussions himself.

153.  Grover was aware that Spriggs would be terminated prior to June 21, 2022. (Id., p. 36, lns. 20 - 24).

Response:    Disputed.  Again, Grover is an interested witness and so his testimony on this point need not be believed by a jury and not accepted as an

undisputed fact at the summary judgment stage.  <u>See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc.</u> supra.  Further the asserted fact is unclear as it can be interpreted to mean when Grover became aware of it or when Spriggs would actually be terminated.

154.   Grover did not recall having conversations directly with Mayor Williams over the long weekend before Spriggs was terminated. (Id., p. 38, lns. 21 – 24; p. 39, ln. 1).

<u>Response</u>:    Disputed.  Again, Grover is an interested witness and so his testimony on this point need not be believed by a jury and not accepted as an undisputed fact at the summary judgment stage.  <u>See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc.</u> supra.  As well, the asserted fact is unclear as to whether his memory has failed him on this point or whether he didn't have any such discussions.

155.   Grover testified that Dion Dockens was never discussed in any way over the long weekend with Grover prior to Spriggs' termination. (Id., p. 45, lns. 12 - 15).

<u>Response</u>:    Disputed.  Again, Grover is an interested witness and so his testimony on this point need not be believed by a jury and not accepted as an undisputed fact at the summary judgment stage.  <u>See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc.</u> supra.

156.   In fact, Grover only heard about Dockens discipline when he returned to the office on June 23, 2022, after his illness. (Id., p. 45, lns. 16 - 21).

<u>Response</u>:    Disputed.  Again, Grover is an interested witness and so his testimony on this point need not be believed by a jury and not accepted as an undisputed fact at the summary judgment stage.  <u>See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc.</u> supra.

157.    Grover testified that Spriggs was terminated because Spriggs put forward a Payroll Action form to give Austin Griffin the full budget amount of pay when the Mayor had specifically indicated that there were to be no pay increases. (Id., p. 68, lns. 19 - 24).

<u>Response</u>:    Disputed.  Again, Grover is an interested witness and so his testimony on this point need not be believed by a jury and not accepted as an undisputed fact at the summary judgment stage.  <u>See Hill v. City of Scranton, Reeves v. Sanderson Plumbing Prods., Inc.</u> supra.  As well, **Grover's testimony is directly contradicted by the Mayor's testimony, as she testified that she fired Plaintiff allegedly because he put in a raise for himself after she had rejected a pay raise for him earlier that week**.. Ex.-5 at 133, 136-37, 138, 166-67;  see also City Answers to Pl.'s Interrogs. at 1 (attached as Ex.-18);  see also Ex.-5 at 165 ("You know, he had asked me for a raise and I said no. And he went over my head when I was not available, I was not in the state, to go take it upon himself to give a payroll action form.").  The Mayor did not "specifically indicate" at any time there were to be no

pay increases.  Ex.-2 ¶ 14;  Ex.-30.  Indeed, Williams had initially authorized a raise to Plaintiff and Griffin in April 2022, which was within the past few months. Ex.-1 at at 164, 166, 168, 169; Ex.-2 ¶ 7. The City has produced not one document establishing Williams had ever issued any such order.

## NATHANIEL SPRIGGS

158.  Nathaniel Spriggs is the Plaintiff in a lawsuit against the City for an alleged violation of the Pennsylvania Whistleblower Law. (ECF Doc. 38, Plaintiff's Second Amended Complaint).

Response:    Undisputed.

159.  The only claim against the City is that by removing Plaintiff from his former position as Public Works Director, the City violated the Whistleblower law because Spriggs alleges he reported on wrongdoing and waste. (Id., paras. 91 and 92).

Response:    Undisputed.

160.  Spriggs worked for the City in the past and was asked by Mayor Papenfuse to return as Public Works Director, and prior to going into office, then President of Council Wanda Williams (now Mayor) had already asked Spriggs to return to the City. (Ex. F, Deposition of Nathaniel Spriggs, p. 39, ln. 1 - 8).

Response:    Undisputed.

161.  Spriggs came back to work for the City at $120,000 in September 2021. (Id., p. 39,

lns. 17 - 18).

Response:    Undisputed.

162.  Spriggs was given the City's employment policies and procedures, and the code of conduct for management employees. He initialed that he received them on a form and signed as such. (Id., p. 232, lns. 14 – 25; p. 233 lns. 1 - 2).

Response:    Undisputed.

163.  As a Department Director, Spriggs was familiar with the Request for Personnel Action form and the Payroll Action Form. (Id., p. 51, lns. 6-21).

Response:    Undisputed.

164.  If there was an individual review or if the City were to pay an employee out of class for a position, then Spriggs would handle that request and he would hit an accept button on a screen once it was processed. (Id., p. 46, lns. 22 – 24, p. 47, ln. 1).

Response:    Disputed.  Williams herself was involved in decisions to pay out of class for a position, as she was with her son Dion.  Ex.-13.

165.  If a Personnel Action form was being done for an individual in Public Works, it would come to him ultimately for approval. (Id., p. 52, lns. 4 - 13).

Response:    Disputed, as Plaintiff was just one of many top-level officials that would have to approve a Personnel Action form for someone in his department.   Ex.-13.

166.  Spriggs alleges that Wanda Williams contacted him regularly and tried to get Spriggs

to promote her son Dion Dockens, and that Spriggs believed it was inappropriate. The first time she did this was on October or November 2021. At the time this occurred, Williams was Council President. (Id., p. 52, lns. 20 – 25; 53. lns. 1 – 22)

Response:     Undisputed.

167.    Spriggs agreed to proceed with a promotion. Spriggs testified that he did not think Dockens was fit to be a manager, but he was not going to argue with Williams about it. (Id., p. 56, lns. 4 - 8).

Response:     Disputed in part, as Plaintiff also testified, "I've known her son for 40 years.  I know that he had a history of tardiness.  He was late.  He was disciplined multiple times, in excess of two, and I believe three days, by previous directors.  He just had a history of not being a very efficient worker."  Ex.-1 at 56.

168.    Spriggs knew Dockens for 40 years before he became Department Director, and he knew that then President of Council Williams, got upset at things. He did not want to upset her. (Id,. p. 56, ln. 11, lns. 19 - 22).

Response:     Disputed in part, as Plaintiff also testified, "And, you know, **she was going to be my boss in a couple months** . . . ."  Ex.-1 at 56.

169.    Spriggs did not report to anyone that worked for the City at the time that Williams had asked him to promote Dockens or that he felt Dockens was not competent for promotion. (Id., p. 56, lns. 23 – 25; p. 57, lns. 1 - 3).

Response:    Disputed in part, as Plaintiff also clarified, "at that time." Ex.-1 at 57.

