## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NATHANIEL SPRIGGS, | : | Civil No. 1:22-CV-01474 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF HARRISBURG and MAYOR | : | |
| WANDA WILLIAMS, | : | |
| | : | Judge Jennifer P. Wilson |
| Defendants. | | |

## **MEMORANDUM**

Before the court are two motions for summary judgment, one by Defendant Mayor Wanda Williams ("Mayor Williams") and one by Defendant City of Harrisburg ("the City"). (Docs 63, 67.) Plaintiff Nathaniel Spriggs ("Spriggs") brings § 1983 and § 1981 claims against Mayor Williams and a Pennsylvania Whistleblower Law claim against the City. (Doc. 38.) Spriggs alleges that his employment as the Public Works Director of the City was terminated in violation of the First Amendment and the Whistleblower Law because he refused to promote Mayor Williams' son. (*Id.*) Spriggs also alleges his termination was racially discriminatory. (*Id.*) Both Defendants argue that they are entitled to judgment as a matter of law on all claims because the City and Mayor terminated Spriggs' employment due to his attempts to procure raises for himself and his deputy. For the reasons that follow, the court will deny Mayor Williams' motion and grant the City's motion.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Preliminary Matters

Before the court discusses the factual background of this case, the court must address Spriggs' response to Mayor Williams' summary of undisputed facts. Mayor Williams asks the court to strike Plaintiff's response to her summary of undisputed facts because the response violates Middle District of Pennsylvania Local Rule 56.1 and contains personal attacks against Mayor Williams and her counsel. (Doc. 88, pp. 3–9.) Spriggs did not move to file a sur-reply to respond to this argument.

> Middle District of Pennsylvania Local Rule 56.1 provides:
>
> The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.
>
> Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.
>
> All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

Local Rule 56.1. A district court is not bound to follow the local rules of its district in every case. Rather, the court "can depart from the strictures of its own local procedural rules where (1) it has a sound rationale for doing so, and (2) so doing does not unfairly prejudice a party who has relied on the local rule to his

detriment." *Advanced Fluid Sys., Inc. v. Huber*, 958 F.3d 168, 181 (3d Cir. 2020) (quoting *United States v. Eleven Vehicles, Their Equipment & Accessories*, 200 F.3d 203, 215 (3d Cir. 2000)).  Further, the purpose of Local Rule 56.1 is "to facilitate the court's understanding of the facts by indicating which facts are undisputed, and to provide specific evidence supporting each party's position as to the facts that remain in dispute." *Id.* (citing *Landmesser v. Hazleton Area Sch. Dist.*, 982 F. Supp. 2d 408, 412 (M.D. Pa. 2013)).

Here, Spriggs' response to the statement of facts does not hinder the court's ability to determine which facts are disputed or undisputed nor does it prejudice Mayor Williams.  While certainly lengthy, Spriggs' response cites to documentary evidence which is a part of the record and explains why he disputes certain facts presented by Mayor Williams with reference to the record.  As such, the response does not violate the Local Rules.  To the extent that the response contains commentary about either Mayor Williams or Attorney MacMain, the court notes that the commentary is not clearly relevant to any fact in dispute and thus, the court will not consider such commentary when deciding the motion.

Second, Williams asks the court to strike Spriggs' affidavit because it contains an alleged statement by Mayor Williams which she unequivocally denied saying during her deposition.  (Doc. 88, pp. 9, 10.)  Williams relies on the sham affidavit doctrine as support for striking the entire affidavit.  (*Id.* at 10.)

The sham affidavit doctrine is inapplicable here because it prohibits a deponent attempting to "dispute his or her own sworn testimony" by filing a contrary affidavit after the fact in order to attempt to create a material issue of fact. *Jiminez v. All American Rathskeller*, 503 F.3d 247, 251 (3d Cir. 2007).  The Third Circuit has held that "[a] sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment."  *Id.* at 253. Moreover, the Third Circuit has "adopted a more flexible approach[,]" which allows a district court to accept an affidavit if "there is independent evidence in the record to bolster an otherwise questionable affidavit[.]"  *Id.* at 254 (citing *Baer v. Chase*, 392 F.3d 609, 625 (3d Cir. 2004)).  Here, Mayor Williams is not challenging a contradiction between Spriggs' testimony and his later affidavit. Rather, she is challenging a contradiction between Spriggs' affidavit and her own testimony.  This is simply a disputed fact.  Accordingly, the court will not strike the affidavit and will consider the statements attributed to Mayor Williams by Spriggs as disputed.

Third, Mayor Williams accuses Spriggs of misrepresenting the record. (Doc. 88, pp. 10–15.)  As the court has the record and the parties' statements of fact before it, the court is able to decide whether facts are disputed or undisputed, whether they are supported by the record, and whether those facts create a genuine

4

issue of material fact.  Where a fact is admitted by both sides either in the

complaint, answer, or statements of material facts, the court will cite pleadings

from both parties and treat the fact as undisputed.  Conversely, where a fact is not

admitted by both sides, the court will view the fact in the light most favorable to

the Plaintiff as the non-movant and draw all reasonable inferences in his favor.

*Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing

*Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535,

538 (3d Cir. 2006)).  In such a situation, the court will generally cite only to

Spriggs' statement of facts because it contains each parties' argument.  The court

also notes that many of the facts cited by both defendants overlap.  For the

overlapping facts, the court will cite the materials relating to the Mayor's motion

because she filed her motion and papers first.  For facts unique to either motion,

the court will cite to the papers in support of that motion.  Using that methodology,

the court will proceed to the facts of the case.

### B.  Factual Background

Plaintiff Nathaniel Spriggs was formerly the Director of Public Works for

the City of Harrisburg.  (Doc. 78, ¶ 1.)  Spriggs is a black male.  (*Id.* ¶ 2.)  Spriggs

was first employed by the City from 1996 until 2017, where he rose from the

position of maintenance technician to the management position of Solid Waste and

Logistics Coordinator in the Department of Public Works.  (*Id.* ¶¶ 6, 7, 12.)

Spriggs left the City's employment in 2017 to become the Director of Public Works at Susquehanna Township.  (*Id.* ¶ 13.)