170.    In November or December 2021, Spriggs claims Williams also contacted him about finding work for Dockens that was lighter than the recycling Dockens had been doing because Dockens had hand and arm injuries. Spriggs agreed to do so. He thought the request was inappropriate. However, he never reported those interactions to anyone within the City of Harrisburg. (Id., p. 59, lns. 23 – 25; p. 60, lns. 1 – 3, lns. 9 - 11, p. 64, lns.18 – 23; p. 64, lns. 4 - 7). There were further requests along this line, but after that, Dockens remained on the leaf truck. Spriggs did not report any of these alleged conversations to anyone. (Id., p. 66, lns. 5 – 25).

Response:    Undisputed.

171.    Spriggs alleged that Williams called him at 4:00 am one morning in March, April or May 2021, insisting that Dockens be promoted or Dockens would move to Ohio. Spriggs felt this was inappropriate but did not report it to anyone.  However, Spriggs also noted that sometimes he would start work with the Sanitation crew and they started at 2:30 am or 3:00 am. He said he was almost always at Public Works by 4:00 am. (Id., p. 81, lns. 13 - 22).

Response:    Disputed in part, as Plaintiff also clarified he didn't report it to anyone "at that time." Ex.-1 at 83.

172.    He felt that the Mayors requests for banners in November 2021 to be used during a public parade on a Public Works' truck was improper. Mayor Williams wanted him

to come out after hours and help decorate the truck so Wiliams would look good. However, he never reported his concerns to anyone. (Id., p. 68, lns. 5 – 11; p. 69 , lns. 9 - 13).

Response:    Disputed in part, as Plaintiff also clarified he didn't report it to anyone "at that time." Ex.-1 at 83.

173.    Spriggs admits that he never reported any of these things to the City or to any outside agency. (Id., p. 82, lns. 17 - 24).

Response:    Disputed in part, as Plaintiff also clarified he didn't report it to anyone "at that time." Ex.-1 at 83.

174.    Spriggs says that Williams contacted him again in April 2022 about changing the position description to modify a CDL license requirement so Dockins would meet the position terms. He did not think her actions were appropriate. However, once again, he did not report his concern to anyone. (Id., p.86, lns. 6 – 25; p. 87, lns. 1 - 3).

Response:    Disputed in part, as Plaintiff also clarified, "at that point [in time]." Ex.-1 at 86-87.

175.    Spriggs also felt that Williams wanted one of Spriggs' workers disciplined for talking bad about her and Dockens. (Id., p. 88, lns. 3 - 14).

Response:    Disputed. Plaintiff didn't just "feel" that it was what Williams wanted, she threatened him, stating "well, you better do something and you better do it now." Ex.-1 at 89.

176.   Spriggs spoke with the employee and asked him to be more civil. The employee filed a grievance against Spriggs, but the union did not pursue it. (Id., p. 89, lns. 7 – 20; p. 90, lns. 1 – 5, lns. 16 - 19).

   <u>Response</u>:      Undisputed.

177.   While Spriggs felt that what Williams asked him to do was inappropriate, he did not report it to anyone. (Id., p. 91, lns. 2 - 7).

   <u>Response</u>:      Disputed in part, as counsel clarified, "at that time."  Ex.-1 at 91.

178.   In January 2022, Williams allegedly contacted Spriggs to get Dockens a management position and that Dockens did not want to work in Parks and Recreation. Spriggs felt this attempt was inappropriate, but he failed to report to anyone that it was wrong. (Id., p. 71, lns. 2 - 10; p. 72, lns. 23 - 25; p. 74, lns. 14 - 18).

   <u>Response</u>:      Disputed, as Plaintiff reported to Hartman that Williams had demanded that Dion get a supervisor's position in Parks and Recreation.  Ex.-1 at 73-74;  Ex.-29

179.   Dan Hartman was Spriggs' supervisor on some topics and Spriggs' answered to the Mayor on other topics. Hartman could give Spriggs directions and assignments. (Id., p. 97, lns. 1 - 3).

   <u>Response</u>:      Undisputed.

180.   Spriggs attended a State Ethics Commission training at City Hall on April 19, 2022. Spriggs thought Neil Grover set the meeting up with the State. (Id., p. 92, lns. 6 - 11,

p. 95, ln. 11 - 18).

Response:     Undisputed.

181.   Spriggs never reported to Hartman on any of the many items that Spriggs felt were not

appropriate. (Id., p. 96, lns. 12 - 17). Spriggs thought Hartman knew about a couple

of the requests but Spriggs did not specify any. (Id., p. 96, lns. 20 - 22).

Response:     Disputed, as Plaintiff reported to Hartman that Williams had demanded

that Dion get a supervisor's position in Parks and Recreation.  Ex.-1 at

73-74;  Ex.-29.

182.   Spriggs worked with Hartman on the 2022 budget. (Id., p. 97, lns. 15 - 19).

Response:     Undisputed.

183.   At no point prior to his termination, did Spriggs ever contact the State Ethics

Commission or any other investigatory or governmental unit about any of his issues

with Williams or concerning Dockens. (Id., p. 100, lns. 10 – 25; p. 101, lns. 1 - 18).

Response:     Undisputed.

184.   The only person he spoke to about his concerns was Grover. (Id., p. 102, lns. 8 - 10).

Spriggs did not recall speaking to anyone else about any of his concerns. (Id. p. 102,

lns. 1 - 23).

Response:     Disputed, as in that very deposition page the City cites, Plaintiff

testified he also shared his concerns with Willingham.  Ex.-1 at 102.

Further, Plaintiff shared his concerns with Williams herself about her

demands regarding Dion. Ex. 1 at 76; <u>see also</u> Ex.-1 at 142-43 (Plaintiff's concerns had been relayed to Williams by Grover).

185. During the April 19, 2022, meeting with the State Ethics Commission, Spriggs failed to report any of his concerns to the Commission. (Id., p. 105, lns. 1 - 4). At that time, he had not spoken with Grover about any of his concerns regarding the promotion of Dockens. (Id. p. 105, lns. 20 - 24). Spriggs testified he had tried to contact Grover, but they did not connect at that time. (Id., p. 105, lns. 24 - 25).

   <u>Response</u>:    Disputed in part, to the extent it insinuates Plaintiff had the opportunity to report his concerns to the Commission about his boss in the middle of the training session. It is disputed that he "failed" to do anything.

186. Spriggs believes he spoke with Grover on April 29, 2022, about Dockens. (Id., p. 107, lns. 11 - 16).

   <u>Response</u>:    Disputed in part, as Plaintiff specified the date was April 29, 2022. Ex.-1 at 107.

187. Spriggs testified that he was in City Hall and Grover came out of the elevator. They went to a conference room and allegedly Spriggs brought up that Williams was pushing to get Dockins promoted. Spriggs told Grover he did not want to do that because it was an ethics violation and he, Spriggs did not want to go to jail. Grover allegedly agreed. Spriggs then said the Mayor was asking him to do other things like promote family members and give a City car to a City worker for personal use. Grover

said he would talk to the Mayor. Gover then left. Spriggs assumed it was to talk to the Mayor. (Id., p. 108, lns. 5 – 12; p. 109, lns. 10 - 25).