In May 2021, Aaron Johnson, a mutual friend of Spriggs and Williams, reached out to Spriggs on behalf of then Mayor-elect Williams to discuss Spriggs returning to employment with the City as the Director of Public Works.  (*Id.* ¶¶ 14, 15.)  Spriggs, Mayor-elect Williams, and Johnson met to discuss Spriggs' return twice.  (*Id.* ¶¶ 16, 17.)  The content of these discussion was provided by Spriggs and not addressed by the Mayor.  Per Spriggs, at their meetings, Mayor-elect Williams and Spriggs discussed the Mayor-elect's dissatisfaction with the current Director of Public Works' management, Spriggs' interest, or lack thereof, in returning to the City, and the salary Spriggs' would require to return to the City.  (*Id.* ¶ 16.)  Spriggs contends that at these meetings they agreed he would return to the City for a salary of $130,000, and Mayor Williams disputes this.  (*Id.*)  In August 2021, then Mayor Eric Papenfuse offered Spriggs the position of Public Works Director, with a salary of $120,000 per year, which Spriggs accepted and began in the position on September 27, 2021.  (*Id.* ¶¶ 18–23.)

Mayor Williams began her term as Mayor in January 2022.  (*Id.* ¶ 24.)  The City asserts, and Spriggs disputes, that "[t]he Mayor's directive on pay raises for Public Works came out in a meeting with Joni Willingham, Deb Robinson, and Dan Hartman, in February 2022."  (Doc. 80, ¶ 17.)  Joni Willingham was the HR

6

Director for the City of Harrisburg.  (*Id.* ¶ 1.)  Deborah Robinson was the special

assistant to the business administrator.  (Doc. 78, ¶ 24.)  Dan Hartman was Mayor

Williams' business administrator and reported directly to the Mayor.  (*Id.* ¶ 28.)  In

this meeting, it was discussed that Spriggs wanted deputy director of Public Works

Austin Griffin's salary to be raised, but "[t]he comment was made that Green

[Griffin][1] was a new hire and his performance needed to be reviewed before any

raise was implemented."  (*Id.* ¶ 18.)  Neither Marita Kelley, Finance Director, nor

Sarah Fedor, Payroll Manager, knew of this directive.  (*Id.* ¶ ¶ 29.)  Spriggs

disputes that this directive existed and points to a video of a City Council meeting

from June 2022 in which John Watson, a Public Works manager was proposed for

a raise.  (*Id.*)  Spriggs avers he was not aware of the directive regarding raises for

Public Works management.  (Doc. 78-2, ¶ 14.)

In March 2022, Williams approved an increase to Spriggs' salary to

$130,000.  (Doc. 78, ¶ 27.)  Spriggs disputes that this is a "raise" because,

according to his testimony, prior to Spriggs leaving Susquehanna Township,

Spriggs and Williams discussed that he would leave if his salary was $130,000.

(*Id.*)

---

[1] Throughout the City's statement of facts, the City mistakenly identifies "Austin Griffin" as "Austin Green."

Spriggs contends that, prior to and after becoming the Mayor, Williams and Spriggs had multiple discussions about her son, Dion Dockens ("Dockens"), his employment with the City, and a potential promotion for Dockens.  (*Id.* ¶¶ 24, 26.) Dockens had been employed by the City since 2014, was a union member, and worked on the recycling crew in the Public Works Department.  (*Id.* ¶¶ 30–33.) Dockens was also a personal friend of Spriggs.  (*Id.* ¶ 31.)  According to Spriggs, some of the conversations between Mayor Williams and Spriggs included threats to Spriggs' job if he did not promote Dockens.  (*Id.*)  Spriggs generally attempted to appease Williams' requests, culminating in April 2022, when Spriggs created a position that Dockens could fill, interviewed him for said position, and recommended him for it.  (*Id.* ¶¶ 33–39; Docs. 78–14, 78-15.)  Dockens was ultimately not hired for the position because City Solicitor Neil Grover advised that the budget only allowed for hiring two people for the position instead of the three Spriggs had selected.  (*Id.* ¶ 40; Doc. 78-14; Doc. 68-13.)  After being told he could only select two people, Spriggs decided not to hire Dockens because he was the least experienced and did not have a CDL.  (Doc. 68-13, p. 2.)

On April 19, 2022, the Pennsylvania State Ethics Commission gave a presentation for the City of Harrisburg's management level employees at the request of Mayor Williams and City Solicitor Neil Grover.  (Doc. 79, ¶¶41–43.)

On April 22, 2022, Spriggs submitted requests for raises for himself and the Deputy Director of Public Works, Austin Griffin. (*Id.* ¶¶ 47, 48.) According to Spriggs, he had discussed both of these raises with Mayor Williams prior to submitting them because both Griffin and Spriggs were going to be undertaking additional duties. (*Id.* ¶ 47.) Per Spriggs, Williams agreed to pay raises for both and instructed him to complete the request forms; Mayor Williams disputes this. (*Id.*) It is undisputed that both raises were denied. According to Spriggs, Williams ultimately told him that she could not "keep her word" about the raises. (*Id.*) Williams contends that she told Dan Hartman she would not raise Spriggs' salary again because he had already received a raise and had not been working for the City for more than a year. (*Id.* ¶ 49.) Hartman was aware that Spriggs attempted to raise his salary multiple times but was unaware that the Mayor had signaled willingness to do so. (Doc. 80, ¶¶ 83, 84.) According to Williams, she had directed Spriggs several times that there would be no more raises. (Doc. 78, ¶ 59.)