Response:    Disputed, as this is not a purported statement of undisputed fact. Rather, it's a purported summary of Plaintiff's testimony of pp. 109-10 of his deposition. See Ex.-1 at 109-10. Plaintiff didn't use the terms "allegedly" in his comments to Grover. Id. The summary also leaves out the other things Grover said, and the fact that Grover turned off the lights as soon as they got into the conference room. Id. The summary also omits Grover's comment, "We'll both be in prison if we allow this to happen." Ex.-1 at 110. The summary omits the fact that Plaintiff also told Grover about Williams' request that he hire her granddaughter and niece. Ex.-1 at 113.

188.  Spriggs was not sure, but he felt the conversation with Grover was within a week of the State Ethics Commission training. (Id., p. 110, lns. 7 - 11).

Response:    Disputed, as the conversation with Grover was ten days after the State Ethics Commission training which took place on April 19, 2022. Ex.-16.

189.  Spriggs agreed that Dockens was not promoted but he had been paid out of class previously. He said he felt what Williams was doing was wrong and he was no longer willing to do it anymore. (Id., p. 111, lns. 14 – 16, lns. 22 - 25).

> Response:    Disputed, in part.  It is undisputed that Dockens was not promoted during Plaintiff's employment, **but Dockens did get an out-of-class, retroactive pay stipend one week after Plaintiff's meeting with Grover on April 29, 2022**.  Ex.-13.

190.    Spriggs then testified that he thought the meeting with Grover occurred on April 29, 2022. Spriggs testified that this was the only time he reported any of his misgivings to Grover. (Id., p. 112, lns. 11 - 20).

> Response:    Undisputed.

191.    Spriggs also alleges that Williams wanted her granddaughter, and a niece hired. Spriggs did not make either hire. (Id., p. 113, lns. 24 – 25; p. 114, lns. 1 – 10, 22 - 24; p. 115, lns. 6 - 18).

> Response:    Again, this is not an averment of undisputed fact.  It's a purported summary of deposition testimony.  The fact is that in the meeting with Grover on April 29, 2022 Plaintiff also told Grover about Williams' request that he hire her granddaughter and niece.  Ex.-1 at 113.  It is undisputed that Plaintiff did not hire either relative.

192.    Spriggs talked to Grover about Dockens and about the Mayor's request to give a City employee a car that Spriggs felt would be used for personal use. (Id. p. 116, lns. 11 – 18). Spriggs admits the Mayor did not tell him to give the employee a car for personal use. (Id., p. 117, lns. 1 - 12) Spriggs does not recall telling Grover anything

else on April 29, 2022, other than about Dockens, promoting relatives, and the car issued to a City employee. (Id., p. 119, lns. 1 - 9).

Response:    Again, this is not an averment of undisputed fact. It's a purported summary of deposition testimony. Irrespective, it's disputed in that the employee was provided the car to pick up party favors and decorations for Williams' granddaughter's wedding. Ex.-1 at 117. It's also disputed that this is all Plaintiff told Grover during their discussion, as Plaintiff specifically told Grover it would be an ethics violation to carry out Williams' directive and promote her son. Id. at 109.

193. On May 2, 2022, there was a meeting with Williams, Hartman, Grover, and a number of other persons where the Mayor threatened to fire everyone there. (Id., p. 119, lns. 20 – 25; p. 121, lns. 1 - 17).

Response:    Undisputed.

194. At this meeting, the Mayor insisted that her son Dockens be promoted. Neil Grover told her directly that Dockens could not be promoted, and he advised her to stop talking about the matter. (Id. p. 121, lns. 3 - 9).

Response:    Undisputed.

195. Williams demanded that Spriggs promote Dockens and Spriggs agreed to do so, however Grover flatly refused to let that occur and reported to the Mayor that staff could not do so and she would need to appeal to the Ethics Commission to make a

case for the promotion/hire. Grover advised her again to stop talking. Eventually,

Williams calmed down, and she ended the meeting. (Id., p. 122, lns. 3 - 14).

> Response:    Disputed.  Spriggs never agreed in that meeting to promote Dion and,
>
>              in fact, he never agreed again to promote Dion after his meeting with
>
>              Grover on April 29, 2022.  Ex.-2 ¶ 16.

196.   Spriggs testified that he was going to do what the Mayor wanted him to do but

eventually he decided he would not do it. (Id., p. 123, lns. 1 - 6).

> Response:    Again, this is not an averment of undisputed fact.  It's a purported
>
>              summary of deposition testimony, without any context.  The actual fact
>
>              from this excerpt is that Plaintiff had intended to comply with the
>
>              Mayor's demands to promote Dion until about a week after the State
>
>              Ethics Commission provided training on April 22, 2002.  One week
>
>              later, on April 29, 2022, is when he notified Grover of his concerns and
>
>              that he wasn't going to do it.  Ex.-1 105-06, 110, 123.  Grover then
>
>              shared Plaintiff's concerns and refusal with Wiliams.  Ex.-8 at 58;
>
>              Ex.-5 at 109-10.

197.   Spriggs was going to promote Dockens into a route supervisor job with two other

employees. (Id., p. 123, lns. 14 - 23). There was a real need for the position because

workers were not completing their entire trash pickup routes. (Id., p. 124, lns. 4 - 14).

Spriggs claimed adding a third position was just for Dockens. (Id., ln 124, lns. 22 –

25; p. 125, lns. 1 - 6).

Response:    It is undisputed that Plaintiff intended to do this, but decided against it

after the State Ethics Commission provided training on April 22, 2022.

Ex.-1 105-06, 110, 123.

198.    On April 1, 2020, originally there was going to be a requirement for a CDL vehicle

license for the route supervisors, but Williams wanted Spriggs to change the notice

to CDL license preferred or it had to be acquired within a year of acceptance into the

job. Spriggs testified this was done to help Dockens, whom Spriggs alleged did not

have a CDL license. (Id., p. 127, lns. 1 - 17).

Response:    Disputed in part.  In April 2022, Plaintiff collaborated with Willingham

to create Route Supervisor positions that would not have a CDL

requirement, and so Dion would be eligible for promotion as the Mayor

instructed. Ex.-1 at 125, 127-28; Ex.-14.  It is undisputed that Dion did

not have a CDL license at this time.  Ex.-12 at 21.

199.    Spriggs wanted Dockens interviewed for the position and sent Human Resources an

email to that effect on April 6, 2022. (Id., p. 130, lns. 23 – 25; p. 131 lns. 1 - 2).

Response:    Undisputed, as this was prior to the State Ethics Commission on April

22, 2022 and Plaintiff's conversation with Grover on April 29, 2022.

200.    Spriggs admitted that the email record shown to him at his deposition proved that as

of April 27, 2022, he wanted to promote Dockens.  Because Dockens' name is

included in the list of three persons that Spriggs wanted to promote. (Id., p. 133, lns. 19 – 22).

Response:    Undisputed, as this was prior to Plaintiff's conversation with Grover on April 29, 2022 when he told Grover he was not going to proceed with the promotion of Dion based on what he had learned at the State Ethics Commission training.