On April 29, 2022, Spriggs and Grover ran into each other in City Hall. The parties dispute who started the conversation, but it is undisputed that they both agreed that, in light of the recent presentation from the Ethics Commission, it would violate state ethics laws to promote Dockens. (*Id.* ¶ 39.) According to Spriggs, Spriggs also related the concerns he had with Mayor Williams pressuring him to promote Dockens and other members of her family. (*Id.*)

The same day that Spriggs and Grover had this conversation, Grover had also advised Mayor Williams that the City could not promote Dockens. (*Id.* ¶¶ 39, 51.) It is disputed whether it was before or after Spriggs and Grover's conversation. (*Id.* ¶ 52.) Grover contends he advised Mayor Williams they could not promote her son before he spoke with Spriggs. (*Id.*) When Grover conveyed to Mayor Williams that the City could not promote her son, it made Mayor Williams upset, although the parties dispute the reason she was upset. (*Id.*) Spriggs says it was because of his refusal to promote Dockens. (*Id.*) Grover contends she was upset because one manager was telling her they could not promote her son (Grover) and the other manager was agreeing to promote her son (Spriggs), which meant one of them was lying. (Doc. 80, ¶ 141.) Mayor Williams called Spriggs with Grover present to express her concerns. (Doc. 80, ¶ 140.)

The next business day, May 2, 2022, Mayor Williams held a meeting with Spriggs, Grover, a staff person from Grover's office, and HR Director Willingham. (Doc. 78, ¶ 53). What was said at the meeting is disputed. According to Spriggs, Mayor Williams called the meeting because she became aware Spriggs was not going to promote Dockens and she told everyone in the room they would be fired if Dockens was not promoted. (*Id.*) According to Grover, Mayor Williams reached the conclusion that she could not promote her son at that meeting and informed all present of that fact. (Doc. 80, ¶ 142.) Grover advised Mayor Williams that the

City could not promote Dockens and advised her to stop speaking. (*Id.*) According to Spriggs, after the meeting, Mayor Williams called him into her office, advised him of how upset she was that Spriggs went to Grover, and also advised that Spriggs he should find a way for Dockens to receive more money. (*Id.*) Four days after this meeting, Mayor Williams signed a personnel action form backdating pay to Dockens for working outside of his job duties. (*Id.*; Doc. 78-13.)

In June 2022, a supervisory employee[2] of the Public Works Department observed Dockens operating a recycling truck with only a CDL permit, rather than a license as required. (Doc. 80, ¶¶ 69–77.) Spriggs directed the supervisory employee to write up Dockens for this violation and advised that Dockens should receive a one-day suspension. (*Id.* ¶¶72, 73.) Dockens met with his immediate supervisors, and they decided to mandate he attend counseling rather than serve a suspension. (*Id.* ¶ 78.) Dockens contends he did not tell his mother, and Spriggs disputes this fact because Dockens is an interested witness due to his mother being a defendant in this case. (*Id.*) It is disputed whether the persons involved in terminating Spriggs' employment knew of Dockens' discipline at the time they made the decision to terminate Spriggs' employment.

---

[2] The exact position of this employee is disputed.

Also in June 2022, Spriggs emailed Marita Kelley, City of Harrisburg Finance Director regarding the availability of funds in the budget for Griffin's salary. (Doc. 78, ¶ 60.) Kelley related to Spriggs that there were funds in the budget sufficient to cover an increase Griffin's salary and, as such, told Spriggs he could process a payroll action request form to "update his [Griffin's] correct budgeted salary allocation." (Doc. 78-20.) Kelley did not know that a request for a raise had been denied in April nor that Mayor Williams had allegedly instituted a "directive" that neither Griffin nor Spriggs were not supposed to receive a pay raise. (Doc. 78, ¶¶ 57, 58.)

Spriggs submitted a request to raise Griffin's salary on June 17, 2022. (Doc. 68-15.) The form reached HR Director Joni Willingham, who knew of the Mayor's "directive" that there should be no more raises for public works, and she took the form to Dan Hartman. (Doc. 78, ¶¶ 63, 64.) Hartman told Willingham the raise was not approved. (*Id.* ¶ 65.) Hartman then called the Mayor, who was out of town, and discussed discipline for Spriggs, including terminating his employment, and Mayor Williams approved terminating Spriggs' employment. (*Id.* ¶¶ 67, 68.) It is undisputed that the Mayor could delegate her authority over employment decisions to Grover, Hartman, or Willingham, and they could carry out employment actions in her absence. (Doc. 80, ¶ 37.) However, it is disputed whose idea it was to terminate Spriggs: Hartman's or the Mayor's. (*Id.* ¶ 91; Doc.

12

78-18.)  Hartman, Grover, and Willingham all discussed the termination of

Spriggs' employment that day.  (Doc. 80, ¶ 109.)

Hartman, Willingham, and Spriggs had a meeting on June 21, 2022.  (*Id.* ¶

37.)  The substance of the meeting is disputed.  Spriggs contends that prior to

entering the meeting, the Mayor's secretary who was seated outside the conference

room told Spriggs "it's fucked up" upon Spriggs asking her what the meeting was

for.  (*Id.*)  Spriggs also asked Willingham what was going on and Willingham

shrugged; Willingham disputes this.  (*Id.*)  Hartman informed Spriggs that his

employment was terminated and provided him with a letter memorializing this

decision.  (*Id.*) The letter stated that terminating Spriggs' employment was

warranted because he had "failed to obey management's lawful orders regarding

management salaries and raises, acting to implement a salary increase in direct

contravention of the Mayor's directives."  (Doc. 79, ¶ 81)(citing Doc. 65-1.)  The

letter also provided an additional reason: Spriggs' "continuous discourteous

conduct or behavior to co-workers has proven to be a disruptive influence to the

operational performance of the City, continuously sewing [sic] conflict instead of

cooperation."  (Doc. 65-1.)  When Spriggs questioned Hartman about the

termination of his employment, Spriggs stated that Hartman said, "the mayor just

wanted you fired."  (Doc. 80, ¶ 37.)  Hartman denies he said this, and Willingham

denies Hartman said exactly this sentiment but rather that Hartman stated, "the

Mayor approved the termination." (*Id.* ¶¶ 37, 41.)  Spriggs contends that members of the Mayor's staff laughed at him as he was leaving after his employment was terminated.  (*Id.* ¶ 37.)