201.    In fact, Spriggs admitted that his handwriting on his interview notes indicated that that Dockens, in fact, did have a CDL permit at the time Dockens applied. (Id., p. 227, lns. 15 - 24).

Response:    Undisputed, as Dion (who claimed to have a learner's permit) did not have a CDL license at this time.  Ex.-12 at 21.

202.    Further, Spriggs admitted that in his own handwriting he wrote that "Great Job! Highly recommended!" on the interview form as to Dockens. (Id., p. 228, lns. 6 - 10). Spriggs admitted he recommended Dockens for the promotion. (Id., p., 228, lns. 13 - 15).

Response:    Undisputed, as this was prior to Plaintiff's conversation with Grover on April 29, 2022 when he told Grover he was not going to proceed with the promotion of Dion based on what he had learned at the State Ethics Commission training.

203.    Spriggs was also shown emails in which he was included as a recipient that plainly

indicated that Grover had informed Human Resources that Dockens could not be promoted as early as April 27, 2022. Spriggs conversation with Grover did not occur until April 29, 2022, Spriggs admitted. (Id., p. 135, lns. 8 – 13, lns. 21 - 25; p. 136, lns. 7 – 20; p. 137 lns. 9 - 22 ).

Response:    Disputed.   Plaintiff testified that Grover permitted only two Route Supervisor positions for budgetary reasons. Ex.-1 at 138, 140.  Plaintiff did not testify that Grover specified at that time that it was Dion who, among the three slotted for the position, could not be promoted.

204.    Spriggs admitted that Grover told Human Resources not to promote Dockens and this occurred two days before Spriggs had a conversation with Grover and relayed Spriggs' concerns to Grover. (Id. p. 139, lns. 3 – 25; p. 140, lns. 1 - 20).

Response:    Disputed.   Plaintiff testified that Grover permitted only two Route Supervisor positions for budgetary reasons. Ex.-1 at 138, 140.  Plaintiff did not testify that Grover specified at that time that it was Dion who, among the three slotted for the position, could not be promoted.

205.    Spriggs alleged that the reason Dockens was not being promoted was only budgetary; however, all three of the positions requested were actually filled.  Dockens was simply not promoted. Spriggs admitted that nothing in the email chain indicated that the decision not to promote Dockens was budgetary. (Id., p. 138, lns. 3 – 4; p. 140 , lns. 3 – 9; p. 141, lns. 7 – 25; p. 142, ln. 1).

> Response:    Disputed.  Plaintiff testified that Grover permitted only two Route
>                Supervisor positions for budgetary reasons.  Ex.-1 at 138, 140.
>                Although nothing in the emails indicated that was the reason, Grover
>                admitted it in his deposition.  Ex.-1 at 140.  It is undisputed that all
>                three of the Route Supervisor positions were filled.

206.  Spriggs agreed that it was because of Grover that Dockens was not promoted at that
time and Spriggs could not recall why it came about that Spriggs was able to promote
three other people. (Id., p. 143, lns. 7 – 25; p. 144, lns. 1 - 2).

> Response:    Disputed, in part, as the cited deposition section does not support the
>                purportedly undisputed fact.  Rather, there is ample testimony that the
>                reason Dockens was not promoted at the end of April 2022 is because
>                both Plaintiff and Grover resisted and told the Mayor it would be illegal
>                to do so.  Ex.-1 at 121, 142-43;  Ex.-8 at 58;  Ex.-5 at 109-10.

207.  Spriggs admits he never told Grover about his conversation with the employee who
was talking badly about the Mayor. (Id., p. 144, lns. 9 - 25; p. 145, lns. 1 - 10).

> Response:    Undisputed.

208.  Spriggs had warned his staff about not driving CDL license required vehicles unless
they had CDL licenses. (Id., p. 147, lns. 23 - 25).

> Response:    Undisputed.

209.  Dion Dockens was disciplined by Ron Wise, who worked for Spriggs, for driving a

CDL trash vehicle without a CDL license. This occurred the week of June 17, 2022, but Spriggs did not recall a date. (Id., p. 145, lns. 20 – 25; p. 146, ln. 1).

Response:    Disputed, in part.  Wise delivered the discipline to Dion, but it was Plaintiff's decision to have it issued.

210.  Wise did not recommend suspension for Dockens, which was Spriggs' idea. (Id., p. 192, lns. 11 - 15).

Response:    Disputed, in part.  It wasn't Plaintiff's "idea" to suspend Dion; it was his decision to suspend Dion.  Ex.-1 at 192.

211.  Spriggs admitted that Dockens told Spriggs he had a CDL permit. (Id., p. 243, lns. 4 - 6).

Response:    Disputed, in part.  This is not an "admission" as it's not detrimental to Plaintiff's factual presentation or legal claims.  Whether Dockens had a learner's permit or not is irrelevant, as the requirement was to have a license.  Ex.-1 at 147-48.  And he didn't have one.  Ex.-12 at 21.

212.  However, Spriggs felt that Dockens could not legally operate the vehicle he was operating at that time because one person would be on the vehicle and not necessarily in the cab. (Id., p. 243, lns. 24 – 25; p. 244, lns. 1 - 13).

Response:    Undisputed, although it didn't matter whether Dockens could lawfully operate the vehicle with a learner's permit.  The requirement at work was that the employee needed to have a CDL in order to drive the

vehicle, and the staff had been notified.  Ex.-1 at 147-48.

213.  Spriggs was not aware if Dockens could have legally driven the vehicle if he were with a licensed CDL driver if Dockens had a permit, but Spriggs added it probably would be legal. (Id. p. 244, lns. 19 – 25; p. 245, lns. 1 - 5).

Response:    Undisputed, although it didn't matter whether Dockens could lawfully operate the vehicle with a learner's permit.  The requirement at work was that the employee needed to have a CDL in order to drive the vehicle, and the staff had been notified.  Ex.-1 at 147-48.

214.  Before the discipline, Spriggs did not talk to Dockens about it. (Id., p. 147, lns 2 - 4).

Response:    Undisputed.

215.  Ron Wise reported to Spriggs he had disciplined Dockens on June 17, 2022. (Id., p. 151, lns. 17 – 25; p. 152, lns. 1 - 3).

Response:    Undisputed, and Wise also reported it to HR Director Joni Willingham on June 17, 2022.  Ex.-27.

216.  Wise allegedly told Spriggs, Dockens was upset and Dockens might call Williams. (Id., p. 152, lns. 21 - 24).

Response:    Disputed in part, in that Wise didn't "allegedly" tell Plaintiff this, but rather Plaintiff testified that Wise told him this.  At summary judgment, Plaintiff's testimony is to be accepted.  At trial, a jury need not believe Plaintiff on this point, just like it need not believe the City's interested

witnesses in their testimony.

217.    Spriggs spoke with Dockens about the discipline on June 20, 2022 (the following

Monday). (Id., p. 146, lns. 18 - 22).