Other reasons advanced by the City and Mayor Williams for terminating Spriggs' employment were alleged issues with the union and generally creating a hostile work environment in the Public Works Department.  Williams and the City assert that Spriggs was the topic of a *Loudermill* hearing where the "hostile work environment" of the Public Works Department was discussed.  (*Id.*)  This fact was testified to by Business Administrator Hartman, who heard of it from Solicitor Grover, who was in attendance at the meeting.  (Doc. 65-1, pp. 76, 77.)  Hartman also testified to multiple issues that he was aware of regarding Spriggs' leadership of the Public Works Department, such as an issue with two employees not wanting to work together, lack of truthfulness by Spriggs, and creating a hostile work environment.  (Doc. 80, ¶¶ 93–100.)  Spriggs disputes these claims and provides meeting minutes from a union and management meeting which show that the problem was between two employees and did not involve Spriggs.  (Doc. 80-32.)[3]

---

[3] The parties raise additional allegations.  They are not addressed here because they are not relevant to the litigation.

## C. Procedural Background

Spriggs initiated this lawsuit by filing a complaint on September 20, 2022. (Doc. 1.)  Both Defendants filed motions to dismiss a subsequent amended complaint in January 2023.  (Docs. 24, 26.)  On June 29, 2023, the court denied in part and granted in part each motion.  (Doc. 36.)  Relevant for purposes of the instant motion, the court held that the amended complaint stated a claim of First Amendment retaliation because Spriggs spoke as a citizen, based on the facts alleged, because "[i]t is clear that reporting the Mayor's purported ethical violations to the City Solicitor was not *ordinarily* within the scope of Spriggs' duties as Director of Public Works for the City."  (Doc. 36, p. 14)(emphasis in original).

Spriggs filed the operative amended complaint on July 20, 2023.  (Doc. 38.) The amended complaint brings a § 1983 First Amendment retaliation claim and a § 1981 racial discrimination claim against Mayor Williams, and a Pennsylvania Whistleblower Law claim against the City of Harrisburg.  (*Id.*)  Mayor Williams answered the complaint on August 3, 2023.  (Doc. 39.)  The City answered the complaint on August 11, 2023.  (Doc. 42.)

Mayor Williams filed a motion for summary judgment on January 6, 2025. (Doc. 63.)  The City filed a motion for summary judgment on January 7, 2023. (Doc. 67.)  Spriggs' counsel attempted to respond to the Defendants' respective

statements of facts, but failed to follow the Local Rules and those responses were stricken on February 9, 2025.  (Doc. 76.)  Spriggs' counsel complied with the Local Rules and filed opposing statements of fact and briefs on February 17 and 18, 2025.  (Docs. 78, 79, 80, 81.)  Mayor Williams filed a reply brief on March 17, 2025.  (Doc. 88.)  The City filed a reply brief on March 18, 2025.  (Doc. 89.)  The motions for summary judgment are ripe and reading for disposition.

### JURISDICTION AND VENUE

This court has jurisdiction under 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States. The court has supplemental jurisdiction over the related state-law claims pursuant to 28 U.S.C. § 1367. Further, venue is appropriate under 28 U.S.C. § 1391 because all acts or omissions giving rise to the claim occurred in the Middle District of Pennsylvania.

### STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary."  *Id.*  "A

dispute is genuine if a reasonable trier-of-fact could find in favor of the
nonmovant' and 'material if it could affect the outcome of the case." *Lichtenstein
v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts
in the light most favorable to the non-moving party and draw all reasonable
inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288
(3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher
Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  The court may not "weigh the evidence"
or "determine the truth of the matter."  *Anderson*, 477 U.S. at 249.  Instead, the
court's role in reviewing the facts of the case is "to determine whether there is a
genuine issue for trial."  *Id.*

The party moving for summary judgment "bears the initial responsibility of
informing the district court of the basis for its motion, and identifying those
portions of 'the pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any,' which it believes demonstrate the
absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S.
317, 323 (1986) (quoting FED. R. CIV. P. 56(c)).  The non-moving party must then
oppose the motion, and in doing so "'may not rest upon the mere allegations or
denials of [its] pleadings' but, instead, 'must set forth specific facts showing that
there is a genuine issue for trial.  Bare assertions, conclusory allegations, or

suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

The court will address the motions separately, as they deal with discrete issues raised by each defendant. The court begins with Mayor Williams' motion.

### A. Mayor Williams' Motion for Summary Judgment

Mayor Williams argues that Spriggs has failed to produce evidence of a prima facie case on both of his claims against Mayor Williams, largely because Mayor Williams contends that termination of Spriggs' employment was based on the insubordinate action of seeking a pay raise for Griffin, rather than on his refusal to promote Dockens or his race. (Doc. 64, p. 7.) Spriggs points the court to

disputed issues of fact he believes support his prima facie case of First Amendment retaliation and racial discrimination.  (Doc. 79.)  The court will discuss each claim in turn.

### 1.  First Amendment Retaliation

In order for a public employee to establish a claim of First Amendment retaliation by their employer, the plaintiff "must show that [their] speech is protected by the First Amendment and that the speech was a substantial or motivating factor in what is alleged to be the employer's retaliatory action." *Flora v. Cnty. of Luzerne*, 776 F.3d 169, 174 (3d Cir. 2015).  The burden then shifts to the employer "to show that it would have taken the same action even if the speech had not occurred." *Id.*

A government employee's speech is protected under the First Amendment when the employee is speaking as a citizen on a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).  Once it is determined that the employee was speaking as a citizen, "[t]he question then becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.*  Accordingly, to establish that his speech is protected, a government employee must prove that "(1) the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification

for treating the employee differently from any other member of the general public." *Palardy v. Twp. of Millburn*, 906 F.3d 76, 81 (3d Cir. 2018) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 241–42 (3d Cir. 2006)). The court first turns to the question of whether Spriggs' speech–i.e. his refusal to promote Dockens because it was an ethical violation as relayed to Grover in the hallway meeting and anything relayed by Spriggs at the May 2 meeting–is protected by the First Amendment.

### i. Protected Speech

As previously noted, an employee's speech is protected only when they speak as a citizen on a matter of public concern. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. Thus, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014). Moreover, "[a]n employee does not speak as a citizen if the mode and manner of his speech were possible only as an ordinary corollary to his position as a government employee[.]" *De Ritis v. McGarrigle*, 861 F.3d 444, 454 (3d Cir. 2017).