Response:    Undisputed.

218.    Dockens told him his hands were in pain and that's why he was driving. Spriggs told

Dockens, you should have said something, and Dockens agreed and he went back to

work. Spriggs did not know if Dockens had ever actually spoken with Williams at all.

Spriggs assumed Dockens had spoken to Williams because Spriggs was terminated

the next day. (Id. p. 156, lns. 4 – 8, lns. 12 - 19, p. 157, lns. 1 - 4).

Response:    Disputed, as in that excerpt Plaintiff made no such assumption as to

Dion telling his mother.  Ex.-1 at 156-57.

219.    Spriggs further admitted that he had heard murmurs that Dockens had spoken to

Williams and that was why he was terminated. He said he had heard the rumor form

Tisha Barillo, who supposedly heard the same from Tanita Williams, who is

Williams' daughter. All this occurred after he was terminated, sometime in 2022. (Id.,

p. 158, lns. 5 – 9, lns. 22 – 25; p. 159, lns. 1-6).

Response:    Disputed in part.  Again, this is not an averment of undisputed fact.  It's

a purported summary of deposition testimony.  As well, none of this

constitutes an "admission" as it's not detrimental to Plaintiff's factual

presentation or legal claims.  It's undisputed that someone stated to

Plaintiff that Williams was fired because he disciplined Dion. Ex.-1 at 158-59.

220. Spriggs testified that when he sought a raise for Griffin, he did not know the Mayor was in Florida. (Id., p. 161, lns. 18 – 25.

> Response:    Disputed in part. Plaintiff did not "seek" a raise for Griffin. Rather, on June 15, 2022, City Finance Director (Ex.-1 at 174), Marita Kelley sent Plaintiff a list of positions (including Griffin's) that had been approved for a pay increase at the mid-point of the year. Ex.-1 at 177-79; see also Email from Kelley to Spriggs dated June 15, 2022 (attached as Ex.-20). In that email, Kelley specifically wrote to Plaintiff that he could submit a Request for Payroll Action form for Griffin's raise to be effectuated. Ex.-20.

221. Spriggs alleges that Williams approved a raise for Griffin to $110,000. However, Spriggs admits there is nothing in writing that indicates the same. (Id., p. 166, lns. 1 - 18).

> Response:    Disputed. Again, this is not an averment of undisputed fact. It's a purported summary of deposition testimony. But it's incorrect.
>
> In April 2022, the Mayor had called Plaintiff to her office and told him that she was assigning him two additional departments to manage. Ex.- 1 at 162; Ex.-6 at 55-56, 57. There were several managers present.

Ex.-1 at 162.  The two additional departments Williams was assigning to Plaintiff were Traffic Engineering and Engineering.  Id.; see also Spriggs Email dated 4/26/22 (attached as Ex. 28).  Plaintiff raised the question of whether he should be compensated for the extra work.  Id. at 163.  Williams said she was willing to discuss compensation for the extra duties.  Id. She and Plaintiff agreed on a raise from $130,000 to $150,000.  Id. at 167.  She also agreed on a raise for Plaintiff's Deputy Director of Public Works, Austin Griffin, to $110,000.  Id. at 164, 166. Further, the City's assertion, "However, Spriggs admits there is nothing in writing that indicates the same" is **deliberately misleading.** Plaintiff did not say that.  Rather, he acknowledged there was nothing in writing **from the mayor** that would indicate that.  Id. at 166.

And, in fact, there is something in writing that corroborates Plaintiff's testimony that Williams initially agreed to Griffin's payraise in April 2022: the Payroll Action form Plaintiff put in for Griffin.  Ex.-21 (last two pages).

222.   On April 21, 2022, Spriggs sought to get a raise up to $110,000 for Griffin and up to $150,000 for himself. (Id., p. 164, lns. 1 – 5; p. 167, lns. 16 - 19).

Response:    Disputed, for the reasons set forth in Resp. to ¶ 221.

223.   That April, Spriggs testified he submitted and signed the form for his own requested

raise to $150,000 and that of his employee, Austin Griffin. Rosemary Nye (another of Spriggs' employees) and he signed off on the request for a raise for Griffin up to $130,000. (Id. p. 167, lns. 16 – 25; p. 168, lns. 1 - 9). However, neither of these raises went forward because the Mayor told Spriggs she could not move forward with the raises. (Id. p. 168, lns. 16 - 24).

Response:    Disputed, in part, as the raise for Griffin was to $110,000, not $130,000. Ex.-1 at 171. As well, the City conveniently omits that Plaintiff put in the forms for both himself and Griffin at that time **because Williams specifically approved it before changing her mind a few days later**. See Resp. to ¶ 221; Ex.-2 ¶ 7; Ex.-1 at 168-69.

224.  Spriggs admitted that in April 2022, he was aware that neither his raise for $150,000 nor Griffin's for $110,000 were going to go through. (Id., p. 170, lns. 2 - 7, 171, lns. 6 - 13).

Response:    Undisputed, as Williams told him she had changed her mind. Ex.-1 at 168-69.

225.  Spriggs admitted that the April 2022 decisions to not give out the raises he wanted for himself and for Griffin had nothing to do with his later report to Grover about Williams and Dockens' promotion. (Id., p. 173, lns. 15 - 19).

Response:    Undisputed, although the raises were sought and approved (initially) because Williams was assigned Plaintiff and Griffin two more

department to oversee.

226. Spriggs said that Williams never specifically told him Griffin would not get a raise.
However, Spriggs knew that Griffin did not get a raise in April. Spriggs just did not
discuss Griffin with the Mayor directly. (Id. p. 175, lns. 20 – 25; p. 174, lns. 6 - 8).

Response:    It is both undisputed that Plaintiff said this in his deposition and that
what he said is true.

227. Spriggs said he never inquired why Griffin had not been given the requested raise in
April 2022. (Id., p. 178, lns. 21 - 24).

Response:    It is both undisputed that Plaintiff said this in his deposition and that
what he said is true.

228. Spriggs testified that he did not know why Griffin had not been given a raise in April
2022. (Id., p. 195, lns. 3 - 16).

Response:    It is both undisputed that Plaintiff said this in his deposition and that
what he said is true.

229. Spriggs admitted he never discussed with Marita Kelly, the April denials of the raises.
(Id., p. 179, lns. 7 - 10).

Response:    It is both undisputed that Plaintiff said this in his deposition and that
what he said is true.

230. Spriggs recalled a budget meeting in January 2022 with Hartman and Kelly and
monies were budgeted for raises. (Id., p. 181, lns. 6 - 21).

Response:    It is both undisputed that Plaintiff said this in his deposition and that what he said is true.

231.    Spriggs thought he sent an email in June 2022 about a raise for Austin Griffin to Marita Kelly but he did not have the email. (Id., p. 181, lns. 22 - 24).

Response:    It is both undisputed that Plaintiff said this in his deposition and that what he said is true. The City produced the email, dated June 15, 2022, in discovery. See Ex.-20.