20

Although there is no set formula for determining when an individual's speech is within the scope of his duties as a public employee, the court's analysis is guided by numerous Supreme Court and Third Circuit cases that have considered the question. The courts have generally determined that speech is within the scope of an employee's duties when the employee is required to engage in the speech as part of his job. For example, in *Bradley v. West Chester Univ. of Pa. State Sys. of Higher Educ.*, the Third Circuit determined that the director of budget and financial planning at a public university was acting within the scope of her duties when she raised concerns regarding the university's budget because her job duties included reviewing and recommending changes to the university's budget. 880 F.3d 643, 652 (3d Cir. 2018).

The Supreme Court reached a similar conclusion in *Garcetti*, where the Court held that a district attorney acted within the scope of his duties when he wrote a memo questioning a search warrant application because writing the memo was "part of what he . . . was employed to do." 547 U.S. at 421–22; *see also Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 244 (3d Cir. 2016) (holding that police officers acted within the scope of their duties when they complained about a departmental policy through the filing of internal police counseling forms because the officers were required to complete the forms as part of the police disciplinary process); *Gorum v. Sessoms*, 561 F.3d 179 (3d Cir. 2009)

(holding that professor acted within the scope of his duties when he opposed the appointment of university president, advised a student, and disinvited university president from speaking engagement, because all of those actions were pursuant to his duties as a professor); *Foraker v. Chaffinch*, 501 F.3d 231 (3d Cir. 2007) (holding that instructors in Delaware State Police's firearms training unit acted within the scope of their duties when they reported problems with one of the unit's firing ranges because "[r]eporting problems at the firing range was among the tasks [they] were paid to perform"), *abrogated on other grounds*, *Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011).

Where, on the other hand, the speech is related to the individual's job duties but is not required as part of the job, the courts have generally determined that the speech is not within the scope of the individual's duties. For example, in *Javitz v. Cnty. of Luzerne*, a county's director of human resources was allegedly illegally wiretapped during a conversation with a local union representative and subsequently reported the wiretapping to high-ranking county officials. 940 F.3d at 861. The Third Circuit acknowledged that the director was only able to report the wiretapping because of her job and that she learned about the information while performing her job, but held that she was not acting within the scope of her duties because reporting crimes was not within her ordinary job duties. *Id.* at 866.

22

Similarly, in *Flora*, the chief public defender for Luzerne County, Pennsylvania alleged the county had retaliated against him because he brought a mandamus action against the county to secure adequate funding for the public defender's office and because he reported the county's failure to complete its court-ordered expungement duties arising from the so-called "Kids for Cash" scandal that occurred in the county between 2003 and 2008. 776 F.3d at 173. The district court dismissed the case, finding the public defender was acting within the scope of his duties because his speech related to his job. *Id.* at 174. The Third Circuit reversed, holding that the relevant question was not whether the speech concerned or related to his job, but rather whether the speech was included within his "ordinary job duties." *Id.* at 179; *see also, e.g.*, *Lane*, 573 U.S. at 241 (holding employee was not acting within the scope of his duties when he testified in criminal proceedings about information related to his job because "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen ... even when the testimony relates to his public employment or concerns information learned during that employment"); *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 988 (3d Cir. 2014) (holding former employee of School District of Philadelphia was not acting within the scope of his duties when he told newspaper about superintendent's alleged misconduct in

steering a contract to a specific contractor because reporting misconduct was not part of his normal job responsibilities).

Williams argues that Spriggs' speech was not protected by the First Amendment because it was made pursuant to Spriggs' official duties as director of public works.  (Doc. 64, p. 12.)  Williams notes that Spriggs' "speech" in this case was limited to two "private" (i.e. not open to the public) discussions with City Solicitor Grover and Mayor Williams.  (*Id.* at 12, 13.)  Williams argues that, considering either instance, "Plaintiff did not speak outside his chain of command, rather he was responding to and discussing a matter in his official capacity as Director of Public Works[,]" namely, "the possible promotion of a Public Works employee."  (*Id.* at 13)(analogizing to *Bradley*, 880 F.3d at 653).  Williams further argues that Spriggs was speaking as an employee and not a citizen because Grover was the person who identified that promotion of Dockens would be improper and informed Mayor Williams of such, and Spriggs "brought no new information to the conversation [with Grover] and had no impact on a process already put into motion.  Plaintiff never communicated his concerns with anyone outside of the City prior to the inception of his lawsuit."  (*Id.* at 14, 15.)

Spriggs argue his speech was protected by the First Amendment because "[h]is ordinary job duties did not include reporting Williams' violations of the state ethics law."  (Doc. 79, p. 10.)  Spriggs points to this court's prior decision at the

motion to dismiss stage which held that Spriggs had sufficiently alleged that reporting on ethical issues is not ordinarily within his job duties. (*Id.* at 11 n.3.)(citing Doc. 36, p. 14.)  Spriggs also argues that Mayor Williams' argument that his speech was not protected because Grover reported the same thing to Mayor Williams is irrelevant because "Plaintiff's speaking out about it to Grover was still protected speech[,]" and because Mayor Williams knew that Spriggs was opposed to Dockens promotion for ethical reasons. (*Id.* at 16.)

Although not determinative, Spriggs has helpfully provided the official job description of the Public Works Director position. (Doc. 78-31.)  The general duties of the Public Works Director include the management, planning, and supervising of the Public Works Department itself, including determining policies and managing the budget of the department. (*Id.*)  The Public Works Director reports directly to the Mayor or the Business Administrator. (*Id.*)  An essential function of the Public Works Director is "[h]ir[ing], disciplin[ing] and perform[ing] related personnel activities of employees who supervise bureaus." (*Id.*)  Further, the Director also provides "technical advice" to the Mayor, Business Administrator, City Council and other department heads regarding "engineering problems." (*Id.*)

The parties do not dispute that the conversation between Grover and Spriggs involved, at minimum, two topics: 1) a promotion for Dockens and 2) whether that

was an ethical violation. A conversation solely about promoting Dockens would be within Spriggs' duties as director of public works because he would be fulfilling his function of managing the personnel of the public works department. However, the additional topic of whether such a promotion is an ethical violation takes the conversation outside the scope of Spriggs' job duties. Spriggs' was not paid to monitor the ethical propriety of Mayor Williams' activities. This specific speech is more akin to those cases cited above in which an employee speaks about a topic related to their job duties, but not compelled by their job duties. *See Javitz*, 940 F.3d at 861.