232.    Spriggs did not discuss the second attempt to get Griffin a raise in June 2022 with Kelly directly. He only communicated to her by email. (Id., p. 181, ln. 25, pg. 182, lns. 1 - 2).

Response:    Disputed, as Plaintiff indicated he spoke with Kelley about it before receiving the June 15, 2022 email from her. Ex.-1 at 176-77; Ex.-20 (impliedly responding to earlier conversation between Plaintiff and Kelley).

233.    Spriggs also did not discuss the second attempt to get Griffin a raise with Joni Willingham, in Human Resources in June 2022. (Id., p. 182, lns. 3 - 6).

Response:    Disputed, as Willingham was there on June 17, 2022 when Plaintiff signed the Payroll Action forms and they talked about Griffin's situation. Ex. 7 at 61-62.

234. Spriggs signed and submitted the Griffin form on June 17, 2022, in the morning and he left afterward to go to his uncle's funeral. (Id., p. 182, lns. 21 – 25; p. 183, lns. 1 - 6).

Response:    Undisputed.

235. He did not speak with anyone in administration after June 17, 2022, because of the Juneteenth holiday. (Id., p. 183, lns. 16 – 24).

Response:    Undisputed.

236. On June 20, 2022, Spriggs received a text from Hartman, who told Spriggs Hartman needed to meet with him. (Id., p. 184, lns. 15 - 21).

Response:    Disputed, as it was June 21, 2022.  Ex.-1 at 184.

237. He then met with Hartman and Joni Willingham and he was told he was terminated for filling out the Payroll Action form. (Id., p. 187, lns. 21 - 24).

Response:    Disputed, as Plaintiff was told he was terminating for "for filling out **a** payroll action slip." Ex.-1 at 187.  And when he questioned Hartman, Hartman replied, "the Mayor just wants you fired."  Id. at 188.

238. Spriggs told Hartman that Marita Kelly had approved the action. Hartman then allegedly said the Mayor just wants you fired. They shook hands and Spriggs left. (Id., p. 188, lns. 2 - 10).

Response:    Undisputed, and the City admits here that Hartman told Plaintiff, "the Mayor just wants you fired."

239.   Spriggs understood that the termination letter stated he was being terminated for trying to implement salary increases in direct contravention of the Mayor's directives. (Id., p. 196, lns. 19 - 25).

Response:   It is undisputed Plaintiff understood the letter and phony assertions in there.

240.   Spriggs asked Hartman what positions he was referring to and Hartman told him Austin Griffin's. (Id., p. 197, lns. 2 - 5).

Response:   Undisputed, and - indeed - what Hartman said as to the reason for Plaintiff's firing **conflicts with the Mayor's sworn testimony**. Williams fired Plaintiff because, according to her, he had put in a payroll request form to increase his own pay. Ex.-5 at 136-37, 138. According to Williams, earlier that same week she had rejected a pay raise for Plaintiff when he came to her asking for a raise. Id. at 137. According to Williams, Plaintiff did this intentionally while she was out of state (Ex.-5 at 133), stating, "You know, he had asked me for a raise and I said no. And he went over my head when I was not available, I was not in the state, to go take it upon himself to give a payroll action form." Ex.-5 at 166-67.

241.   Spriggs stated that Hartman and Kelly were aware that the budget had raises for the position in the budget. (Id., p. 198, lns. 14 - 20).

Response:    Undisputed.

242. Spriggs was asked directly about his complaint against the City. (Id., p. 200, lns. 5 -
6).

Response:    Disputed, as the allegedly undisputed fact is not clear.  It does state
when, or by whom.

243. Spriggs stated that this report was specifically related to the one conversation he had
with Neil Grover. (Id., p. 200, lns. 11 - 19).

Response:    Disputed, in part, as Plaintiff did not limit his answer to only his report
to Grover.  Ex.-1 at 200.

244. Spriggs admitted that he could not think of a single instance where he reported waste
pursuant to the Whistleblower law. (Id., p. 200, lns. 20 - 24).

Response:    Disputed, in part, as Plaintiff actually said, he "wasn't sure".  Ex.-1 at
200.

245. Spriggs said that the instances of wrongdoing he reported to Grover were the
promotion of Dockens, promoting Williams' family members, and hiring Williams'
family members. (Id., p. 200, ln. 25; p. 201, lns. 1 - 5).

Response:    Undisputed.

246. Spriggs admitted that Dockens was never promoted and that he never promoted or
hired any of Williams' relatives. He thought Dockens might have been paid out of
class at some point, but he did not know if it as a fact. (Id., p. 201, ln , p. 202, ln ).

Further he admitted that Dockens being paid out of class did not get mentioned by him until after he spoke with Grover. It did not come out until sometime after May 2, 2022, and he did not report the pay out of class to anyone, the City, or any government entity. (Id., p. 220, ln p. 203, ln ).

Response:    Disputed, in part, as Dockens was paid out of class, retroactively.  Ex-. 13;  Ex.-6 at 39-40.

247.    Within three months of termination, Spriggs found a job making $130,000 which was his prior wage. (Id., p. 206, lns. 9 – 12; p. 207, lns. 18 – 20; p. 208, lns. 8 - 10).

Response:    Undisputed, and he fact that he was able to get a comparable position in such a short time, despite the ample news reports of his firing, provides a glimpse as to the business community's perception of Williams.

248.    Spriggs then went to work for another company in 2023 and is now making $225,000. (Id., p. 210, lns. 2 – 5, lns. 13 - 14).

Response:    Undisputed, and the fact that he was able to get a more lucrative position in such a short time, despite the ample news reports of his firing, provides a glimpse as to the business community's perception of Williams.

249.    Spriggs' wife Lisa wrote Mayor Williams a letter on November 4, 2021 after Spriggs was employed as a City employee, asking Mayor Williams for a City job. (Id., p. 218,

lns. 7 - 13).

Response:    Disputed in part, as Williams was not Mayor at that time.  She took

office in January 2022.  Ex.-5 at 12.

250.    Spriggs denied knowing that his wife had sought such position. (Id., p. 220, lns. 6 -

10).

Response:    It is both undisputed that Plaintiff testified did not know his wife had

sought a position and true;  he did not know.  Ex.-1 at 219-20.[14]

251.    Spriggs indicated he probably did not inform anyone at the City that his wife was

applying for City work while he was also employed there. (Id., p. 221, lns. 1 - 8).

Response:    It is both undisputed that Plaintiff testified did not inform anyone and

true;  he did not know.  Ex.-1 at 219-20.

252.    Spriggs admitted that another employee he tried to get a raise for was his cousin, a

man named John Watson. (Id., p. 222, lns. 10 - 15).

Response:    Undisputed, although Williams and Grover were aware of the

relationship.  Ex.-1 at 222-23.

253.    Spriggs admitted he did not disclose his familial relationship with Watson when he

sought to get Watson a raise. (Id., p. 222, ln. 10 - 20).