To the extent Mayor Williams argues that Spriggs' speech is not citizen speech because it was actually Grover's idea that promoting Dockens was unethical, Grover still shared information that Spriggs was involved in a discussion regarding the ethics of promoting her son with Mayor Williams. It is undisputed that Spriggs agreed with Grover that promoting Dockens would be unethical and that Mayor Williams was aware of Spriggs' reasoning for not promoting Dockens, i.e. that it would be unethical to do so.

At summary judgment, Spriggs' burden is to establish that he engaged in speech that was outside the scope of his job duties. In this case, Spriggs has presented his own testimony as well as that of Grover, which shows that his speech about promoting Dockens was in relation to a potential violation of ethics laws.

Because the court must draw all reasonable inferences in favor of the non-movant, the court holds Spriggs engaged in speech related to his employment but not strictly within the scope of his duties. Accordingly, Spriggs has established that he was speaking as a citizen when he spoke to Grover about the idea of promoting Dockens.

Turning to the second prong in determining whether Spriggs' speech is protected, whether the speech was on a matter of public concern, Mayor Williams does not address whether Spriggs' speech addressed a matter of public concern. Spriggs contends that his speech was on a matter of public concern because it "disclosed Williams' 'misfeasance.'" (Doc. 79, p. 11.)(citing *Falco v. Zimmer*, 767 F. App'x 228 (3d Cir. 2019)). With no contrary argument from Mayor Williams, the court agrees that Spriggs' speech was on a matter of public concern because it was speech disclosing a public officials' misfeasance. *Falco*, 767 F. App'x at 303 (quoting *Swineford v. Snyder Cnty.*, 15 F.3d 1258, 1271 (3d Cir. 1994)).

Third and finally, the court balances the "government's interest as an employer in promoting the efficiency of the services it performs through its employees" with "the public employee's interest in speaking about a matter of public concern and the value to the community of [his] being free to speak on such matters[.]" *Azzaro v. Cnty. of Allegheny*, 110 F.3d 968, 980 (3d Cir. 1997).

Williams argues that Plaintiff was "disruptive and untrustworthy" due to alleged problems with union members, problems with Solicitor Grover, and Spriggs' "obsession" with procuring a raise for himself and Griffin after being told "no." (Doc. 64, p. 19). Spriggs argues that Mayor Williams had no legitimate interest, other than her own personal interests, to terminate Spriggs' employment. (Doc. 79, p. 11.)

There are disputed facts regarding whether Spriggs' was untrustworthy or disruptive. For example, Spriggs disputes that he had any issues with the union, citing the fact that he had never attended a *Loudermill* hearing, and he provided management and union meeting notes that shows the issue Williams refers to was between two employees not wanting to work together rather than relating to Spriggs. (*See* Doc. 78-2, ¶ 20.) Moreover, Mayor Williams points only to the general interest of an employer in running its office effectively and overlooks the "substantial public interest in [Spriggs'] revelations because they were relevant to an evaluation of the performance of the office of an elected official." *Azzaro*, 110 F.3d at 980. Accordingly, the court cannot say as a matter of law that the government's interest in running an effective workplace outweighs Spriggs' interest in speaking as a citizen on matters of government misconduct.

Accordingly, Spriggs has provided a sufficient factual basis for a reasonable jury to find his speech was protected.[4]

### ii. Substantial or Motivating Factor

The final element of a First Amendment retaliation claim is whether "the speech was a substantial or motivating factor in what is alleged to be the employer's retaliatory action." *Flora*, 776 F.3d at 174. This is a question of fact. *Falco*, 767 F. App'x at 299. Williams argues that the termination of Spriggs' employment was not caused by his protected activity because the termination of his employment was temporally too far removed from his protected activity. (Doc. 64, p. 16.) Williams notes that the alleged speech occurred on April 29, 2022, and May 2, 2022, and Spriggs' employment was not terminated until June 21, 2022, and "the record is devoid of any pattern of antagonism coupled with timing or anything else that would demonstrate causation." (*Id.*) Williams additionally argues that she was informed of Spriggs' speech immediately after it occurred and did not fire him at that time. (*Id.* at 18.) Williams notes that Spriggs' employment was terminated three days after he submitted forms for a raise for himself and Griffin after having already been directed that those raises were not approved. (*Id.*)

---

[4] To be clear, the court is merely concluding that Spriggs has presented sufficient evidence of record to survive summary judgment. The court is not concluding that he is entitled to judgment on issue or that his speech is protected as a matter of law. It will be left to a jury to make the ultimate decision of whether his speech was protected.

Spriggs argues there was a pattern of antagonism sufficient to infer causation because Williams had consistently pressured him to promote her son, and after he refused to do so, she "invented a reason for firing him[.]"  (Doc. 79, p. 12.) Spriggs argues the reason given for firing him was pretextual because her top staffers testified that Spriggs was fired for putting in a pay raise request for Griffin or having a difficult relationship with the union, while Williams testified that at the time she approved the decision to terminate Spriggs' employment, she believed he had put in a raise request for himself.  (*Id.*)  Spriggs also discredits Williams' argument about problems with the union by noting that the hostile work environment claim was between union members not wanting to work with each other and the fact that Spriggs did not attend any *Loudermill* meetings as public works director.  (*Id.* at 14.)

The cause of Spriggs' employment termination remains a disputed issue of fact as there is sufficient circumstantial evidence such that a reasonable jury could find that Spriggs' speech was a substantial or motiving factor in the decision to terminate his employment.  To the extent the parties' dispute what Mayor Williams testified as to the reason she terminated Spriggs' employment in her deposition, it remains unclear what she said.  For example, Mayor Williams was asked about what Dan Hartman called her about while she was in Florida, and she responded "Just that he [Spriggs] went up with a personnel action form for increase in pay[,]"

and that Hartman did not state who it was for at that time. (Doc. 78-5, p. 35).