Response:    Undisputed, although Williams and Grover were aware of the

---

[14]  As Plaintiff has previously advised the Court (ECF No. 53), this is when Williams'
attorney, David MacMain, ambushed Plaintiff at his deposition with a copy of his wife's letter that
had never been produced during discovery.  Ex.-1 at 217-20.

relationship.  Ex.-1 at 222-23.

254.    He did not think that a cousin qualified as a reportable relationship under the Ethics

Rules, but he did not ask anyone because he'd read the material presented by the

Ethics Commission. (Id., p. 223, lns. 10 - 21).

Response:    Disputed, as Williams and Grover knew.  Ex.-1 at 222-23.

255.    Spriggs was aware that the other reason he was fired was for discourteous conduct

and disruptive behavior. (Id., p. 188, lns. 16 – 25, p. 189, ln. 1).

Response:    Disputed.  Plaintiff was aware that one of the phony reasons being

offered by the City for firing him is alleged discourteous conduct and

disruptive behavior.  No such issues were raised prior to his termination

and he had never been told he was discourteous to anyone.  Ex.-1 at

191.  As well, this conflicts with another phony reason being offered by

Williams, i.e., that he put in a pay raise for himself during his last week

of employment in June 2022.  Ex.-5 at 136-37, 138, 165-67.

256.    Spriggs was aware that the AFSCME union had made complaints about him. (Id., p.

189, lns. 2 - 7). He was aware that the union had issues with his handling of the

reallocation of positions regarding Kevin Jackson and Howard Drayton, in particular.

(Id. p. 189, lns. 20 - 21).

Response:    Undisputed, as Plaintiff had written their jobs out of the budget, as

directed to by Williams (who thought they were stealing money). Ex.-1

at 189-90, 194.  As well, regarding Jackson, he was being suspended on

a for violating his union contract.  He authorized his own overtime, and

once he did, on a holiday, which he earned triple time that day, he came

into work, and turned off his lights, and slept for the whole day, so he

was disciplined.  Ex.-1 at 190.

257.  Spriggs agreed that there were several labor management issues between the union

and Public Works during his tenure. (Id., p. 193, lns. 17 - 20).

Response:    Undisputed, although there was nothing out of the ordinary.  Ex.-1 at

194.

258.  Spriggs stated that in his 22-year tenure with the City, there had been other attempts

to discipline him but none succeeded. (Id., p. 236, lns. 12 - 14).

Response:    Undisputed, as he has a clean record.  Ex.-1 at 236.

259.  Dockens was not promoted but the other people Spriggs wanted promoted were. (Id.,

p. 124, ln. 21; p. 125, lns. 1 - 4).

Response:    Undisputed, as the two individuals he initially wanted to promote to

Route Supervisor positions in April 2022, before adding Dion to the

list, were promoted.  Ex.-1 at 124-25;  Ex.-7 at 39-40;  Ex.-5 at 109.

260.  Spriggs admitted he is not under any medical or other treatment, nor did he seek any

treatment. (Id., p. 248, lns. 6 - 8).

Response:    Undisputed, although he has relied on prayer.  Ex.-1 at 248.

261. Spriggs admitted he was not aware how the media found out he had been terminated. (Id., p. 250, lns. 8 - 10).

    Response:    Undisputed.

## DION DOCKENS

262. Dion Dockens first started to work for the City of Harrisburg on June 30, 2014. (Ex. G, Deposition of Dion Dockens , p. 11, lns. 21 - 23).

    Response:    Undisputed.

263. Dockens is an hourly wage employee . (Id., p. 13, ln. 2).

    Response:    Undisputed.

264. Dockens' mother is Mayor Wanda Williams. (Id., p. 11, ln. 24; p. 12, lns. 1 - 2).

    Response:    Undisputed.

265. Dockens had his cell phone with him during his deposition. (Id., p. 15, lns. 19 - 21). Dion Dockens, in fact, offered his phone for examination during the deposition to the Plaintiff. He provided his phone number and his carrier information. He has had the same phone for ten years. (Id., p. 13, ln. 24; p. 14, lns. 1 - 7, p. 15, lns. 6 - 8).

    Response:    Disputed in part.  Dockens did have his cell phone with him at his deposition, but Dockens did not "offer" his phone.  Rather he was asked to look for messages.  His testimony is disputed as a jury need not believe him because he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

266. He had not discussed the deposition with his mother. (Id., p. 13, lns. 18 - 20)

    Response:    Disputed. Dockens testified this way but a jury need not believe him because he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

267. Dockens was asked about all the texts he had with his mother. (Id., p. 15, lns. 9 - 15).

    Response:    Undisputed.

268. He was asked how far his text messages went back and Dockens informed counsel that they went back to March 21, 2019. (Id. p, 15, lns. 22 - 24).

    Response:    Disputed. Dockens testified this way but a jury need not believe him because he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

269. Dockens was asked about texts with his mother on June 17, 2022, June 19, 2022 and he also had one for June 27, 2022. (Id., p. 16, lns. 6 - 24).

    Response:    Disputed. Dockens testified this way but a jury need not believe him because he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

270. Dockens testified that he had no texts with his mother on June 17, 2022. On June 19, 2022, his mother wished him a happy Father's Day. Finally, the text on June 27, 2022 was a mass text from Nate Spriggs' mother-in-law trying to get a crowd to attend a City Council meeting to "show up and show out" in support of Nate Spriggs. Dockens

was not sure who sent him the text but there were 14 different numbers associated with it. He assumed his mother was in the text chain. (Id., p. 16, lns. 15 – 18; p. 17, ln. 1 – 25; p. 18, lns. 1 - 16).

> Response:   Disputed.  Dockens testified this way but a jury need not believe him because he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

271.   He was asked about any calls to or from his mother, that were made on June 17, 2022, but his phone's call history did not go back that far, at least as far as he could personally retrieve it. (Id., p. 19, lns. 2 - 10).

> Response:   Disputed.  Dockens testified this way but a jury need not believe him because he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

272.   Dockens clarified that he was not actually suspended on June 17, 2022. The one-day suspension was reduced to counseling. (Id., p. 19, lns. 12 - 16).

> Response:   Undisputed, as after Plaintiff was fired the suspension was reduced.

273.   Ron Wise, his supervisor, wanted to discipline him for driving a vehicle without a CDL license. (Id., p. 20, lns. 15 - 17). Kevin Jackson was also at the meeting where this was to occur on June 17, 2020. (Id., p. 20, ln . 8 - 9). Dockens also thought Austin Griffin may have been there. (Id., p. 20, ln. 8 - 10).

> Response:   Disputed in part, as it was Plaintiff who wanted to discipline Dockens.

Ex.-1 at 147-48.

**By way of further answer**, Plaintiff was made aware of the incident earlier that week by Dion's supervisor, Ronald Wise.  Ex.-1 at 145-46. Plaintiff decided to discipline Dion because his staff was warned prior that they were not to drive vehicles that required a CDL license unless they had one.  Id. at 147-48.