Mayor Williams then testified that when she came back to work she was:

> originally told that it was for himself [Spriggs]. Mr. Spriggs had came to me and demanded that I increase his pay to $150,000 and I said most certainly not. I am trying to pay our debt off, which was $638,000,000. He insisted because he had other duties. And I responded to Mr. Spriggs that his duties did not change from when he originally started the job. . .But I was under the understanding that was for himself [the payroll action form] because just during that week, he asked me. He came into my office to ask me for $150,000 raise.

(*Id.*) Further, when asked if she eventually found out who the raise was for, Mayor Williams responded:

> I can't–I don't have the document in front of me. If you'd asked me, I'd have brought that document with me. I haven't seen that document. I don't know who it was for at that time. Mr. Hartman asked for consideration of terminating his services, so I thought it was for Mr. Spriggs.

(*Id.* at 36.) On cross-examination by the City's counsel, Mayor Williams confirmed she does not remember who the pay raise action form was for. (*Id.* at 43.) Mayor Williams also testified that Hartman did not advise her of any issues with labor at the time of their call. (*Id.* at 42.)

However, Dan Hartman testified that, on his call with Mayor Williams about the payroll action form, he cited the payroll action form for Griffin as well as "the news that came out of the AFSCME *Loudermill* hearing" as reasons for terminating Spriggs' employment. (Doc. 78-6, p. 21.)

Thus, there is a dispute among the Defendant's own witnesses as to Mayor Williams' reason for terminating Spriggs' employment. These are disputes of fact such that a reasonable jury could find that Spriggs' speech was a motivating factor in the termination of his employment.

### iii. Affirmative Defense

The burden now shifts to Williams to show she would have taken the same action if the speech had not occurred. *Flora*, 776 F.3d at 174. The parties do not explicitly address this issue, but any potential affirmative defense relating the reasoning behind the Mayor's decision making are subject to the same factual disputes as above. Accordingly, because there are disputed issues of material fact that a jury must resolve, Mayor Williams is not entitled to judgment as a matter of law. Therefore, Mayor Williams' motion for summary judgment is denied as to the First Amendment retaliation claim.

### 2. Racial Discrimination under Section 1981

In relevant part, 42 U.S.C. § 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  Under the statute, a plaintiff who belongs to a racial minority may bring a claim for purposeful race-based discrimination. See *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001) (identifying elements) (citation omitted); *see also Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982) (concluding that § 1981 "can be violated only by purposeful discrimination"); *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) ("Although § 1981 does not itself use the word 'race,' the [Supreme] Court has construed the section to forbid all 'racial' discrimination . . . .") (citation omitted).

In order to demonstrate purposeful discrimination for the purpose of a § 1981 claim, a plaintiff may rely on either direct or circumstantial evidence.  This case deals with purported circumstantial evidence of discrimination, not direct evidence.  Accordingly, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) governs and will guide the court's analysis. *See Manning v. Temple Univ.*, 157 F. App'x 509, 513–14 (3d Cir. 2005) (applying the burden-shifting framework to affirm the district court's grant of summary judgment to the defendants on plaintiff's race-discrimination claim under § 1981 and other federal statutes where the plaintiff failed to present a prima facie case of discrimination.)  At the first step of the *McDonnell-Douglas* framework, a plaintiff must establish a prima facie case of discrimination.  *Burton v. Teleflex, Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).  If the plaintiff meets that burden, the

burden of production shifts to the defendants to offer a legitimate

nondiscriminatory reason for the adverse treatment of the plaintiff. *Id.* The burden

then shifts back to the plaintiff to show that the proffered nondiscriminatory reason

was a pretext for discrimination. *Id.* at 427.

　　To establish a prima facie case of discrimination at the first step of the

*McDonnell Douglas* framework, a plaintiff must show (1) that he is a member of a

protected class, (2) that he was qualified for the position he had, (3) that he

suffered an adverse employment action, and (4) that "the action occurred under

circumstances that could give rise to an inference of intentional discrimination."

*Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013) (quoting

*Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)). At the summary judgment

stage, the plaintiff's burden is to show that there is sufficient evidence "to convince

a reasonable factfinder to find all of the elements of the prima facie case." *Burton*,

707 F.3d at 426 (quoting *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 167 (3d

Cir. 2001)).

　　With respect to whether Spriggs' has presented evidence of prima facie case,

the parties' arguments focus on whether Spriggs has met his burden of meeting the

fourth element above. "The most common evidence of circumstances suggesting

discrimination is evidence of disparate treatment, 'whereby a plaintiff shows that

[he] was treated less favorably than similarly situated employees' of a different

race." *Barker v. Boeing Co.*, 21 F.Supp.3d 417, 422–23 (E.D. Pa. 2014)(citing *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 366 (3d Cir. 2008)). Moreover, "[w]hether compactors are similarly situated is generally a question of fact for the jury." *Abdul-Latif v. Cnty. of Lancaster*, 990 F.Supp.2d 517, 526 (E.D. Pa. 2014).

Spriggs offers two comparators that allegedly engaged in the same conduct he did but were treated differently. First, Spriggs offers Solicitor Grover and argues that Grover, a white male, participated in the same challenged activity, i.e. voicing ethical concerns, but was not fired. Second, Spriggs also offers Marita Kelley, a white female, as someone who signed off on the pay raise for Griffin but was not fired.

Williams argues that Grover is not a sufficient comparator because Grover did not try to obtain a pay raise and used legal expertise to advise the mayor on legal issues, which Spriggs did not do. (Doc. 65, p. 25.) Mayor Williams argues Kelley is not a sufficient comparator because she was unaware of Williams' directive to not give pay raises and that her involvement was limited to confirming the pay raise was within the budget. (*Id.* at 26.) Spriggs argues that these two are sufficiently similar comparators because "accepting Plaintiff's facts as true, *Plaintiff and Grover engaged in the same conduct*[,]" and Grover is still employed while Plaintiff is not. (Doc. 79, at 20)(emphasis in original). Spriggs does not address Kelley.

The issue of whether the proffered comparators are sufficient comparators is an issue of material fact that is disputed by the parties, making this issue a question better decided by the jury. *Abdul-Latif*, 990 F.Supp.2d at 526. Accordingly, Spriggs has established this element for purposes of summary judgment.