Wise issued the discipline per Plaintiff's instructions.  Ex.-24 at 11-12.  After Plaintiff was fired, Dion's discipline was reduced.  <u>See</u> Wise Dep. at 22 (attached hereto as Ex.-26). Wise was demoted two weeks after David West was rehired to replace Plaintiff as Public Works Director.  Id. at 25-26.

274.  The actual alleged driving had occurred on the 15th. (Id., p. 20, lns. 20 - 23).

<u>Response</u>:    Disputed.  The infraction occurred on Thursday, June 16, 2022.  Ex.-25.

275.  Dockens had a CDL permit at the time, but Wise did not ask him for the permit or even if he had a permit. Dockens was not actually given a disciplinary paper at the time. (Id., p. 21, lns. 6 - 19).

<u>Response</u>:    Disputed.  Dockens testified this way but a jury need not believe him as he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

276.  Dockens told Wise he had a permit. The men then discussed it. Wise reported that he was going to give Dockens a Class A violation which can only be done by a Director. Dockens, in turn, told him that since he had a permit he was going to file a union

grievance. (Id., p. 22, lns. 1 - 17).

> Response:    Disputed.  Dockens testified this way but a jury need not believe him as he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

277.    Jackson and Wise discussed it, and they offered to reduce the matter to a counseling, but Dockens refused because he did not want a Class A violation on his record, especially for something he did not do. (Id., p. 23, lns. 2 - 12).

> Response:    Disputed.  Dockens testified this way but a jury need not believe him as he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.  As well, a counseling is not a Class A infraction;  it's a Class C infraction, which is a minor discipline that's purged from an employee's personnel file in two years. Ex.-2 ¶ 17.

278.    Dockens categorically denied that he discussed the attempted disciplinary matter with his mother. (Id., p. 23, lns. 22 - 24).

> Response:    Disputed.  Dockens testified this way but a jury need not believe him as he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

279.    In fact, he never told his mother about the matter. He was not aware when she may have found out about it. (Id., p. 24, lns. 1 - 5).

Response:    Disputed.  Dockens testified this way but a jury need not believe him as he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

280.    Also, Dockens stated succinctly in his sworn deposition that he was a grown man, and he did not need to run to his mother about something that was his business and that he could handle as a grown man. (Id., p. 24, lns. 16 - 21).

Response:    Disputed.  Dockens testified this way but a jury need not believe him as he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.  It is also disputed because Williams herself told Plaintiff about Dion's complaints about his job. Ex.-1 at 62-67.

281.    Dockens never discussed the attempted June 17th, discipline with his mother. (Id., p. 25, lns. 11 - 15).

Response:    Disputed.  Dockens testified this way but a jury need not believe him as he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

282.    On a Monday after the 17th meeting, Spriggs came to Dockens job site in casual clothes and in Spriggs' personal vehicle and Spriggs asked Dion why Dion had not come to Spriggs about the matter with Ron Wise. Dion told Spriggs that Spriggs had to already know about it because it was going to be a Class A discipline and that had

to come from Springs. (Id., p. 27, lns. 6 – 24; p. 28, ln. 1).

Response:    Disputed.   What actually happened is that Plaintiff was checking sanitation routes on that Monday, June 17, 2022 (the Juneteenth holiday).  Dion approached him and said "sorry about that Cuz."  Dion said "my hands were hurting so I decided to drive the truck for a while last week." Plaintiff asked, "why didn't you say something to me about your hands hurting?"  Dion replied, "I should have."  Plaintiff told Dion that they can talk about it further tomorrow.  Ex.-1 at 146-47;  Ex.-2 ¶ 18.

283.   Dockens stated that they'd been friends for decades. Spriggs stated Dockens could come to him for anything. (Id., p. 28, lns. 2 - 10).

Response:    Undisputed.

284.   After the encounter on Dion's route, he saw Spriggs about six more times. (Id., p. 29, lns. 21 – 24; p. 30 lns. 1 - 6).

Response:    Undisputed.

285.   Dockens said these encounters were all inadvertent and they included seeing Spriggs at a convenience store, Boscov's and Giant. (Id., p. 30, lns. 11 - 14).

Response:    Undisputed.

286.   Dockens reported that in the encounters Spriggs was sarcastic. Spriggs continued to use Dion's childhood nick name which was "Doc." (Id., p. 31, lns. 7 - 15).

Response:    Disputed.  Dockens testified this way but a jury need not believe him as he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

287.    Dockens did not recall how he found out Spriggs had been fired but no one from the Mayor's office told him. (Id., p. 32, lns. 20 - 23).

Response:    Disputed.  Dockens testified this way but a jury need not believe him as he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

288.    Dockens was not aware his mother had been trying to get him promoted. (Id., p. 31, ln. 25; p. 32, lns. 1 - 4).

Response:    Disputed.  Dockens testified this way but a jury need not believe him as he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

289.    Dockens testified that Spriggs himself, Dave West and Aaron Johnson had told him that his mother was trying to get him promoted. (Id., p. 32, lns. 5 - 8).

Response:    Undisputed, as it's true.  She was.

290.    Dockens said he was not surprised Spriggs got fired but to this day, he did not know why he had been fired. (Id., p. 32, lns. 9 - 18).

Response:    Disputed.  Dockens testified this way but a jury need not believe him as he is an interested witness (his mother is a defendant) and so this

may not be accepted as an undisputed fact.

291.   Dockens had only heard rumors about why Spriggs had been fired. The rumors included Spriggs' attitude, the way Spriggs talked to people, he heard a rumor that it was because Spriggs and his mother got into a row and he heard that Spriggs had given Spriggs' cousin, John Watson, a write-up and that might have been why. Dockens heard various and different reasons. (Id., p. 32, lns. 20 – 24; p. 33, lns. 1 - 15).

   Response:   Disputed.  Dockens testified this way but, it's not competent first-hand testimony.  It's hearsay and cannot be considered as an undisputed fact. Further, Dockens testified this way but a jury need not believe him as he is an interested witness (his mother is a defendant) and so this may not be accepted as an undisputed fact.

292.   Dockens testified that he had never spoken with his mother about Spriggs' firing. (Id., p. 33, lns. 16 - 22).

   Response:   Disputed.  Dockens testified this way but a jury need not believe him as he is an interested witness and so this may not be accepted as an undisputed fact.

## <u>CERTIFICATE OF SERVICE</u>

I, Marc E. Weinstein, Esquire, hereby certify that on this day I caused the foregoing document to be filed on the ECF system. Defendant's counsellors are filing users under the ECF system. Upon the electronic filing of a pleading or other document, the ECF system will automatically generate and send a Notice of Electronic Filing to all filing users associated with this case. Electronic service by the Court of the Notice of Electronic Filing constitutes service of the filed document and no additional service upon the filing user is required.

By:    <u>/s/ Marc E. Weinstein</u>
Marc E. Weinstein, Esquire
500 Office Center Drive
Suite 400
Fort Washington, PA 19034
267.513.1942
marc@meweinsteinlaw.com
Counsel to Plaintiff