Thus, the court moves to the next element of the *McDonnell-Douglas* framework, whether Mayor Williams had a legitimate, non-discriminatory reason for terminating Spriggs' employment. Mayor Williams argues the legitimate, non-discriminatory reason for terminating Spriggs' employment was that he "violated her direct order and surreptitiously attempted to circumvent her prohibition on raises by attempting to sneak a raise for his friend in while Mayor Williams was out of town." (Doc. 64, p. 27.) Spriggs does not dispute that this is a legitimate, non-discriminatory reason. (Doc. 78, p. 21.)

The burden shifts back to Spriggs to show that the proffered reason is pretextual. To meet his burden at this stage, a plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

Spriggs argues the reasons offered by Williams are pretext because, although Williams claims that she fired Spriggs because he put in a pay raise for himself, others in her administration claim it was because of putting in a pay raise for Griffin.  (Doc. 58, p. 22.)  Spriggs argues he did not put in a raise for himself, he did not know there was a directive barring pay raises for those in public works having worked less than a year, Kelley said he could submit a payroll action form, Willingham had sent an email saying Griffin's salary could be reviewed later, implicitly contradicting the "directive" on pay raises for public works, and other public works managers received raises during the same time period.  (*Id.* at 22.) This is sufficient to create a genuine issue of material fact as to whether Williams' proffered reason was pretext.  Accordingly, because there remain genuine issues of material fact, the court cannot say that Mayor Williams is entitled to judgment as a matter of law on this claim.  Therefore, Mayor Williams' motion for summary judgment regarding the § 1981 racial discrimination claim is denied.

## B. City of Harrisburg's Motion for Summary Judgment

The only claim against the City is a Pennsylvania Whistleblower Law claim. Because it is the dispositive element, the court will only address whether Spriggs made a report of wrongdoing under the Whistleblower Law.  The court concludes that he has not.

The Pennsylvania Whistleblower Law provides that:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.

43 P.S. § 1423(a). The statute defines "wrongdoing" as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." *Id.* § 1422.

To succeed on a Whistleblower Law claim, a plaintiff is required to "show not only that he filed a good faith report of wrongdoing or waste, [but] he must also establish by concrete facts or surrounding circumstances that the report led to the termination of his employment." *Cipriani v. Lycoming Cnty. Housing Auth.*, 177 F.Supp.2d 303, 329 (M.D. Pa. 2001). Then, the employer has the opportunity to raise a defense by "prov[ing] by a preponderance of the evidence that the action by the employer occurred for separate and legitimate reasons, which are not merely pretextual." 43 P.S. § 1424(c).

In order to establish the element of making a report of wrongdoing, an employee must "demonstrate [he] made a report of some action by [his] employer or its agent, which, if proven, would constitute a violation of a law or regulation." *Greco v. Myers Coach Lines, Inc.*, 199 A.3d 426, 434 (Pa. Super. 2018).

"Moreover, the report must be of an actual violation, not a potential or contemplated violation." *Id.* (*see also Rodriguez v. Sullivan Cnty. Victim Svcs.*, No. 4:05-CV-358, 2006 WL 942404, (M.D. Pa. April 2, 2006) (holding that "attempt[s] to persuade Plaintiff to breach statutorily recognized confidentiality provisions[]" were insufficient to show wrongdoing under the Whistleblower Law when plaintiff did not succumb to the attempts.)

The City argues that Spriggs is not a whistleblower as defined by the law because he reported only potential wrongdoing, not actual wrongdoing, and only reported it to Solicitor Grover. (Doc. 69, pp. 20, 35–37.) Spriggs responds that he made a good faith report of wrongdoing in discussing Dockens' promotion with Grover because promoting Dockens would have been in violation of the Pennsylvania Ethics Act[5] and he reported this to both Grover and Williams, who would be considered employers under the Whistleblower Act. (Doc. 81 p. 11.) In furtherance of this conclusion, Spriggs argues that the Whistleblower statute does not "absolve an employer from liability for violating its provisions . . . simply because the report of 'wrongdoing' achieved the statutory objective of prevent such wrongdoing." (*Id.* at 20.) Spriggs also contends his report was sufficiently

---

[5] Specifically, Spriggs alleges that promoting Dockens would have been a prohibited conflict of interest, as defined by the Pennsylvania Ethics Act. *See* 65 PA. CON. STAT. ANN. § 1103(a) ("No public official or public employee shall engage in conduct that constitutes a conflict of interest."); *Id.* § 1102 defining "conflict of interest" as "[u]se by a public official . . . of the authority of his office . . . for the private pecuniary benefit of . . . a member of his immediate family[;]" and "immediate family" as "[a] parent, spouse, child, brother or sister."

specific because it implicated a "specific legal or ethical authority[,]" namely the Pennsylvania Ethics Act.  (*Id.*)  Spriggs also asserts that the violation he reported was not "merely technical."  (*Id.* at 20, 21.)

In reply, the City further develops its argument that Spriggs is not a whistleblower because he did not report actual wrongdoing but rather, he reported only potential wrongdoing.  The City relies on *Greco*, wherein the Pennsylvania Superior Court held that, in order to prove a violation of the Whistleblower Law, a plaintiff must show that his report of wrongdoing was "an actual violation, not a potential or contemplated violation."  199 A.3d at 434.

In the absence of contrary case law to support Spriggs' argument, the court must apply the precedent presented by the City and conclude that, as a matter of law, Spriggs cannot make a prima facie case that he made a report of wrongdoing because he did not report an *actual* violation of state ethics law.  It is undisputed that Spriggs did not succumb to Williams' attempts to secure her son a promotion, Dockens was not hired, and therefore, the Ethics Law was not actually violated. Accordingly, as a matter of law, Spriggs has failed to show that he made a report of wrongdoing under the Pennsylvania Whistleblower Act.  Therefore, the City's motion for summary judgment will be granted.

CONCLUSION

In light of the foregoing, the court will deny Mayor Williams' motion and grant the City's motion.  Judgment will be entered in favor of the City.  An order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: June 11, 2025